# EXHIBIT A



**null / ALL**
**Transmittal Number: 29077544**
**Date Processed: 05/09/2024**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Tessa Manzanarez<br>Sunrun Inc.<br>600 California St<br>Ste 1800<br>San Francisco, CA 94108-2704 |
| **Electronic copy provided to:** | Kelley Molton<br>Corp Legal<br>RJ Pallari<br>Jennifer Wilson<br>Haley Hodgkins<br>Pam Buckley<br>Amanda King<br>Jay Maloney<br>Anjali Patel |

| | |
|---|---|
| **Entity:** | Vivint Solar Developer, LLC<br>Entity ID Number  4163413 |
| **Entity Served:** | Vivint Solar Developer, LLC |
| **Title of Action:** | Maren Mayhew vs. Vivint Solar Developer LLC |
| **Matter Name/ID:** | Maren Mayhew vs. Vivint Solar Developer LLC (15682857) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Breach of Warranty |
| **Court/Agency:** | Prince George's County Circuit Court, MD |
| **Case/Reference No:** | C-16-CV-24-002166 |
| **Jurisdiction Served:** | Maryland |
| **Date Served on CSC:** | 05/09/2024 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | The Law Office Of Derek A. Hills, LLC<br>443-239-4626 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

**CIRCUIT COURT FOR PRINCE GEORGE'S**
**COUNTY, MARYLAND**
14735 Main Street, Upper Marlboro, Maryland, 20772

**To:** VIVINT SOLAR DEVELOPER, LLC
SERVE ON: RESIDENT AGENT CSC LAWYERS
INCORPORATING SVC. CO.
7 ST. PAUL STREET, SUITE 820
BALTIMORE, MD 21202

| | |
|---|---|
| **Case Number:** | C-16-CV-24-002166 |
| **Other Reference Number(s):** | |
| **Child Support Enforcement Number:** | |

**MAREN MAYHEW VS. VIVINT SOLAR DEVELOPER, LLC, ET AL.**

Issue Date: 5/6/2024

## WRIT OF SUMMONS

You are summoned to file a written response by pleading or motion, within 30 days after service of this summons upon you, in this court, to the attached complaint filed by:

MAREN MAYHEW
11409 Cedar Lane
Beltsville, MD 20705

This summons is effective for service only if served within 60 days after the date it is issued.

Mahasin El Amin #845
Clerk of the Circuit Court

To the person summoned:
Failure to file a response within the time allowed may result in a judgment by default or the granting of the relief sought against you.
Personal attendance in court on the day named is NOT required.
It is your responsibility to ensure that the court has your current and correct mailing address in order to receive subsequent filings and notice in this case.

Instructions for Service:

1. This summons is effective for service only if served within 60 days after the date issued. If it is not served within the 60 days, the plaintiff must send a written request to have it renewed.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Maryland Rule 2-126.
4. If this notice is served by private process, process server shall file a separate affidavit as required by Maryland Rule 2-126(a).

Circuit Court for Prince George's County
Case Number: C-16-CV-24-002166

Maren Mayhew vs. Vivint Solar Developer, LLC, et al.

## SHERIFF'S RETURN
### (please print)

To:  VIVINT SOLAR DEVELOPER, LLC

_____ ID# _____ of the _____
　　　Serving Sheriff's Name

County Sheriff's office present to the court that I:

　　　(1) Served　_____
　　　　　　　　　　　　　　　　　　　　　Name of person served

on _____ at _____
　　　　Date of service　　　　　　　　　　　　　　　　　Location of service

_____ by _____ with the following:
　　　　　　　　　　　　　　　　　　　　Manner of service

☐ Summons　　　　　　　　　　　　☐ Counter-Complaint

☐ Complaint _____　☐ Domestic Case Information Report

☐ Motions　　　　　　　　　　　　☐ Financial Statement

☐ Petition and Show Cause Order　　☐ Interrogatories

☐ Other _____
　　　　　　　　Please specify

(2) Was unable to serve because:
　　☐ Moved left no forwarding address　　☐ No such address

　　☐ Address not in jurisdiction　　　　☐ Other _____
　　　　　　　　　　　　　　　　　　　　　　　　　　Please specify

Sheriff fee: $ _____ ☐ waived by _____

_____        _____
　　　Date　　　　　　　　　Signature of serving Sheriff

Instructions to Sheriff's Office or Private Process Server:
1. This Summons is effective for service only if served within 60 days after the date issued. If it is not served within 60 days, the plaintiff must send a written request to have it renewed.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Rule 2-126.
4. If this summons is served by private process, process server shall file a separate affidavit as required by Rule 2-126(a).

**IN THE CIRCUIT COURT OF MARYLAND FOR PRINCE GEORGE'S COUNTY**

| | |
|---|---|
| Maren Mayhew | * |
| 11409 Cedar Lane | * |
| Beltsville, MD 20705 | * |
| | *    Case No. _____ |
|       *Plaintiff,* | * |
| | * |
| v. | * |
| | * |
| Vivint Solar Developer LLC | * |
| 251 Little Falls Dr. | * |
| Wilmington, DE 19808 | * |
| **Serve on:** | * |
|       Resident Agent | * |
|       CSC Lawyers Incorporating Svc. Co. | * |
|       7 St. Paul Street, Suite 820 | * |
|       Baltimore, MD 21202 | * |
| | * |
| and | *    **JURY TRIAL DEMANDED** |
| | * |
| Sunrun, Inc. | * |
| 45 Fremont St. | * |
| 32nd Floor | * |
| San Francisco, CA 94105 | * |
| **Serve on:** | * |
|       Resident Agent | * |
|       CSC Lawyers Incorporating Svc. Co. | * |
|       7 St. Paul Street, Suite 820 | * |
|       Baltimore, MD 21202 | * |
| | * |
|       *Defendants.* | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>COMPLAINT</u>

In 2017, Vivint Solar Developer, LLC ("Vivint") installed a solar panel system on the Plaintiff's house and installed a second solar panel system in 2021. Vivint warranted the system for a period of between 10 and 20 years. Vivint (which was eventually purchased by Sunrun, Inc., "Sunrun") was negligent in the installation of the system. Two years after the installation of the second system, and as a proximate result of Defendants' negligence, the Plaintiff's roof leaked, causing severe damage to the roof, structure and

interior of the house. Although Defendants have admitted liability, they refuse to pay full compensation for the damage they proximately caused.

To make matters worse, Plaintiff never signed either of the contracts, which have the appearance of 20-year leases. Despite the absence of her signature, the Defendants proceeded to file UCC-1 Financing Statements in the land records for Prince George's County, Maryland, designating the Plaintiff as a "debtor" under the purported lease agreements. This maneuver effectively encumbered her home without her knowledge or consent.

## PARTIES, JURISDICTION AND VENUE

1.      Maren Mayhew is an adult resident of Maryland who owns a home at 11409 Cedar Lane, Beltsville, MD 20705. Ms. Mayhew resides in her home with her husband, William Mayhew.

2.      Sunrun, Inc. ("Sunrun") is a Delaware Corporation registered to do business in Maryland, with a Principal Address of 45 Fremont Street, 32nd Floor, San Francisco, CA, 94105. Sunrun acquired Vivint Solar Developer LLC ("Vivint") on or about October 8, 2020.

3.      Vivint Solar Developer LLC is a Delaware Limited Liability Corporation registered to do business in Maryland, with a Principal Office in Lehi, UT.

4.      This Court has personal jurisdiction over the Defendants pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-102(a) because the Defendants regularly transact business and perform work and services in Maryland.

5.      Venue is appropriate in this Court pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-201(a), because the Defendants carry on a regular business in Prince George's County, Maryland.

6.    This Court has jurisdiction to hear this matter pursuant to Md. Code Ann., Cts. & Jud. Proc. §3-403(a), which provides that "a court of record within this jurisdiction may declare rights, status, and other legal relations."

## STATEMENTS OF FACT

7.    William Mayhew and his wife, Maren Mayhew, live together in a home that is owned solely by the wife, Maren Mayhew, who is the Plaintiff in this case.

8.    On or about April 2, 2013, William Mayhew responded to a knock at his door from a salesperson with Vivint who was offering "significant savings" in their home electrical utility bills, with no up-front costs. Intrigued, Mr. Mayhew listened to the sales pitch.

9.    In reliance on several false promises in the sales pitch, Mr. Mayhew hand-signed a solar power purchase agreement ("First SPPA"). A true and correct copy of the First SPPA is attached as **Exhibit 1**.

10.    Approximately seven years later, on or about February 2, 2021, Mr. Mayhew signed a second solar power purchasing agreement ("Second SPPA") in response to Sunrun's solicitation for the chance for Mr. Mayhew to increase savings.

11.    Under the First SPPA, Vivint promised to install a system of solar panels ("System") on the roof of the Subject Property, and Mr. Mayhew would pay Vivint a set price for the energy produced by the System over twenty years, beginning at $0.10 per kWh, and increasing each year by 2.9%.

12.    As described in more detail below, under the Second SPPA, the Second SPPA was supposed to increase savings for Mr. Mayhew.

13.    Both the First and Second SPPAs contain clauses that are unfair or unconscionable in the following ways:

3

a.  Each SPPA includes a blanket waiver of rights to reject or revoke acceptance;

b.  Each SPPA limits the statute of limitations to one year;

c.  Each SPPA excludes express and implied warranties;

d.  Each SPPA unlawfully limits recovery of consequential and punitive damages; and

e.  Each SPPA authorizes the filing of a UCC-1 statement concerning its interest in the System on a consumer's home, creating a lien while, at the same time, stating it will not file a lien against the consumer's property.

14.  As stated above, although Mr. Mayhew resides in the Subject Property, he does not own it. In fact, the Subject Property is owned solely by his wife, Claimant Maren Mayhew. A true and correct copy of the deed to the Subject Property, recorded among the land records for Prince George's County at Liber 7867, Folio 810, is attached as **Exhibit 2.**

15.  In 2017, Vivint recorded a UCC-1 Financing Statement regarding the First SPA and listed Ms. Maren Mayhew as the sole debtor ("2017 Financing Statement") among the land records for Prince George's County at Liber 39937, Folio 573. A true and correct copy of the 2017 Financing Statement is attached as **Exhibit 3.**

16.  Although Maren Mayhew did not sign the First SPPA, Vivint listed her as the sole debtor in the 2017 Financing Statement without her knowledge or consent.

17.  The 2017 Financing Statement includes an attachment identified as Exhibit A, which falsely states, among other things, that:

a.  Ms. Mayhew entered into a contract with the Defendants;

b.  Ms. Mayhew granted Defendants a right to access, enter into, and use the Property to install, operate, and maintain the System.

c.  Ms. Mayhew agreed to purchase all electricity produced by the System;

d.  Ms. Mayhew may be responsible for paying Defendants if she sells or transfers the home or defaults under the contract;

e.  The UCC-1 financing statement is binding upon Ms. Mayhew and her heirs, legal representatives, successors, and assigns.

18.  On or about February 2, 2021, Mr. Mayhew received a phone call from Sunrun suggesting the installation of additional solar panels on the roof of their garage in order to maximize his potential savings for solar energy. Vivint emailed Mr. Mayhew a new SPPA ("Second SPPA"), which he signed electronically. A true and correct copy of the Second SPPA is attached as **Exhibit 4**.

19.  Under the Second SPPA, Vivint would install a system of solar panels ("System") on the roof of the Subject Property, and Mr. Mayhew would pay Vivint a set price for the energy produced by the System over twenty years, beginning at $0.135 per kWh, and increasing each year by 2.9%.

20.  As it had done regarding the First SPPA in 2017, in 2021, Vivint recorded another UCC-1 Financing Statement regarding the Second SPPA ("2021 Financing Statement") among the land records for Prince George's County at Liber 45896, Folio 238. A true and correct copy of the 2017 Financing Statement is attached as **Exhibit 5**.

21.  Although Plaintiff did not sign either the First or Second SPPA and did not grant a security interest in the collateral in the 2017 and 2021 Financing Statements, Defendants listed her as a debtor in the 2021 Financing Statement without her knowledge or consent, along with her husband, who does not own the Subject Property. In other

words, whereas they listed Ms. Mayew as the sole debtor in the 2017 UCC-1 statement, they listed her together with her husband in the 2021 UCC-1 statement.

22.    A UCC financing statement that is filed without the debtor's authorization is invalid under Md. Code Ann., Com. Law §9-509(a).

23.    In or about August 2023, Plaintiff and her husband noticed staining on the walls of their home and drywall damage, which resulted from a roof leak.  Mr. Mayhew contacted Sunrun, who sent an unknown technician out to their home.  The technician claimed that the roof leak was not due to any fault of Sunrun.  Regardless, the Sunrun technician caulked the apparent leak point.

24.    In December 2023, Plaintiff and her husband noticed that the roof continued to leak, causing more staining and drywall damage to their home.  Plaintiff contacted WV Construction Remodeling, LLC, a licensed home improvement contractor, who inspected the Subject Property and determined that there is significant damage caused by the leak. The contractor provided Plaintiff with an estimate of $37,095.03 to repair the roof and interior damage. A true and correct copy of the estimate is attached hereto as **Exhibit 6**.

25.    The damage was caused by the improper installation of the solar panel system by Sunrun or its predecessor or their agents.

26.    According to WV Construction Remodeling, LLC, their estimate does not account for additional hidden but probable damage caused by the improper installation of the System, which could result in up to, or even more than $20,000.00 in additional repair costs.

27.    Plaintiff filed a claim with her homeowner's insurance company, State Farm, who sent a technician to her home to inspect the roof. State Farm determined that the

damage resulted from the improper installation of the System.  A true and correct copy of State Farm's denial of coverage is attached as **Exhibit 7.**

28.    Plaintiff contacted Sunrun again, by leaving messages on the phone and sending them emails with no response. Eventually, Plaintiff contacted a supervisor at Sunrun and demanded that they reinspect the roof.

29.    In February 2024, at Sunrun's request, CS1 Remodeling went to the Subject Property to inspect the roof leaks but failed to bring a ladder with them to inspect the roof. CS1 provided a written estimate for $3,200.00 to perform the interior repairs only. A true and correct copy of the CS1 estimate is attached as **Exhibit 8.**  Upon information and belief, CS1 Remodeling provided Sunrun with a verbal estimate of $8,000.00 to perform the roof repairs.

30.    Frustrated, Plaintiff or Mr. Mayhew contacted Sunrun and insisted that they send another contractor out to their Subject Property to inspect the leak and the damage to their home.

31.    In March 2024, Sunrun sent New Day Construction of Barnegat, NJ[1] to inspect the damage to the Plaintiff's home.  A representative from WV Construction Remodeling, LLC, met with the estimator from New Day Construction, who conceded that the damage resulted from improper installation of the solar panels and provided an estimate of $15,873.26 to perform the repairs. A true and correct copy of the estimate from New Day Construction is attached as **Exhibit 9.**

32.    After Sunrun conceded that the damage to Plaintiff's home resulted from the improper installation of the System, it produced a damage investigation report, which

---

[1] New Day Construction is not a licensed home improvement contractor in Maryland.

substantiated WV Construction Remodeling, LLC's findings that there may be additional latent damage:

| Type | | Location | |
| --- | --- | --- | --- |
| Damage Investigation | ✎ | | |
| Provider | | Roof Leak | ✎ |
| Sunrun | ✎ | Probable Cause | |
| Root Cause | | Secondary damage (damaged shingles, tiles, ridge cap, valley) | ✎ |
| Sunrun at fault | ✎ | Blocker | |
| Resolution Action | | Other | ✎ |
| Partial Roof (full roof plane) | ✎ | Interior Resolution | |
| Comment | | Minimal - Drywall & paint | ✎ |
| Inspected reported leak with customer and contractor. There's no attic but we were able to remove mesh covering in the soffit area to see the roof decking/leak. The leaks are coming from both adjacent rafters and unfortunately have been dripping onto the reflective insulation (not familiar with correct term) and running down to the mesh screen instead of on the drywall for a long time causing the leak to go unnoticed. The insulation has started to erode and the decking looks to be rotting out. On the roof we noticed a shingle torn from the installation. Didn't want to remove any mounts due to the planks rotting and the outdated Zep racking as it would risk further damage. In addition we noticed the chimney flashing on same roof plane was also leaking. | ✎ | | |
| Panels on array above leak location need removed so the roof plane can be replaced | | | |
| **Confirmed most likely solar related due to torn shingles. It's been leaking for so long it's hard to tell at this point. Definitely won't be a simple pilot hole flash. the plywood is completely shot | | | |

33.    Even though Sunrun conceded that the improper installation of the System caused the damage, they refused to pay WV Construction Remodeling, LLC to perform the repair work and insisted that they would only pay CS1 Remodeling to perform the repairs due to the "high value" of the estimate from WV Construction Remodeling, LLC.

34.    Plaintiff has contacted Defendants on numerous occasions to ask that they fully repair the roof of her home or to at least make temporary repairs to prevent further water infiltration. Plaintiff has repeatedly attempted to contact the Defendants with no response.

35.    Notwithstanding the above, Defendants continue to send invoices for energy produced by the Systems.

8

36.    The scope of work identified in the estimate from CS1 (**Ex. 8**) grossly differs from the scope of work in the estimate from WV Construction Remodeling, LLC (**Ex. 6**) in that it fails to account for the restoration of all of the damage to the Plaintiffs' home.

37.    By failing to install the System in a good and workmanlike manner, according to construction industry practices, Defendants created a nuisance at the Subject Property.

38.    To the extent that Plaintiff in any way acquiesced to the installation of the System or payment of the electricity produced by the System, she did not sign either the First SPPA or the Second SPPA, and the Defendants had no authority to file either of the UCC-1 financing statements naming her as a debtor.

39.    Plaintiff has standing to enforce the terms of any warranty offered by the Defendants because the System was installed on the roof of her home and has caused extensive damage to her home, as well as some of her personal property therein.

40.    Under paragraph 21(a) of the Second PPA, Vivint promised to warranty all roof penetrations for ten years.

41.    Additionally, under the Second PPA, Vivint states in section 5(c):

"We will be in default under this Agreement if we fail to perform any material obligation under this Agreement and we have not made diligent efforts to cure such default within a reasonable time after you give us written notice of such failure ("*Seller Default*"). If a Seller Default occurs and is continuing, you may terminate this Agreement and request removal of the System from your Property. To the fullest extent permitted under applicable law, you have no right to claim damages as a result of the termination of this Agreement, except for the actual costs to remove the System (if we fail to remove the System) and any damages to your Property that we cause in connection removal of the System.

42.    Under paragraph 21(a) of the Second PPA, Vivint promised to warranty all roof penetrations for ten years.

43.    Under the First and Second PPAs, Defendants own the System and may recover it at the expiration of the 20-year period.

44.    The 2017 Financing Statement and the 2021 Financing Statement state that the underlying PPAs are "true leases."

45.    Paragraph 8(g) of the First SPPA states:

You will pay all taxes assessed or arising from installation or operation of the System, including any sales tax on the Energy produced by the System. We shall be responsible for income tax and property tax assessed in relation to Our ownership of the System.

46.    The installations of the Systems under the First and Second PPA increased the assessment value of the Subject Property, thereby increasing Plaintiff's property tax liability, for which Defendants are responsible.

47.    The First SPPA includes the following language suggesting the System is a bailment:

- We [Vivint] shall own the System as Our sole personal property. You will have no property interest in the System.

- The System was leased for a 20-year term.

- At the end of the Term, You may elect to (i) continue with this Agreement on a year-to-year basis; (ii) enter into a new Agreement with Us and cancel this Agreement; (iii) purchase the System at the end of the Term and cancel this agreement (the "Purchase Option"); or (iv) cancel this Agreement and have the System removed at no cost to You.

48.    The Second SPPA includes the following language suggesting the System is a bailment:

- We own and hold all property rights in (i) the System; and (ii) any credits, rebates, incentives, allowances, tax benefits, or certificates that are attributed, allocated, or related to the System, the Energy, or environmental attributes thereof (collectively, the "System Interests").

- The System was leased for a 20-year term.

10

- At the End of Your Initial Term

  •You can renew the Agreement for a subsequent term;

  •You can purchase the System; or

  •You can request that we remove the System at no additional cost.

49.     The 2017 Financing Statement indicates in Sec. 4, "This UCC financing statement is exempt from recordation tax based on § 12-108(k)(1)(v) to publicize a lease of goods or fixtures. This is a True Lease filed for notification purposes only and does not create a security interest."

50.     The 2021 Financing Statement indicates in Sec. 4, "This is a true lease and does not create a Security Interest.  Amount of taxable debt for recording purposes is $0.00. Not subject to Recordation Tax based on Section 12-108(k)(v) to publicize a lease of goods or fixtures, provided that the security agreement states on its face that it does not create a security interest."

51.     The First SPPA lacks any express language concerning the installation of the System other than the following: "Only we have the right to enforce any warranty provided by Our contractors or suppliers on the manufacture or installation of the System."

52.     The Second SPPA includes the following express warranty on its first page: "We warranty all of our work for 20 years, and that our roof penetrations will be watertight, for 10 years". In Section 21(a)(i), the Second SPPA also states, "unless the System is installed on a tar-and-gravel or built-up roof, then the System will be free from material defects that we cause in workmanship for twenty (20) years after installation is completed, and any rooftop penetrations we make in connection with installation will be watertight for ten (10) years after installation is completed."

11

## COUNT I – DECLARATORY JUDGMENT UNDER MARYLAND CODE ANN., COURTS AND JUD. PROC. § 3-403

53. The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

54. The First and Second SPPAs meet the definition of a lease under Md. Code Ann., Com. Law §2A-103 (j).

55. The First and Second SPPAs are consumer leases under Md. Code Ann., Com. Law §2A-103 (e).

56. Leases may not be enforced if they are unconscionable. Md. Code Ann., Com. Law § 2A-108  provides:

> (2) With respect to a consumer lease, if the Court, as a matter of law, finds that a lease contract or any clause of a lease contract has been induced by unconscionable conduct or that unconscionable conduct has occurred in the collection of a claim arising from a lease contract, the Court may grant appropriate relief.

> (3) Before making a finding of unconscionability under subsection (1) or (2), the Court, on its own motion or that of a party, shall afford the parties a reasonable opportunity to present evidence as to the setting, purpose, and effect of the lease contract or clause thereof, or of the conduct.

57. The setting and purpose of the lease were part and parcel of providing Plaintiff's husband with solar energy at a lower cost than what he paid under his current electric utility provider and a warranty that all roof penetrations resulting from the System's installation would be weatherproof.

58. The First SPPA and Second SPPA disclaim any warranties concerning the amount of energy produced by the System.

59. The 2017 and 2021 Financing Statements identifying Plaintiff as debtor were procedurally and substantively unconscionable because Plaintiff did not sign either of the

SPPAs and was not a debtor, yet the 2017 and 2021 Financing Statements act as a lien upon the Plaintiff's property, which Plaintiff's husband does not own.

60.    The terms of the SPPAs that provide for any continuing obligations by Plaintiff if the Defendants failed to honor the roof penetration warranty are procedurally and substantively unconscionable in that Plaintiff did not sign either of the SPPAs. Yet, the Subject Property, which she owns, is encumbered by the 2017 and 2021 Financing Statements and has suffered property damage due to the faulty installation by the Defendants.

61.    The SPPAs are also procedurally and substantively unconscionable in that they grant the Defendants a "non-exclusive lease to access and use" Plaintiff's property so that Defendants may "install, operate and maintain the System," even though Plaintiff did not sign the SPPAs.  First SPPA ¶ 12(c).

62.    The value of the equipment which is the subject of the lease is a small fraction of the payments to be made under the SPPA and is a small fraction of the damages incurred by the Plaintiff due to the Defendants' failure to install the System in a good and workmanlike manner, which resulted in leaks and extensive property damage.

63.    The Plaintiff seeks a declaratory judgment that the SPPAs may not be enforced.

**Wherefore,** the Plaintiff prays for the following relief under this claim:

a.    A declaratory judgment that the First and Second SPPAs are unconscionable and are null, void, and of no legal effect;

b.    A declaratory judgment that the 2017 and 2021 Financing Statements filed in the State of Maryland against Plaintiff Maren Mayhew are null, void, and of no legal effect.

13

c. Enter an order Compelling Defendants to authorize and file a termination statement terminating the 2017 and 2021 Financing Statements and compelling Defendants to perform such other and further acts as may be reasonably necessary or appropriate to cancel and forever terminate the 2017 and 2021 Financing Statements.

d. That the Plaintiff be granted her costs, including attorney's fees;

e. That the Plaintiff be granted such other and further relief as the nature of his cause may require.

## COUNT II–Breach of Express and Implied Warranties Under Maryland Code Ann., §2A-101, *et seq.*

64.    The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

65.    The First and Second SPPAs meet the definition of a lease under Md. Code Ann., Com. Law §2A-103 (j).

66.    The First and Second SPPAs are consumer leases under Md. Code Ann., Com. Law §2A-103 (e).

67.    Plaintiff is a third-party beneficiary of the leases under the First and Second SPPAs and has standing to enforce express and implied warranties against the Defendants pursuant to Md. Code Ann., Com. Law §2A-216.

68.    Under Maryland Commercial Law § 2A-214.1, the Defendants may not exclude an implied warranty, and this, by itself, meets the definition of "implied warranty" contained in 15 U.S.C. § 2301 (7).

69.    Although Plaintiff is not in privity of contract with the Defendants, there is a significant nexus between the parties because the Defendants installed the System on

Plaintiff's home and filed the 2017 and 2021 UCC Financing Statements identifying the Plaintiff as "debtor."

70.    The Defendants breached the implied warranty of merchantability since the System, in view of the nonconformities and Defendants' inability to correct them, was not fit for the ordinary purpose for which the System was used. 15 U.S.C. §§ 2308, 2310 (d).

71.    Defendant breached an express warranty that all roof penetrations would be watertight and refused to fully repair the damage to Plaintiff's home caused by the faulty installation of the System.

72.    Pursuant to Maryland Code Ann., Commercial Law § 2A-214.1, a supplier may not exclude an express warranty.

73.    The Defendants retain ownership of the System and enforce the manufacturer's warranty as to defects, component breakdowns, and performance, and promise to enforce those warranties while simultaneously disclaiming them in violation of 15 U.S.C. § 2302(a).

74.    Defendant excluded or limited consequential damages for breach of any warranty and other liability by intentionally concealing these terms Md. Code Ann., Com. Law § 2A-214.1(2) and (3).

75.    The Defendants' breach of express and implied warranties has caused substantial damage to the Plaintiff's home, as well as reasonable safety concerns, and has also diminished the value of her home because subsequent purchasers must either qualify to assume the terms of the SPPA or pay a default penalty if they do not qualify.

76.    Because significant defects arose within the first few months after the System was installed, it would not pass without objection in the trade under the contract description.

77.     As a proximate result of the Defendants' violations of the Magnuson Moss Warranty Act and breach of these warranties, Plaintiff has been damaged, for which the Defendants are responsible.

**WHEREFORE,** Plaintiff requests this Honorable Court award judgment for the Plaintiff against Defendants and order an award for actual and consequential damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

### COUNT III–Breach of Express and Implied Warranties Under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et. seq.*

78.     The Defendants fit the definition of "supplier" and "warrantor" as defined in 15 U.S.C. §§ (4), (5).

79.     Plaintiff is a "consumer" as defined in 15 U.S.C. § 2301(3) because she is entitled to enforce express or implied warranties arising under state law.

80.     Solar Panels are "consumer products" as defined in 15 U.S.C. § 2301(1); the electricity produced by the System is also a "consumer product" as defined in 15 U.S.C. § 2301(1).

81.     The First and Second SPPAs are consumer leases subject to Maryland Commercial Law § 2A-101, et seq.

82.     Plaintiff is a third-party beneficiary of the leases under the First and Second SPPAs and has standing to enforce express and implied warranties against the Defendants pursuant to Md. Code Ann., Com. Law §2A-216.

83.    Under Maryland Commercial Law § 2A-214.1, the Defendants may not exclude an implied warranty, and this, by itself, meets the definition of "implied warranty" contained in 15 U.S.C. § 2301 (7).

84.    Although Plaintiff is not in privity of contract with the Defendants, there is a significant nexus between the parties because the Defendants installed the System on Plaintiff's home and filed the 2017 and 2021 UCC Financing Statements identifying the Plaintiff as "debtor."

85.    The Defendants breached the implied warranty of merchantability since the System, in view of the nonconformities and Defendants' inability to correct them, was not fit for the ordinary purpose for which the System was used. 15 U.S.C. §§ 2308, 2310 (d).

86.    Defendants breached an express warranty that all roof penetrations would be watertight and refused to repair the full scope of the property damage to Plaintiff's home caused by the faulty installation of the System.

87.    Pursuant to Maryland Code Ann., Commercial Law § 2A-214.1, a supplier may not exclude an express warranty.

88.    The Defendants retain ownership of the System and enforce the manufacturer's warranty as to defects, component breakdowns, and performance, and promise to enforce those warranties while simultaneously disclaiming them in violation of 15 U.S.C. § 2302(a).

89.    Defendants excluded or limited consequential damages for breach of any warranty and other liability by intentionally concealing these terms in violation of 15 U.S.C. § 2304(a)(3) and Maryland Code Ann., Commercial Law § 2A-214.1(2) and (3).

90.    The Defendants' breach of express and implied warranties has caused substantial damage to the Plaintiff's home, as well as reasonable safety concerns, and has

also diminished the value of the Subject Property because subsequent purchasers must either qualify to assume the terms of the SPPAs or pay a default penalty if they do not qualify.

91. Because significant defects arose after the System was installed within the warranty period, and the damages were caused by the installation of the Systems, they would not pass without objection in the trade under the contract description.

92. As a proximate result of the Defendants' violations of the Magnuson Moss Warranty Act and breach of these warranties, Plaintiff has been damaged, for which the Defendants are responsible. 15 U.S.C. §§ 2304(a) and 2310(d).

**WHEREFORE,** Plaintiff requests this Honorable Court award judgment for the Plaintiff against Defendants and order an award for actual and consequential damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

## COUNT IV–Violations of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101, *et. seq*, ("MCPA")

93. The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

94. Plaintiff is a "consumer" as that term is defined in the MCPA.

95. The transactions between Plaintiff and Defendants involve "consumer credit" and "consumer goods," as those terms are defined by the MCPA.

96. The Defendants are each a "person" and a "merchant," as those terms are defined in the MCPA.

97.    The transactions were also for "leases" and "services," as those terms are defined in the MCPCA.

98.    The Maryland legislature enacted the MCPA in response to a "mounting concern over the increase of deceptive practices in connection with sales of merchandise, real property, and services and the extension of credit." Md. Code Ann., Com. Law § 13-102(a)(1).

99.    The practices of the Defendants are the practices that the MCPA addresses and for which the MCPA gives consumers an avenue of redress.

100.    Under the MCPA, such practices include false oral or written statements that have "the capacity, tendency, or effect of deceiving or misleading consumers." MCPA § 13-301(1).

101.    Under the MCPA, such practices include any "[f]ailure to state a material fact if the failure deceives or tends to deceive;" MCPA § 13-301(3).

102.    MCPA § 13-303(5) states, "A person may not engage in any unfair, abusive, or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in (5) The collection of consumer debts."

103.    MCPA § 13-303(1) states, "A person may not engage in any unfair, abusive, or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in (1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services."

104.    Defendants sold, promoted, and performed a "consumer product or service" within the meaning of the MCPA.

105.    Defendants were unfair and deceptive in their dealings with Plaintiff when they filed the 2017 and 2021 Financing Statements indicating Plaintiff was a "debtor" even

though she did not sign either the First or Second SPPA, and Defendants knew that Plaintiff was the sole owner of the Subject Property.

106.    Defendants were also unfair and deceptive in their dealings with Plaintiff when they refused to fully repair the Subject Property, which was damaged by the improper installation of the System by the Defendants.

107.    Defendants were also unfair and deceptive in their dealings with Plaintiff when they included contradictory language in the First and Second SPPA concerning their warranty obligations.

108.    The Defendants' violations of the MCDCA, described in Count V, *infra*, are per se violations of the MCPA pursuant to § 13-301(14) (iii) of the Commercial Law Article.

109.    Under the MCPA, a person injured by a violation of the MCPA may bring an action to recover for injuries or loss sustained, as well as reasonable attorney's fees.

110.    As the result of the Defendants' conduct, the Plaintiff suffered damages including but not limited to property damage and the ability to refinance the Subject Property in order to pay for its repairs or otherwise sell the Subject Property without satisfying the SPPAs, which she did not sign.

111.    The Plaintiff incurred noneconomic damages resulting from the stress, frustration, and anxiety caused by the Defendants' conduct. This emotional distress has culminated in a loss of sleep, anger, frustration, anxiety, fear that her home will suffer further damage, headaches, distraction, disgust, and other physical manifestations of emotional distress.

112.    As a direct, proximate, and foreseeable result of Defendants' misrepresentations and unfair and deceptive trade practices, Plaintiff incurred damages and will continue to incur damages in an amount in excess of $75,000.

**WHEREFORE,** Plaintiff requests this Honorable Court award judgment for the Plaintiff against Defendants and order an award for actual and consequential damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

### COUNT V—Violation of the Maryland Consumer Debt Collection Act Md. Code Ann., Com. Law §§ 14-201, *et. seq* ("MCDCA")

113.    The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

114.    The Defendants are "collectors" within the contemplation of the MCDCA and claim that the Plaintiff owes a debt arising out of a consumer transaction as defined by the MCDCA.

115.    When the Defendants filed the 2017 and 2021 Financing Statements listing Plaintiff as "debtor," the Plaintiff incurred an alleged debt even though she was not contractually obligated under the First or the Second SPPAs, which were primarily for personal, family, or household purposes, and is, therefore, a "consumer transaction" as that term is defined by the MCDCA.

116.    Defendants attempted to collect a debt arising from consumer debt and are, therefore, "collectors" within the meaning of the Maryland Consumer Debt Collection Act (MCDCA), Md. Code Ann. Com. Law § 14-201 (b).

117.    Pursuant to MCDCA § 14-202 (8), a collector may not attempt to collect a debt with the knowledge that the right to collect the debt does not exist.

118.     Pursuant to MCDCA § 14-202 (11), a collector may not engage in any conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act (15 U.S.C. §§ 1692, *et. seq*).

119.     Defendant violated Md. Code Ann., Com. L. § 14-202(11) by engaging in conduct that violates §§ 804 through 812 of the federal Fair Debt Collection Practices Act (15 U.S.C. §§ 1692, *et seq*.).

120.     Defendant violated 15 U.S.C. § 1692e(2)(A) by falsely representing the character, amount, or legal status of the allege debt. Specifically, Defendants represented (1) that the debt was owed when it was not and (2) that the debt was secured when it was not.

121.     Pursuant to § 14-203, a collector in violation of the MCDCA is liable for any damages proximately caused by the violation. This explicitly includes damages for emotional distress or mental anguish suffered with or without accompanying physical injury.

122.     As the result of the foregoing MCDCA violation, the Plaintiff suffered damages including but not limited to property damage and the ability to refinance the Subject Property in order to pay for its repairs or otherwise sell the Subject Property without satisfying the SPPAs, which she did not sign.

123.     The Plaintiff incurred noneconomic damages resulting from the stress, frustration, and anxiety caused by the Defendants' unlawful debt collection practices. This emotional distress has culminated in a loss of sleep, anger, frustration, anxiety, fear that her home will suffer further damage, headaches, distraction, disgust, and other physical manifestations of emotional distress.

124.    The Defendants' foregoing violation renders it liable for actual damages in an amount to be determined by the Court pursuant to MCDCA, Md. Code Ann., Com. Law § 14-203.

**WHEREFORE,** Plaintiff requests this Honorable Court award judgment for the Plaintiff against Defendants and order an award for actual and consequential damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

## COUNT VI—Negligence (per se)

125.    The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

126.    The 2017 and 2021 Financing Statements meet the definition of a financing statement under Md. Code Ann., Com. Law § 9-102(39).

127.    Defendants had a duty of care to comply with Maryland law and the procedures provided by the Maryland Uniform Commercial Code for properly filing a financing statement, including specifically Md. Code Ann., Com Law §9-509(d), and not to misrepresent to the public that Plaintiff was a debtor to the Defendants.

128.    Defendants breached their duty of care by falsely and carelessly filing the 2017 and 2021 financing statements in the land records for Prince George's County with the knowledge that they contained false information, in violation of Md. Code Ann., Com. Law § 9-509(f) and Md. Code Ann., Crim. Law § 9-508(b).

129.    Pursuant to Md. Code Ann., Crim. Law § 9-508(c):

(1) A person who violates this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $500.

23

(2) Each act of filing a financing statement or an amendment to a
financing statement is a separate violation.

130.    The violation of a statutory duty establishes prima facie negligence. The aggrieved party must be "a member of the class the statute was designed to protect has been injured." *Hammond v. Robins*, 60 Md. App. 430, 435 (1984).

131.    The statutes concerning the filing of Financing Statements, including Md. Code Ann., Com. Law § 9-509(f), are designed to protect the public against the consequences of disparaging title to their property and interfering with their financial relations.

132.    Such negligence was the direct and proximate cause of the Plaintiffs' injuries.

133.    As a direct and proximate result of Defendants' negligence, Plaintiffs suffered damages including XXX.

**WHEREFORE,** Plaintiff requests this Honorable Court award judgment for the Plaintiff against Defendants and order an award for actual and consequential damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

## COUNT VI—Negligence

134.    The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

135.    Defendants owed Plaintiff a duty to use reasonable care in designing and installing the System on the Subject Property, such that the System would be installed in an ordinary, workmanlike manner and according to industry standards.

136.    Defendants breached the duty of care they owed to Plaintiff by failing to install the System in a good and workmanlike manner and according to industry standards, and as a result of their breach of duty of care, the roof of the Subject Property leaked, causing significant water damage to the Subject Property over a period of time.

137.    The Plaintiff was actually harmed because she owns the Subject Property, which has been damaged due to the Defendants' improper installation of the System. As a result, Plaintiff has been living in a home with a leaking roof and water-stained and leaking ceilings, and the water damage has caused rot and other issues that require repairs in excess of $37,095.03.

138.    As a proximate result of Defendant's conduct, Plaintiff suffered the aforementioned economic damages and other non-economic damages, including emotional distress, frustration, mental anguish, and inconvenience.

**WHEREFORE,** Plaintiff requests this Honorable Court award judgment for the Plaintiff against Defendants and order an award for actual and consequential damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

### COUNT VII—Private Nuisance

139.    The preceding allegations of this Complaint are reiterated and incorporated by reference as if fully set forth herein.

140.    Defendants installed two Systems on the roof of Plaintiff's home pursuant to the First and Second SPPAs, which she did not sign.

141.    The installation of the Systems has caused the roof of Plaintiff's home to leak, causing extensive damage to her home and her personal property.

142.    Defendants have refused to fully or even temporarily repair the damage they caused to Plaintiff's home.

143.    The leaks caused by the faulty installation of the Systems and the damage resulting therefrom unreasonable and cause a substantial and unreasonable interference with Plaintiff's use and enjoyment of her home.

144.    The damage caused by the leaks is so unreasonable that the Plaintiff has suffered a diminution in value because the home requires substantial repairs.

145.    The leaks into the Plaintiff's home, which are continuing and caused by the improper installation of the System, constitute a nuisance.

146.    Defendants' conduct in causing the leaks and in failing to fully or even temporarily repair the damage to the Plaintiffs' home resulting from their improper installation of the Systems is unreasonable and imposes immediate, substantial, and irreparable injury upon Plaintiff.

147.    As the direct and proximate cause of the Defendants' conduct, Plaintiff has suffered property damage and non-economic damages, including emotional distress.

**WHEREFORE,** Plaintiff requests this Honorable Court award judgment for the Plaintiff against Defendants and order an award for actual and consequential damages in excess of $75,000, to be determined at trial, and for attorney's fees, costs incurred, and court costs, and other assessments proper by law, with legal interest, and for such other and further relief as deemed proper.

**COUNT VIII—Claim for Attorney's Fees Allowed by Law**

148.    Under Rule 2-703(b), the Plaintiff includes this separately numbered claim for attorney's fees in this initial pleading. Further, under Rule 2-703(d), the Plaintiff advises the Court and the Defendants that she believes this case is likely to result in a substantial claim for attorneys' fees for services over a significant period.

Respectfully submitted:

By:    */s/ Derek A. Hills*
Derek A. Hills, Esq.
The Law Office of Derek A. Hills, LLC
129 N. West St., Suite 1
Easton, MD 21601
Phone: 443-239-4626
dhills@dahlawoffice.com
AIS No. 1506160146

and

*/s/ Peter A. Holland*
Peter A. Holland
The Holland Law Firm, P.C.
914 Bay Ridge Road, Suite 230
Annapolis, MD 21403
Telephone: (410) 280-6133
peter@hollandlawfirm.com
AIS No. 9212160067

*Attorneys for Plaintiff*

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

*/s/ Derek A. Hills*
Derek A. Hills, Esq.

27

**IN THE CIRCUIT COURT OF MARYLAND FOR PRINCE GEORGE'S COUNTY**

| | |
|---|---|
| Maren Mayhew | * |
| | *  Case No. _____ |
| *Plaintiff,* | * |
| | * |
| v. | * |
| | * |
| Vivint Solar Developer LLC, *et al.* | * |
| | * |
| *Defendants.* | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## Line of Appearance

Dear Clerk:

Please enter the appearance of Derek A. Hills and The Law Office of Derek A. Hills, LLC, on behalf of the Plaintiff in the above-captioned matter.

Respectfully Submitted:

By:    **/s/ Derek A. Hills**
Derek A. Hills, Esq.
The Law Office of Derek A. Hills, LLC
129 N. West St., Suite 1
Easton, MD 21601
Phone: 443-239-4626
dhills@dahlawoffice.com
AIS No. 1506160146

and

**/s/ Peter A. Holland**
Peter A. Holland
The Holland Law Firm, P.C.
914 Bay Ridge Road, Suite 230
Annapolis, MD 21403
Telephone: (410) 280-6133
peter@hollandlawfirm.com
AIS No. 9212160067
*Attorneys for Plaintiff*

**IN THE CIRCUIT COURT OF MARYLAND FOR PRINCE GEORGE'S COUNTY**

| | | |
|---|---|---|
| Maren Mayhew | * | |
| | * | Case No. _____ |
| *Plaintiff,* | * | |
| | * | |
| v. | * | |
| | * | |
| Vivint Solar Developer LLC, *et al.* | * | |
| | * | |
| *Defendants.* | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>Line of Appearance</u>

Dear Clerk:

Please enter the appearance of Peter Holland and The Holland Law Firm, PC, on behalf of the Plaintiff in the above-captioned matter.

Respectfully Submitted:

By:     */s/ Derek A. Hills*
Derek A. Hills, Esq.
The Law Office of Derek A. Hills, LLC
129 N. West St., Suite 1
Easton, MD 21601
Phone: 443-239-4626
dhills@dahlawoffice.com
AIS No. 1506160146

and

*/s/ Peter A. Holland*
Peter A. Holland
The Holland Law Firm, P.C.
914 Bay Ridge Road, Suite 230
Annapolis, MD 21403
Telephone: (410) 280-6133
peter@hollandlawfirm.com
AIS No. 9212160067
*Attorneys for Plaintiff*

**IN THE CIRCUIT COURT OF MARYLAND FOR PRINCE GEORGE'S COUNTY**

| | |
|---|---|
| Maren Mayhew | * |
| *Plaintiff,* | * Case No. _____ |
| | * |
| v. | * |
| | * |
| Vivint Solar Developer LLC, *et al.* | * |
| | * |
| *Defendants.* | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>REQUEST TO ISSUE SUMMONS</u>

The Plaintiff hereby requests that the Clerk of this Court issue writs of summons for the Defendants for service by private process pursuant to MD Rule 2-112, and deliver the same to: The Law Office of Derek A. Hills, 129 North West Street, Suite 1, Easton, MD 21601.

Respectfully Submitted:

By: */S/ Derek A. Hills*
Derek A. Hills, Esq.
The Law Office of Derek A. Hills, LLC
129 N. West St., Suite 1
Easton, MD 21601
Phone: 443-239-4626
dhills@dahlawoffice.com
AIS No. 1506160146

and

*/s/ Peter A. Holland*
Peter A. Holland
The Holland Law Firm, P.C.
914 Bay Ridge Road, Suite 230
Annapolis, MD 21403
Telephone: (410) 280-6133
peter@hollandlawfirm.com
AIS No. 9212160067
*Attorneys for Plaintiff*

IN THE CIRCUIT COURT FOR Prince George's County

(City/County)

## CIVIL – NON-DOMESTIC CASE INFORMATION SHEET

### DIRECTIONS

***Plaintiff:*** This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Justice of the Supreme Court of Maryland pursuant to Rule 2-111(a).

   ***Defendant:*** You must file an Information Report as required by Rule 2-323(h).

### *THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING*

**FORM FILED BY:** ☒ PLAINTIFF ☐ DEFENDANT   CASE NUMBER c-16-CV-24-002166
(Clerk to insert)

**CASE NAME:** Maren Mayhew      vs.   Vivint Solar Developer, et al.

**PARTY'S NAME:** Maren Mayhew   Plaintiff      **PHONE:**   Defendant

**PARTY'S ADDRESS:** 11409 Cedar Lane, Beltsville, MD 20705

**PARTY'S E-MAIL:**

**If represented by an attorney:**

**PARTY'S ATTORNEY'S NAME:**  Derek A. Hills      PHONE: 443-239-4626

**PARTY'S ATTORNEY'S ADDRESS:**  129 N. West St., Suite 1, Easton, MD 21601

**PARTY'S ATTORNEY'S E-MAIL:**  dhills@dahlawoffice.com

**JURY DEMAND?** ☒ Yes ☐ No

**RELATED CASE PENDING?** ☐ Yes ☒ No  If yes, Case #(s), if known:

**ANTICIPATED LENGTH OF TRIAL?:** ____ hours  4  days

### PLEADING TYPE

**New Case:** ☒ Original      ☐ Administrative Appeal    ☐ Appeal
**Existing Case:** ☐ Post-Judgment    ☐ Amendment
***If filing in an existing case, skip Case Category/ Subcategory section – go to Relief section.***

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY *(Check one box.)*

**TORTS**
☐ Asbestos
☐ Assault and Battery
☐ Business and Commercial
☐ Conspiracy
☐ Conversion
☐ Defamation
☐ False Arrest/Imprisonment
☐ Fraud
☐ Lead Paint – DOB of Youngest Plt:____
☐ Loss of Consortium
☐ Malicious Prosecution
☐ Malpractice-Medical
☐ Malpractice-Professional
☐ Misrepresentation
☐ Motor Tort
☐ Negligence
☒ Nuisance
☐ Premises Liability
☐ Product Liability
☐ Specific Performance
☐ Toxic Tort
☐ Trespass
☐ Wrongful Death

**CONTRACT**
☐ Asbestos
☐ Breach
☐ Business and Commercial
☐ Confessed Judgment (Cont'd)
☐ Construction
☐ Debt
☐ Fraud

☐ Government
☐ Insurance
☐ Product Liability

**PROPERTY**
☐ Adverse Possession
☐ Breach of Lease
☐ Detinue
☐ Distress/Distrain
☐ Ejectment
☐ Forcible Entry/Detainer
☐ Foreclosure
  ☐ Commercial
  ☐ Residential
  ☐ Currency or Vehicle
  ☐ Deed of Trust
  ☐ Land Installments
  ☐ Lien
  ☐ Mortgage
  ☐ Right of Redemption
  ☐ Statement Condo
☐ Forfeiture of Property / Personal Item
☐ Fraudulent Conveyance
☐ Landlord-Tenant
☐ Lis Pendens
☐ Mechanic's Lien
☐ Ownership
☐ Partition/Sale in Lieu
☐ Quiet Title
☐ Rent Escrow
☐ Return of Seized Property
☐ Right of Redemption
☐ Tenant Holding Over

**PUBLIC LAW**
☐ Attorney Grievance
☐ Bond Forfeiture Remission
☐ Civil Rights
☐ County/Mncpl Code/Ord
☐ Election Law
☐ Eminent Domain/Condemn.
☐ Environment
☐ Error Coram Nobis
☐ Habeas Corpus
☐ Mandamus
☐ Prisoner Rights
☐ Public Info. Act Records
☐ Quarantine/Isolation
☐ Writ of Certiorari

**EMPLOYMENT**
☐ ADA
☐ Conspiracy
☐ EEO/HR
☐ FLSA
☐ FMLA
☐ Worker's Compensation
☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
☐ Assumption of Jurisdiction
☐ Authorized Sale
☐ Attorney Appointment
☐ Body Attachment Issuance
☐ Commission Issuance

☐ Constructive Trust
☐ Contempt
☐ Deposition Notice
☐ Dist Ct Mtn Appeal
☐ Financial
☐ Grand Jury/Petit Jury
☐ Miscellaneous
☐ Perpetuate Testimony/Evidence
☐ Prod. of Documents Req.
☐ Receivership
☐ Sentence Transfer
☐ Set Aside Deed
☐ Special Adm. – Atty
☐ Subpoena Issue/Quash
☐ Trust Established
☐ Trustee Substitution/Removal
☐ Witness Appearance-Compel

**PEACE ORDER**
☐ Peace Order

**EQUITY**
☐ Declaratory Judgment
☐ Equitable Relief
☐ Injunctive Relief
☐ Mandamus

**OTHER**
☐ Accounting
☐ Friendly Suit
☐ Grantor in Possession
☐ Maryland Insurance Administration
☐ Miscellaneous
☐ Specific Transaction
☐ Structured Settlements

**CC-DCM-002** (Rev. 12/2022)      Page 1 of 3

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

| | | | |
|---|---|---|---|
| ☐ Abatement | ☐ Earnings Withholding | ☐ Judgment-Default | ☐ Reinstatement of Employment |
| ☐ Administrative Action | ☐ Enrollment | ☐ Judgment-Interest | ☐ Return of Property |
| ☐ Appointment of Receiver | ☐ Expungement | ☐ Judgment-Summary | ☐ Sale of Property |
| ☐ Arbitration | ☐ Financial Exploitation | ☒ Liability | ☐ Specific Performance |
| ☐ Asset Determination | ☐ Findings of Fact | ☐ Oral Examination | ☐ Writ-Error Coram Nobis |
| ☐ Attachment b/f Judgment | ☐ Foreclosure | ☒ Order | ☐ Writ-Execution |
| ☐ Cease & Desist Order | ☐ Injunction | ☐ Ownership of Property | ☐ Writ-Garnish Property |
| ☐ Condemn Bldg | ☐ Judgment-Affidavit | ☐ Partition of Property | ☐ Writ-Garnish Wages |
| ☐ Contempt | ☐ Judgment-Attorney Fees | ☐ Peace Order | ☐ Writ-Habeas Corpus |
| ☒ Court Costs/Fees | ☐ Judgment-Confessed | ☐ Possession | ☐ Writ-Mandamus |
| ☒ Damages-Compensatory | ☐ Judgment-Consent | ☐ Production of Records | ☐ Writ-Possession |
| ☒ Damages-Punitive | ☐ Judgment-Declaratory | ☐ Quarantine/Isolation Order | |

*If you indicated **Liability** above,* mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☒ Liability is conceded.    ☐ Liability is not conceded, but is not seriously in dispute.    ☐ Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

☐ Under $10,000    ☐ $10,000 - $30,000    ☐ $30,000 - $100,000    ☒ Over $100,000

☐ Medical Bills $ _____    ☐ Wage Loss $ _____    ☐ Property Damages $ _____

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)
A. Mediation        ☒ Yes ☐ No        C. Settlement Conference    ☒ Yes ☐ No
B. Arbitration      ☐ Yes ☐ No        D. Neutral Evaluation       ☐ Yes ☒ No

## SPECIAL REQUIREMENTS

☐ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated **LENGTH OF TRIAL**.*

**(Case will be tracked accordingly)**

☐ 1/2 day of trial or less        ☐ 3 days of trial time
☐ 1 day of trial time             ☒ More than 3 days of trial time
☐ 2 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

***For all jurisdictions,** if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited** - Trial within 7 months of        ☐ **Standard** - Trial within 18 months of
Defendant's response                              Defendant's response

EMERGENCY RELIEF REQUESTED

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited** - Trial within 7 months of Defendant's response

☐ **Standard** - Trial within 18 months of Defendant's response

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | |
|---|---|
| ☐ Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ Civil-Short | Trial 210 days from first answer. |
| ☐ Civil-Standard | Trial 360 days from first answer. |
| ☐ Custom | Scheduling order entered by individual judge. |
| ☐ Asbestos | Special scheduling order. |
| ☐ Lead Paint | Fill in: Birth Date of youngest plaintiff_____. |
| ☐ Tax Sale Foreclosures | Special scheduling order. |
| ☐ Mortgage Foreclosures | No scheduling order. |

### CIRCUIT COURT FOR BALTIMORE COUNTY

| | |
|---|---|
| ☐ Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

May 5, 2024
_____
Date

129 N. West St., Suite 1
_____
Address

Easton          MD          21601
_____
City     State     Zip Code

/s/ Derek A. Hills, Esq.          1506160146
_____
Signature of Attorney / Party     Attorney Number

Derek A. Hills
_____
Printed Name

CC-DCM-002 (Rev. 12/2022)          Page 3 of 3

**vivint.solar**

Phone: 877.404.4129 Fax: 801.765.2558
E-Mail: support@vivintsolar.com
www.vivintsolar.com
Employer Identification No.: 30-0756438

AR No.: __2947953__

MHIC License Number: _____

Approval #: _____   Approval Date: _____

## RESIDENTIAL POWER PURCHASE AGREEMENT

This RESIDENTIAL POWER PURCHASE AGREEMENT (this "*Agreement*") is entered into by and between VIVINT SOLAR DEVELOPER, LLC, a Delaware limited liability company ("*We*", "*Us*", "*Our*") and the undersigned Customer(s) ("*You*", "*Your*"), as of the Transaction Date set forth below.

| Customer(s): | Full Name *if not, ME here*  Property Owner ☐ Yes ☐ No  William Mayhew | Full Name *if not, ME here*  Property Owner ☐ Yes ☐ No  Bill mayhew@comcast.net |
|---|---|---|
| | Telephone No: 301-515-7928 | E-Mail: Bill mayhew@comcast.net |
| Property Address: | Street Address: 11909 Cedar LN | |
| | City, County, State, Zip: Beltsville prince George, MD, 20705 | |

### 1. SERVICES

**A.   DESIGN AND INSTALLATION.** We will design and install a solar photovoltaic system on Your Property, which will include all solar panels, inverters, meters, and other components (collectively, the "*System*"), as further described in the Initial Customer Packet and the Work Order that We will provide to You our Your approval hereafter. With Your cooperation, We will (i) design, install and connect the System in material compliance with all applicable laws, (ii) complete all required inspections; and (iii) obtain all required certifications and permits. In order to design a System that meets Your needs, You hereby agree that We may obtain Your electrical usage history from Your electric utility (the "*Utility*"). Other than the activation fee described in Section 1.B below, We will design and install the System at no cost to You.

**B.   ACTIVATION.** You agree to pay Us a one-time activation fee in the amount of $ _____. We will interconnect the System with Your Utility, and cause the System to generate energy measured in kilowatt hours ("*kWh*") (the "*Energy*"). Installation of the System is anticipated to begin and be substantially complete between two (1) and five (5) weeks thereafter.

**C.   OWNERSHIP OF SYSTEM.** We shall own the System as Our sole personal property. You will have no property interest in the System.

### 2. TERM, PRICE, PAYMENTS, AND FINANCIAL DISCLOSURES

**A.   TERM.** This Agreement shall be effective as of the Transaction Date written below and continue until the twentieth (20th) anniversary of the In-Service Date (as defined in Section 5) (the "*Term*"). At the end of the Term, You may elect to (i) continue with this Agreement on a year-to-year basis; (ii) enter into a new Agreement with Us, (iii) purchase the System at the end of the Term (the "*Purchase Option*"); or (iv) have the System removed at no cost to You. You will need to notify Us concerning Your election sixty (60) days prior to the end of the Term. If You elect the Purchase Option, We will engage an independent appraiser to determine the fair market value of the System. The appraiser's valuation (the "*Purchase Option Price*") will be provided to You in writing and will be binding. If We receive Your payment of the Purchase Option Price, costs of the appraisal, applicable taxes, and all other amounts then owing and unpaid hereunder, We will transfer ownership of the System to You at the end of the Term on an "As Is, Where Is" basis. If You elect to have the System removed, We will remove the System from Your Property within ninety (90) days after the end of the Term.

**B.   ENERGY PRICE.** The price of Energy delivered to You at the Delivery Point (as defined in Section 10(a)). You shall pay Us $0. __10__ per kWh (the "*Energy Price*"), plus applicable taxes. Pursuant to Section 8(f), the Energy Price shall increase each year by two and nine-tenths percent (2.9%). Please refer to the Initial Customer Packet for additional information regarding the estimated System output.

**C.   INVOICING AND LATE FEES.** Beginning with the first month following the In-Service Date and throughout the Term, You shall make monthly payments to Us reflecting the charges for Energy delivered to You in the preceding month. You agree that all payments hereunder shall be made by automatic payment deduction from Your designated checking account or credit card. If You fail to increase provided for in Section 8(f), in the event of an emergency, You may call Us at the financing charge associated with this Agreement. If You fail to make any payment within ten (10) days of when due, upon written notice to You, We may discontinue Our services hereunder, terminate this Agreement, and/or remove all damages to which We may be entitled, as further described in Section 1(d). For all payments more than ten (10) days past due, We may impose a late charge equal to Twenty-Five Dollars ($25) and interest at an annual rate of ten percent (10%).

**D.   CREDIT CHECK.** In connection with the execution of this Agreement and at any time during the Term, You hereby authorize Us to obtain Your credit rating and report from credit reporting agencies, and to report Your payment performance under this Agreement to credit reporting agencies.

### 3. REMOVAL OF THE SYSTEM

You shall not make any Alterations (as defined in Section 8(e)) to any portion of the System. If You want to make repairs or improvements to Your Property that require the temporary removal of the System or that could interfere with its performance or operation, You must give Us at least thirty (30) days prior notice. At compensation for Our removal and reinstallation of the System, You agree to pay to Us a fee equal to Four Hundred and Ninety-Nine Dollars ($499) plus the Shutdown Payment (as defined in Section 16), subject to increase provided for in Section 8(f). In the event of an emergency, You may call Us at the number listed above and contact Us immediately. If We are unable to timely respond to such emergency, You may (at Your own expense) contract with a licensed and qualified solar installer to remove the System as necessary to make repairs required by the emergency. You shall be responsible for any damage to the System that results from actions taken by Your contractor. You shall notify Us by calling 877.404.4129 within forty-eight (48) hours of taking any emergency action.

### 4. ARBITRATION OF DISPUTES

Most customer concerns can be resolved quickly and amicably by calling Our customer service department at 877.404.4129. If Our customer service department is unable to resolve Your concern, You and We agree to resolve any Dispute (as defined below) through binding arbitration or small claims court instead of courts of general jurisdiction. **BY SIGNING BELOW, YOU ACKNOWLEDGE AND AGREE THAT (I) YOU ARE HEREBY WAIVING THE RIGHT TO A TRIAL BY JURY, AND (II) YOU MAY BRING CLAIMS AGAINST US ONLY IN YOUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

You and We agree to arbitrate all disputes, claims and controversies arising out of or relating to (i) any aspect of the relationship between You and Us, whether based in contract, tort, statute or any other legal theory; (ii) this Agreement or any other agreement concerning the subject matter hereof; (iii) any breach, default, or termination of this Agreement; and (iv) the interpretation, validity, or enforceability of this Agreement, including the determination of the scope or applicability of this Section 4 (each, a "*Dispute*"). Prior to commencing arbitration, a party must first send a written "Notice of Dispute" via certified mail to the other party. The Notice of Dispute must describe the nature and basis for the Dispute and the relief sought. If You and We are unable to resolve the Dispute within thirty (30) days, then either party may commence arbitration. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures (available at: http://www.jamsadr.com/rules-streamlined-arbitration, the "*JAMS Rules*") and under the rules set forth in this Agreement. The arbitrator shall be bound by the terms of this Agreement. No matter the circumstances, the arbitrator shall not award punitive, special, exemplary, indirect, or consequential damages to either party. If You utilize arbitration, You shall be responsible to pay $250. All attorneys' fees, travel expenses, and other costs of the arbitration shall be borne by You and Us in accordance with the JAMS Rules and applicable law. The arbitration shall be conducted at a mutually agreeable location near Your Property. Judgment on an arbitration award may be entered in any court of competent jurisdiction. Nothing in this Section 4 shall preclude You or We from seeking provisional remedies in aid of arbitration from a court of competent jurisdiction.

**NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY APPLICABLE LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF APPLICABLE LAWS. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY. WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.**

**I/WE AGREE TO ARBITRATION AND WAIVE THE RIGHT TO A JURY TRIAL.**   Customer's Initials: __WM__

### 5. NOTICE TO CUSTOMERS

**A.   LIST OF DOCUMENTS TO BE INCORPORATED INTO THIS CONTRACT:** (i) this Agreement, (ii) the Additional Terms and Conditions, (iii) the Initial Customer Packet, (iv) the Work Order, and (v) the State Notices. These documents are expressly incorporated into this Agreement and apply to the relationship between You and Us.

**B.   IT IS NOT LEGAL FOR US TO ENTER YOUR PREMISES UNLAWFULLY OR COMMIT ANY BREACH OF THE PEACE TO REMOVE GOODS INSTALLED UNDER THIS AGREEMENT.**

**C.   DO NOT SIGN THIS AGREEMENT UNLESS YOU HAVE READ ALL OF ITS PAGES.** You acknowledge that You have read and received a legible copy of this Agreement, that We have signed the Agreement, and that You have read and received a legible copy of every document that We have signed during the negotiation.

**D.   DO NOT SIGN THIS AGREEMENT IF THIS AGREEMENT CONTAINS ANY BLANK SPACES.** You are entitled to a completely filled in copy of this Agreement, signed by both You and Us, before any work may be started.

**E.   YOU MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE TENTH (10TH) DAY AFTER THE TRANSACTION DATE. SEE THE NOTICE OF CANCELLATION BELOW FOR AN EXPLANATION OF THIS RIGHT.**

| VIVINT SOLAR DEVELOPER, LLC | CUSTOMER(S): |
|---|---|
| By: _____ | By: __William Mayhew__ |
| Printed Name: __MARK Thole__ | Printed Name: __William mayhew__ |
| Title: __District manager__ | By: _____ |
| Transaction Date: __4-7-13__ | Printed Name: _____ |

Home Improvement Contractors are required to be licensed. For license information, contact the Maryland Home Improvement Commission at 888-218-5925 or http://www.dllr.state.md.us/license/mhic.

### NOTICE OF CANCELLATION

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN TEN DAYS FROM THE TRANSACTION DATE. IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED. IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE, OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK. IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN 20 DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THIS CONTRACT. TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM, TO VIVINT SOLAR, INC., AT 4931 NORTH 300 WEST, PROVO, UT 84604 NOT LATER THAN MIDNIGHT OF THE TENTH DAY AFTER THE TRANSACTION DATE.

I HEREBY CANCEL THIS TRANSACTION DATED: _____

AR No.: _____   Customers' Signature: _____

*Exhibit 1*

**18. DISCLAIMER OF WARRANTY.** EXCEPT FOR THE REPAIR SERVICES EXPRESSLY SET FORTH IN SECTION 7 AND SECTION 11 OF THIS AGREEMENT, WE MAKE NO WARRANTY TO YOU OR ANY OTHER PERSON, WHETHER EXPRESS, IMPLIED OR STATUTORY, AS TO THE INSTALLATION, DESIGN, OPERATION, OR MAINTENANCE OF THE SYSTEM, THE GENERATION AND DELIVERY OF ENERGY, OR ANY ASSOCIATED SERVICE PROVIDED UNDER OR DESCRIBED IN THIS AGREEMENT, OR AS TO ANY OTHER MATTER, ALL OF WHICH WE HEREBY EXPRESSLY DISCLAIM. OUR LIABILITY FOR ANY BREACH OF ANY WARRANTY IS LIMITED TO REPAIRING THE SYSTEM TO THE EXTENT REQUIRED UNDER THIS AGREEMENT. YOU ACKNOWLEDGE THAT WE ARE RELYING ON THIS SECTION 18 AS A CONDITION AND MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT. Only We have the right to enforce any warranty provided by Our contractors or suppliers on the manufacture or installation of the System.

**19. LIMITATION OF LIABILITY.** You understand that: (a) We are not an Insurer of Your Property, personal property, or personal safety of persons in or on Your Property; (b) You are solely responsible for providing any insurance with respect to Your Property and its contents; (c) the amount You pay to Us is based only on the value of the Energy We provide and not on the value of Your Property or its contents; (d) the System may not always operate properly for various reasons; (e) it is difficult to determine in advance the value of the components of the System that might be lost, or destroyed if the System or the System installation fail to operate properly; (f) it is difficult to determine in advance what portion, if any, of any property loss, personal injury or death would be proximately caused by Our failure to perform, or negligence, or a failure of the System, or the System installation.

THEREFORE, NOTWITHSTANDING ANY BREACH OF THIS AGREEMENT BY US, ANY FAILURE OF THE SYSTEM, THE INSTALLATION, OR THE REPAIR SERVICES DESCRIBED IN SECTION 7 AND SECTION 11, OR ANY NEGLIGENT ACT BY US THAT CAUSED OR ALLOWED ANY INJURY OR LOSS (WHETHER PROPERTY DAMAGE, PERSONAL INJURY, OR DEATH) TO YOU OR ANYONE IN OR ON YOUR PROPERTY, YOU AGREE THAT, UNLESS SUCH INJURY OR LOSS WAS CAUSED BY OUR GROSS NEGLIGENCE, FRAUD, OR WILLFUL INJURY, OUR LIABILITY SHALL BE LIMITED TO THE AMOUNT YOU HAVE PAID FOR THE ENERGY PRODUCED BY THE SYSTEM, AND THIS SHALL BE YOUR SOLE AND EXCLUSIVE REMEDY REGARDLESS OF WHAT LEGAL THEORY IS USED TO DETERMINE THAT WE WERE LIABLE FOR THE INJURY OR LOSS.

NO CLAIM SHALL BE MADE BY YOU AGAINST US OR ANY OF OUR AFFILIATES, DIRECTORS, EMPLOYEES, REPRESENTATIVES, OR AGENTS FOR ANY SPECIAL, EXEMPLARY, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHETHER OR NOT THE CLAIM THEREFORE IS BASED ON CONTRACT, TORT, DUTY IMPOSED BY LAW OR OTHERWISE, IN CONNECTION WITH, ARISING OUT OF, OR IN ANY WAY RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY ACT OR OMISSION OR EVENT OCCURRING IN CONNECTION THEREWITH, AND YOU HEREBY WAIVE, RELEASE AND AGREE NOT TO SUE UPON ANY SUCH CLAIM FOR ANY SUCH SPECIAL, EXEMPLARY, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN YOUR FAVOR. YOU AND WE FURTHER AGREE THAT NO CLAIM, LAWSUIT, OR ANY OTHER LEGAL OR ARBITRATION PROCEEDING IN CONNECTION WITH ARISING OUT OF, OR IN ANY WAY RELATED TO THIS AGREEMENT MAY BE BROUGHT, COMMENCED OR FILED MORE THAN ONE (1) YEAR AFTER INCIDENT GIVING RISE TO THE CLAIM OCCURRED. YOU ACKNOWLEDGE THAT WE ARE RELYING ON THIS SECTION 19 AS A CONDITION AND MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT.

**20. INDEMNIFICATION AND SUBROGATION.** To the fullest extent permitted by applicable law, You hereby agree to indemnify, advance expenses, and hold Us harmless, and Our representatives, employees, contractors, attorneys, and other agents (each, a "Covered Person") who is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (each, a "Proceeding"), arising out of or in connection with (i) Our breach of this Agreement, (ii) a failure of the System, or (iii) a claim for indemnification or contribution against any liability and loss suffered and all expenses (including attorneys' fees) reasonably incurred by such Covered Person. Your indemnification obligations under this Section 20 shall not apply if the harm or damage that is the basis for such action, suit or proceeding occurred while one of Our employees or agents was in or about Your Property, until such employee or agent was the sole cause of such harm or damage. Unless expressly prohibited by Your property insurance policy, You agree to release all Covered Persons from any claims of any parties suing through Your authority or in Your name, such as Your insurance company, and You agree to defend Us against any such claim. YOU AGREE TO NOTIFY YOUR INSURANCE COMPANY OF THIS RELEASE.

**21. AMENDMENTS AND WAIVERS.** This Agreement may only be amended or modified by ...

13. 50

7867  610

## THIS DEED

Made this 25th day of January, 1991, by and between
ROBERT N. STEWART and MAYDELLE B. STEWART, husband and wife, as
tenants by the entirety, parties of the first part, and;
MAREN S. MAYHEW, as sole owner, party of the second part:

WITNESSETH, that in consideration of the sum of NO CONSIDERATION
and other good and valuable considerations, the receipt of which is
hereby acknowledged, the said parties of the first part, do grant
and convey unto the party of the second part, her heirs and
assigns, in fee simple, retaining a life estate unto the grantors,
ROBERT N. STEWART and MAYDELLE B. STEWART, husband and wife, as
tenants by the entirety, the following described land and premises
with the improvements, easements, and appurtenances thereunto
belonging, situate, lying and being in the First Election District
of Prince George's County, State of Maryland, namely:

Lot numbered Eleven (11) in Block numbered Four (4) in the
subdivision known as "SECTION 1, HOME ACRES" as per plat thereof
recorded in Plat Book BB 10 at Plat 7 among the Land Records of
Prince George's County, Maryland.

NO CONSIDERATION - INTERFAMILY TRANSFER FROM PARENTS TO DAUGHTER
THERE ARE NO MORTGAGES OUTSTANDING AGAINST THIS PROPERTY
THIS DEED IS BEING EXECUTED FOR ESTATE PLANNING PURPOSES

BEING the same land conveyed to the grantors herein by Deed
recorded in Liber 1182 at folio 56.

SUBJECT to all easements, covenants and restrictions of record.

AND the grantors herein warrant specially the property hereby
conveyed; and covenant to execute such further assurances of said
land as may be requisite.

WITNESS our hands and seals.

ATTEST:

_signature_                         _Robert N. Stewart_
                                    ROBERT N. STEWART

_signature_                         _Maydelle B. Stewart_
                                    MAYDELLE B. STEWART

STATE OF MARYLAND, COUNTY OF PRINCE GEORGE'S:SS:

I HEREBY CERTIFY that on this 25th day of January, 1991, before the
undersigned officer, a Notary Public in and for the jurisdiction
aforesaid, personally appeared ROBERT N. STEWART and MAYDELLE B.
STEWART, known to me to be the persons whose names are subscribed
to the within instrument and did acknowledge that they executed the
same for the purposes therein contained.

WITNESS my hand and official seal.

_signature_
Notary Public

My commission expires:  6/1/94

I HEREBY CERTIFY THIS INSTRUMENT WAS PREPARED UNDER MY SUPERVISION
AND THAT I AM AN ATTORNEY DULY ADMITTED TO PRACTICE BEFORE THE
COURT OF APPEALS FOR MARYLAND.

_signature_
LEO F. X. PRAHINSKI

Exhibit 2

7867   811

WHEN RECORDED MAIL TO:
Leo F. X. Prahinski
Attorney At Law
10752 Baltimore Blvd.
Beltsville, MD 20705

All Taxes on assessments certified to the
Collector of Taxes for Prince George's
County, Md. by _____ have been paid
Md. This statement is for registration and is not
insurance against further taxation even
for prior periods, nor does it guarantee
satisfaction of outstanding tax sales.

TRANSFERRED
JAN 31 1991

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
877-404-4129 (option 7)

**B. E-MAIL CONTACT AT FILER (optional)**
filings@vivintsolar.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Vivint Solar Developer, LLC
P.O. Box 4589
Portland, OR  97208

PRINCE GEORGE'S COUNTY, MD
APPROVED BY _____
Mail #4

AUG 19 2017

$ N/A RECORDATION TAX PAID
$ N/A TRANSFER TAX PAID

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **1b. INDIVIDUAL'S SURNAME** Mayhew | **FIRST PERSONAL NAME** Maren | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **1c. MAILING ADDRESS** 11409 Cedar Ln | **CITY** Beltsville | **STATE** MD | **POSTAL CODE** 20705 | **COUNTRY** USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **2b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** USA |

Item 09:FS-L
Recording Fee        20.00
Name: mayhew
Ref-
LK - Other FS-L
Surcharge            40.00
SubTotal:            60.00
Total:            1,500.00
08/23/2017  08:35
#0051096 CLK03 -
Prince George's
County/CCO COUNTY 04 -
Register 04

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME Vivint Solar Developer, LLC | | | | |
|---|---|---|---|---|
| **3b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **3c. MAILING ADDRESS** 1850 W. Ashton Blvd. | **CITY** Lehi | **STATE** UT | **POSTAL CODE** 84043 | **COUNTRY** USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

See Exhibit A attached hereto.

This UCC Financing Statement is exempt from recordation tax, based on section 12-108(k)(1)(v) of the Annotated Code of Maryland, and filed to publicize a lease of goods or fixtures.  This is a True Lease filed for notification purposes only and does not create a security interest.

*Exhibit 3*

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative
**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility
**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien  ☒ Non-UCC Filing
**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor
**8. OPTIONAL FILER REFERENCE DATA:**
Acct # 2947953

UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

PRINCE GEORGES COUNTY CIRCUIT COURT (Land Records) SJH 39937, p. 0573, MSA_CE64_40246. Date available 08/31/2017. Printed 03/20/2024.

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) SJH 39937, p. 0574, MSA_CE64_40246. Date available 08/31/2017. Printed 03/20/2024.

## UCC FINANCING STATEMENT ADDENDUM

**FOLLOW INSTRUCTIONS**

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

**9a. ORGANIZATION'S NAME**

OR

**9b. INDIVIDUAL'S SURNAME**
Mayhew

**FIRST PERSONAL NAME**
Maren

**ADDITIONAL NAME(S)/INITIAL(S)**     **SUFFIX**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

**10a. ORGANIZATION'S NAME**

OR

**10b. INDIVIDUAL'S SURNAME**

**INDIVIDUAL'S FIRST PERSONAL NAME**

**INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)**     **SUFFIX**

**10c. MAILING ADDRESS**   **CITY**   **STATE** **POSTAL CODE**   **COUNTRY**

**11.** ☐ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (11a or 11b)

**11a. ORGANIZATION'S NAME**

OR

**11b. INDIVIDUAL'S SURNAME**   **FIRST PERSONAL NAME**   **ADDITIONAL NAME(S)/INITIAL(S)** **SUFFIX**

**11c. MAILING ADDRESS**   **CITY**   **STATE** **POSTAL CODE**   **COUNTRY**

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut    ☐ covers as-extracted collateral    ☒ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):
Maren Mayhew

**16.** Description of real estate:

**County of:** Prince Georges

**Address of Real Estate:** 11409 Cedar Ln, Beltsville, MD, 20705

**Parcel Number:** 010067140

**Property Description:** Dist 01 ID 0067140 SUB Home Acres Lot 11 Block 4

**17. MISCELLANEOUS:**

UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

BOOK: 39937   PAGE: 0575

APN:  010067140

Service No.:          2947953

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) SJH 39937, p. 0575, MSA_CE64_40246. Date available 08/31/2017. Printed 03/20/2024.

## EXHIBIT A

This NOTICE (this *"Notice"*) is provided by VIVINT SOLAR DEVELOPER, LLC, a Delaware limited liability company (*"Company"*) with reference to the following facts:

1.  Maren Mayhew (*"Homeowner"*) and Company entered into that certain Residential Solar Power Purchase Agreement, dated as of April 02, 2013 (the *"Agreement"*).  Any capitalized term used but not defined herein shall have the meaning ascribed to such term in the Agreement. To request a copy of the Agreement, please contact Company by calling 1.877.404.4129, or by writing at 1850 W. Ashton Blvd., Lehi, UT 84043.

2.  The Agreement commenced on April 02, 2013 and will terminate on approximately October 02, 2033 (the *"Term"*). At the end of the Term, Homeowner may elect to continue with the Agreement on a year-to-year basis, enter into a new agreement, request removal of the System, or purchase the System. If Homeowner elects removal, then Company shall remove the System within ninety (90) days.

3.  Pursuant to the Agreement, Homeowner granted to Company a right to access, enter into, and use the Property for the installation, operation, and maintenance of a solar photovoltaic energy system (the *"System"*) at Homeowner's residential property located at 11409 Cedar Ln, Beltsville, County of Prince Georges, MD, 20705 (the *"Property"*).

4.  Pursuant to the terms and conditions of the Agreement, the Company has agreed to sell and Homeowner has agreed to purchase all electricity produced by the System.

5.  Company owns the System, collectively with all associated rights, privileges, assets, incentives, rebates, and benefits arising from, relating to, or attributable to the System (the *"System Interests"*). At all times during the Term, the System and the System Interests shall remain Company's sole personal property and shall not be deemed or characterized as a "fixture" or any part of the "realty" as those terms

may be defined by applicable law.  THIS NOTICE SHALL NOT IN ANY WAY MODIFY THE CHARACTER OR CLASSIFICATION OF THE SYSTEM.  THE SYSTEM IS NOT A FIXTURE.

6.  COMPANY DOES NOT HAVE A SECURITY INTEREST OR LIEN ON THE PROPERTY.  THIS NOTICE SHOULD NOT BE CONSTRUED AS AN ENCUMBRANCE AFFECTING TITLE TO THE PROPERTY.

7.  Pursuant to the terms and conditions of the Agreement, if the Homeowner proposes to sell or transfer the Property, it must provide Company with thirty (30) days' prior written notice of such sale or transfer, including the name of the proposed purchaser or transferee (*"Property Transferee"*).  If Property Transferee will not assume the obligations under the Agreement, or if Company determines that Property Transferee does not qualify, then Homeowner will be required to purchase the System at Four Dollars ($4) per watt installed, subject to reduction pursuant to the terms of the Agreement.

8.  If Homeowner defaults under the Agreement and Company elects to terminate the Agreement, then Homeowner may be responsible to purchase the System at Seven Dollars ($7) per watt installed, subject to reduction pursuant to the terms of the Agreement. Alternatively, Company may elect to terminate the Agreement and remove and retake the System.

9.  If Company defaults under the Agreement and Homeowner elects to terminate the Agreement, then Company shall remove the System within ninety (90) days.

10. The Agreement is binding upon Homeowner's and Company's respective heirs, legal representatives, successors, and permitted assigns.

11. This Notice shall not, under any circumstances, be deemed to modify or change any provision of the Agreement.  In the event of any conflict between the terms of this Notice and the Agreement, the Agreement shall control.

Copyright © 2016 Vivint Solar Developer, LLC.  All Rights Reserved.

**State of Maryland Land Instrument Intake Sheet**

☐ Baltimore City   ☒ County: _Prince George's_

*Information provided is for the use of the Clerk's Office, State Department of Assessments and Taxation, and County Finance Office Only.*
(Type or Print in Black Ink Only—All Copies Must Be Legible)

| 1 | Type(s) of Instruments | ( Check Box if addendum Intake Form is Attached.) |
|---|---|---|

| Deed | Mortgage | X Other UCC 1 | Other _____ |
|---|---|---|---|
| Deed of Trust | Lease | Financing | |

| 2 | Conveyance Type Check Box | Improved Sale Arms-Length [1] | Unimproved Sale Arms-Length [2] | Multiple Accounts Arms-Length [3] | Not an Arms-Length Sale [9] |
|---|---|---|---|---|---|

| 3 | Tax Exemptions (if applicable) Cite or Explain Authority | Recordation | 12-108 K (v) to publicize a lease of goods or fixtures, provided that the |
|---|---|---|---|
| | | State Transfer | security agreement states on its face that it does not create a security |
| | | County Transfer | interest |

| 4 | | Consideration Amount | | Finance Office Use Only — Transfer and Recordation Tax Consideration | |
|---|---|---|---|---|---|
| Consideration and Tax Calculations | Purchase Price/Consideration | $ | Transfer Tax Consideration | $ | |
| | Any New Mortgage | $ | X ( )% | $ | |
| | Balance of Existing Mortgage | $ | Less Exemption Amount | – | $ |
| | Other: | $ | Total Transfer Tax | = | $ |
| | Other: | $ | Recordation Tax Consideration | | $ |
| | | | X ( ) per $500 | = | $ |
| | Full Cash Value: | $ | TOTAL DUE | | $ |

| 5 | Fees | Amount of Fees | Doc. 1 | Doc. 2 | Agent: |
|---|---|---|---|---|---|
| | | Recording Charge | $ 60.00 | $ | |
| | | Surcharge | $ | $ | Tax Bill: |
| | | State Recordation Tax | $ 0 | $ | |
| | | State Transfer Tax | $ | $ | C.B. Credit: |
| | | County Transfer Tax | $ | $ | |
| | | Other | $ | $ | Ag. Tax/Other: |
| | | Other | $ | $ | |

| 6 | Description of Property | District | Property Tax ID No. (1) | Grantor Liber/Folio | Map | Parcel No. | Var. LOG |
|---|---|---|---|---|---|---|---|
| | SDAT requires submission of all applicable information. A maximum of 40 characters will be indexed in accordance with the priority cited in Real Property Article Section 3-104(g)(3)(i). | 01 | 0067140 | | | | (5) |
| | | Subdivision Name | | Lot (3a) | Block (3b) | Sect/AR (3c) | Plat Ref. | SqFt/Acreage (4) |
| | | Home Acres | | 11 | 4 | | | |

Location/Address of Property Being Conveyed (2)
11409 Cedar Ln Beltsville MD 20705

| Other Property Identifiers (if applicable) | Water Meter Account No. |
|---|---|

Residential ✓ or Non-Residential     Fee Simple     or Ground Rent     Amount:
Partial Conveyance?     Yes     No     Description/Amt. of SqFt/Acreage Transferred:

If Partial Conveyance, List Improvements Conveyed:

| 7 | Transferred From | Doc. 1 – Grantor(s) Name(s) | Doc. 2 – Grantor(s) Name(s) |
|---|---|---|---|
| | | Maren Mayhew | |
| | | Doc. 1 – Owner(s) of Record, if Different from Grantor(s) | Doc. 2 – Owner(s) of Record, if Different from Grantor(s) |

| 8 | Transferred To | Doc. 1 – Grantee(s) Name(s) | Doc. 2 – Grantee(s) Name(s) |
|---|---|---|---|
| | | Vivint Solar Developer, LLC | |

New Owner's (Grantee) Mailing Address

| 9 | Other Names to Be Indexed | Doc. 1 – Additional Names to be Indexed (Optional) | Doc. 2 – Additional Names to be Indexed (Optional) |
|---|---|---|---|

| 10 | Contact/Mail Information | Name: Filings Department | ☒ Return to Contact Person |
|---|---|---|---|
| | | Firm Vivint Solar Developer, LLC | ☐ Hold for Pickup |
| | | Address: P.O. Box 4589, Portland, OR  97208 | |
| | | Phone: (877 )404-4129 option (7) | ☒ Return Address Provided |

| 11 | IMPORTANT: *BOTH* THE ORIGINAL DEED *AND A* PHOTOCOPY MUST ACCOMPANY EACH TRANSFER |
|---|---|
| Assessment Information | ☐Yes ☐No   Will the property being conveyed be the grantee's principal residence? |
| | ☐Yes ☐No   Does transfer include personal property?  If yes, identify: |
| | ☐Yes ☐No   Was property surveyed?  If yes, attach copy of survey (if recorded, no copy required). |

Assessment Use Only — Do Not Write Below This Line

| Terminal Verification | Agricultural Verification | Whole | Part | Tran. Process Verification |
|---|---|---|---|---|
| Transfer Number | Date Received: | Deed Reference: | | Assigned Property No.: |

| Year | 20 | 20 | Geo. | Map | Sub | Block |
|---|---|---|---|---|---|---|
| Land | | | Zoning | Grid | Plat | Lot |
| Buildings | | | Use | Parcel | Section | Occ. Cd. |
| Total | | | Town Cd. | Ex. St. | Ex. Cd. | |

REMARKS:

Distribution:   White – Clerk's Office        Canary – SDAT            AOC-CC-300 (5/2007)
                Pink – Office of Finance     Goldenrod – Preparer

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) SJH 39937, p. 0576, MSA_CE64_40246. Date available 08/31/2017. Printed 03/20/2024.

Space Reserved for County Validation

Space Reserved for Court Clerk Recording Validation

Cover Sheet - English (1)

(20)-MD-PPA-v4.1-11.2020

CertificateOfCompletion_d0318db8-6766-4054-bdfd-f3e01c6a1c92



DocuSign Envelope ID: D0318DB8-6766-4054-BDFD-F3E01C6A1C92



# Together, we can power through anything.

Vivint Solar is joining the Sunrun team! Sunrun is the nation's leading home solar, battery, and energy services company, and now Vivint Solar is its wholly-owned subsidiary. Two companies are working even harder for your cleaner, more affordable energy future.

## Stronger together.

Combining the best practices of the two leading solar providers will help us do everything better. Better products. Faster process. Smarter service. What we did well separately, we do even better together.

Combined, we serve 495,000+ solar homes in 23 states plus D.C. and Puerto Rico.

## What does this mean for you?

**You get more!**

✓ More expertise.
✓ More support.
✓ More peace of mind.

**No interrupted service.**

✓ Same great care.
✓ Same great app.
✓ Same low bill.

For Sunrun and Vivint Solar licensing information, please see https://www.sunrun.com/state-contractor-license-information and https://www.vivintsolar.com/licenses.

vivint.Solar

# Residential Solar Power Purchase Agreement

**Customer Name & Contact Information:**

Name(s):  William Mayhew

Email:  marenmayhew@gmail.com

Primary Phone:  (301) 595-7920

Account No.:  S-6571653

**Installation Location:**

Address:  11409 Cedar Ln

Beltsville          MD          20705-2610

Approx. Installation Start and Completion Date:     8/1/2021

Date of Customer Signature:  February 2, 2021 | 9:28 AM MST

| $0 | $.135 | 20yr | 2.9% |
|---|---|---|---|
| Up-Front Cost | Energy Price ($/kWh) | Initial Term | Escalator - Per Year |

## Our Promises

- We will design, install, operate and maintain a solar energy system on your home (the "*System*").
- We warranty all of our work for 20 years, and that our roof penetrations will be watertight, for 10 years.
- We will fix or pay for any damage we may cause to your Property or belongings.
- We will not place a lien on your Property, but will record a notice of our ownership of the System.
- You will not be responsible for any personal property taxes assessed on the System.
- The Energy Price includes a $7.50 monthly discount for paying by automatic debit from your bank account.
- If you need to make Property repairs, we will remove and reinstall the System if you pay our estimated costs.

### At the End of Your Initial Term

- You can renew the Agreement for a subsequent term;
- You can purchase the System; or
- You can request that we remove the System at no additional cost.

### If You Move

- You can transfer the Agreement to the new homeowner, regardless of credit rating;
- You can prepay the Agreement;
- After the sixth anniversary, you can purchase the System; or
- You can relocate the System under certain circumstances.

## Your Commitment

- Pay us for all the power the System produces for 20 years.
- Keep your roof in good condition throughout the Initial Term.
- Respond to our sales and support teams when scheduling work and completing paperwork.
- Maintain a broadband internet connection.
- Continue service with your utility for any energy used beyond the System's production.

*You may cancel this Agreement any time prior to commencement of any work at or near your Property associated with installation of the System.*

Vivint Solar Developer, LLC (EIN: 80-0756438) is a licensed contractor in each state in which we operate, including Maryland. Our contractor license numbers are included as part of Exhibit B to this Agreement. For more information about our contractor licenses please visit www.vivintsolar.com/licenses.

WE MAY HAVE PRESCREENED YOUR CREDIT. PRESCREENING OF CREDIT DOES NOT IMPACT YOUR CREDIT SCORE.

YOU CAN CHOOSE TO STOP RECEIVING "PRESCREENED" OFFERS OF CREDIT FROM US AND OTHER COMPANIES BY CALLING TOLL-FREE 888.567.8688. SEE PRESCREEN & OPT-OUT NOTICE BELOW IN SECTION 25 OF THE GENERAL PROVISIONS FOR MORE INFORMATION ABOUT PRESCREENED OFFERS.

**The Notice of Cancellation may be sent to this address:**
**Vivint Solar Developer, LLC**
**1800 W Ashton Blvd., Lehi, UT 84043**
**ATTN: Processing Department**

help@vivintsolar.com | vivintsolar.com
Phone 877.404.4129 | Fax 801.765.5758

DocuSign Envelope ID: D0318DB8-6766-4054-BDFD-F3E01C6A1C92

# RESIDENTIAL SOLAR POWER PURCHASE AGREEMENT

This RESIDENTIAL SOLAR POWER PURCHASE AGREEMENT (this "**PPA**") which includes the General Provisions included further below (the "**General Provisions**"), along with the Customer Packet (as defined below), any Change Orders (as defined below), any amendments or addenda to the PPA, and any required disclosures including the state-specific disclosures appended here (all of which, together with the PPA, are known as this "**Agreement**") is entered into as of the last date on the Signature Page below (the "**Transaction Date**"), by and between VIVINT SOLAR DEVELOPER, LLC, a Delaware limited liability company ("**Vivint Solar**", "**Seller**", "**we**", "**us**", "**our**") and the undersigned CUSTOMER(s) ("**Customer**", "**you**", "**your**"). Vivint Solar and you are referred to herein as the "**Parties**", and each, a "**Party**."

1. **Description of the Project and of the Significant Materials to be Used and Equipment to be Installed.**

   (a) <u>Our Work</u>. We will survey your home at the address on the first page above (the "**Property**") and design a solar energy system (including solar panels, inverters, meters, and other components, the "**System**"). The System may include energy storage, consumption monitoring, and energy management equipment or devices, along with other items. All such ancillary products or services will be part of the definition of "System" for purposes of this Agreement unless designated otherwise. We will provide you a document reflecting the design, layout, and basic attributes of the System for you to review and approve (the "**Customer Packet**").

> We will design, install, maintain, repair, monitor, and insure the System.

After you sign this PPA and review and approve the Customer Packet, we will (i) obtain all necessary permits for the installation of the System; (ii) install the System using our qualified and licensed employees or subcontractors in material compliance with all local requirements, which installation shall be considered substantial commencement of work; (iii) after installation, work with your municipality to inspect the System; (iv) submit all necessary paperwork to your electricity provider (the "**Utility**") to receive permission to operate ("**PTO**"); and (v) after receipt of PTO, activate and turn on the System (the "**In-Service Date**"). If we use subcontractors to install the System, we will provide you with their names and license numbers. Subject to the delays of permitting authorities, weather, and other conditions outside our control, installation of the System generally takes one (1) day and is anticipated to start and be complete no later than the date set forth on the first page. We cannot promise or guarantee the date your Utility will provide PTO. YOU ARE NOT ALLOWED TO TURN ON THE SYSTEM UNTIL THE UTILITY HAS GIVEN ITS PERMISSION TO OPERATE. YOU ARE LIABLE FOR ANY COSTS OR DAMAGE RELATING TO YOUR PREMATURE ACTIVATION OF THE SYSTEM.

   (b) <u>Extra Work</u>. You and we must agree in writing to any modification or addition to the work covered by this Agreement ("**Extra Work**"). Extra Work related to the System will be governed by a written change order (each, a "**Change Order**"). *However*, failure to obtain written authorization shall not affect your obligation to pay for our costs associated with the Extra Work. Any Change Order shall (i) list the agreed price and any changes in terms, (ii) be signed by both you and us, and (iii) become part of this Agreement. For any Extra Work performed, you shall pay to us an amount to be determined before the Extra Work is performed, plus ten percent (10%) for our overhead expenses, plus any applicable taxes, unless the Change Order provides differently.

   (c) <u>Operations and Maintenance</u>. During the Initial Term (defined below), as long as no Customer Default (defined below) has occurred and is continuing, we will honor the limited warranty set forth in <u>Section 21</u> of the General Provisions, and will operate and maintain the System (i) at our sole cost and expense; (ii) in good condition; and (iii) in material compliance with all applicable laws and permits and the Utility's requirements.

DocuSign Envelope ID: D0318DB8-6766-4054-BDFD-F3E01C6A1C92

2. **Term and Renewal.**

(a) <u>End-of-Term Options</u>. This Agreement starts on the Transaction Date and will continue for twenty (20) years after the In-Service Date (the "**Initial Term**"). Prior to the end of the Initial Term, and provided there is no ongoing Customer Default, we will send to you notice and the applicable forms for three (3) options which you may exercise at the end of the Initial Term (the "**End-of-Term Options**"):

> Initial Term:
> **20 years**

> End of Term Options:
> 1. <u>Renew</u> the Agreement for a subsequent term;
> 2. <u>Purchase</u> the System; or
> 3. <u>Remove</u> the System at no additional cost.

(i)  <u>Renewal</u>. You may renew the Agreement for five (5) years at a price based on our determination of the fair market value of the System at that time as determined by an independent appraiser's valuation of similarly sized photovoltaic systems in your geographic region (the "**FMV**");

(ii)  <u>Purchase</u>. You may purchase the System at a price equal to the FMV at that time plus any outstanding balance and applicable taxes (the "**Purchase Option Price**"), after which this Agreement will automatically terminate; or

(iii)  <u>Removal</u>. You may request that we remove the System within ninety (90) days at no cost to you, after which this Agreement will automatically terminate.

---

**PLEASE REVIEW THE FOLLOWING AUTOMATIC RENEWAL PROVISION CAREFULLY**

(b) <u>Automatic Renewal</u>. If you do not elect any of the options set forth in Section 2(a) as of the due date of your final payment under this Agreement, this Agreement will automatically renew on a year-to-year basis with price based on the anticipated performance of the System in year twenty (derived from the warranted performance of the System described in Section 21(b) of the General Provisions) and a ten percent (10%) discount from the then-current average rate charged by your Utility (the "**Renewal Rate**"). You may cancel this automatic renewal provision prior to any subsequent renewal by contacting us at the number at the top of this Agreement.

---

**YOU MAY HAVE ADDITIONAL RIGHTS RELATING TO RENEWAL.** Please consult Exhibit B for more information.

(c) <u>Early Purchase Option</u>. In addition to your options at the end of the Initial Term, during a ninety (90) day period after the sixth (6th) anniversary of the In-Service Date (the "**Early Purchase Period**"), you have an option to purchase the system at an amount equal to the greater of the Purchase Option Price and an amount equal to the sum of the remaining monthly payments of the Energy Price (based on our reasonable estimation of the energy to be produced) due to us during the Initial Term, discounted by five percent (5%), plus applicable taxes (the "**Prepayment Price**"). If you purchase the System, we will transfer the System to you "**As Is, Where Is**" (without any warranties) and we will retain all right and title to the System Interests (as that term is defined below).

3. **Price and Payment.**

(a) <u>Sale of Electricity</u>. Starting on the In-Service Date, we will sell to you all electricity produced by the System, as measured in kilowatt-hours (the "**Energy**"), at the Energy Price (shown to the right →), plus applicable taxes. Each year of the Initial Term, on the anniversary of the In-Service Date, the Energy Price shall increase by two and nine-tenths percent (2.9%). You are responsible to pay the Energy Price for all Energy produced by the System as measured by the performance meter (the "**Meter**"), whether or not you actually consume the energy.

> List Price: .135  $/kWh
> .000000
> $ .135
>
> Energy Price ($/kWh):
> **Your Energy Price will increase 2.9% per year.**

Copyright © 2020 Vivint Solar Developer, LLC. All Rights Reserved.

An estimate of the System's annual Energy production will be provided to you in the Customer Packet; *but* we reserve the right to modify the size, production, or location of the System at the time of installation as required by applicable law or in our reasonable discretion.

You are required to maintain your Utility interconnection throughout the Initial Term as you will need to purchase electricity from the Utility in addition to the Energy produced by the System. We are not a utility or public service company. We are not subject to rate review or other regulations applicable to a public utility.

> You must continue service with your Utility.

WE DO NOT WARRANT OR GUARANTEE (1) THE AMOUNT OF ENERGY PRODUCED BY THE SYSTEM FOR ANY PERIOD, (2) ANY COST SAVINGS, (3) THE EXISTENCE OF OR PRICING ASSOCIATED WITH ANY NET METERING PROGRAM, OR UTILITY OR GOVERNMENT INCENTIVE PROGRAM, OR (4) THE AVAILABILITY OR YOUR ELIGIBILITY FOR ANY TAX OR OTHER STATE AND FEDERAL INCENTIVES, WHICH ARE ALSO SUBJECT TO CHANGE. ACTUAL UTILITY RATES AND NET METERING COMPENSATION MAY GO UP OR DOWN AND ACTUAL SAVINGS MAY VARY. FOR FURTHER INFORMATION REGARDING RATES, YOU MAY CONTACT YOUR UTILITY.

(b) <u>Payments</u>. Following the In-Service Date, for each month of the Initial Term, we will send you an invoice reflecting the charges for the Energy produced by the System. If the System does not report Energy during a month (for any reason, including your failure to maintain internet), then the invoice will reflect the charges for estimated Energy produced by the System (as we determine in our reasonable discretion) (the "**_Estimated Energy_**"). If we bill you for Estimated Energy and we later determine that we have either overestimated or underestimated the actual Energy production, then we will adjust the next invoice with a non-refundable credit (for over-billing) or an additional charge (for under-billing). You will not be charged for Estimated Energy if we know the System is not working due to our fault. All payments are due within ten (10) days of the invoice date. You agree to make payments under this agreement in the manner you have selected in <u>Section 1</u> of the General Provisions. You will pay the Energy Price in 240 monthly payments.

(c) <u>Ownership of the System and the System Interests</u>. This Agreement is for the sale of Energy, not the sale of the System or the System Interests. We own and hold all property rights in (i) the System; and (ii) any credits, rebates, incentives, allowances, tax benefits, or certificates that are attributed, allocated, or related to the System, the Energy, or environmental attributes thereof (collectively, the "**_System Interests_**"). Other than the Energy, and any rights to incentives, credits or rebates to which you may be entitled under state or federal law as a customer (please review Exhibit B for more details), you have no rights to the System or the System Interests, and you hereby disclaim and/or assign to us all right, title and interest in the System and the System Interests. If we request, you agree to execute all documents to allow us to be the exclusive owner of the System and the System Interests. You agree to keep the System and System Interests free from all liens, security interests, and encumbrances of any type. You agree to not take any action or allow any omission that could have the effect of impairing the value of the System or the System Interests. By entering into this Agreement, you will host a system that generates clean energy, but a third-party, and not you, will own the right to claim the clean energy attributes of the energy.

> We will not place a lien on your home, but we will file a notice of our ownership of the System.

You and we agree that the System is our sole personal property and is not a "fixture" or any part of the "real property" associated with your home, as those terms may be defined by applicable law. We will not place a lien on your Property; however, you authorize us to make filings and recordings with relevant governmental authorities as may be necessary to provide notice of our ownership of the System and our interest in the System Interests, including

Copyright © 2020 Vivint Solar Developer, LLC. All Rights Reserved.

(without limitation): notice filings, UCC-1 financing statements, and fixture filings.

You are not allowed to touch, handle, operate, alter, repair, or otherwise modify the System or any component thereof or take any action that could void or impair any warranty relating to the System.

## 4. Customer Obligations.

(a) <u>Your Representations and Warranties</u>. You represent, warrant, and agree that each of the following is true and correct, and will remain true and correct throughout the Initial Term:

(i)    all information you have provided to us is true, correct, and complete;

(ii)   you own the Property, including the roof, in fee simple (in other words, you have full and exclusive ownership rights to the Property), or if your Property has been placed into a trust, you are the trustee;

(iii)  your roof is in good condition and repair, without defects, sufficient to support the System;

(iv)   you are at least eighteen (18) years of age;

(v)    you have had the opportunity to review and discuss this Agreement with anyone you choose;

(vi)   if there is more than one person signing this Agreement, each of you is responsible for all of the obligations under this Agreement (jointly and severally);

(vii)  you are either a citizen of the United States or not exempt from paying United States federal income taxes;

(viii) you have customary property and liability insurance covering the Property;

(ix)   you will use the Energy primarily for personal, family, or household purposes, and not to heat a swimming pool;

(x)    you will ensure that the Property remains grid-connected at all times with the Utility;

(xi)   you have access to a functioning internet connection with one (1) wired Ethernet port and a standard electrical outlet available; and

(xii)  you have or will obtain all approvals necessary for us to install the System, including from your home owners association, your mortgage lender, or your insurer.

(b) <u>Your Property</u>. You are responsible to ensure that your Property (including all electrical systems and the roof) is maintained in good condition and repair and in compliance with all permits, codes, and ordinances. We are not responsible for any existing violations of applicable building regulations or ordinances on your Property. You agree that we are not responsible for any damage or loss to your Property, personal property, fixtures, or other belongings caused by: (i) snow falling from your roof;    (ii) animals or other pests under or near the System; (iii) other natural events or acts of god outside our reasonable control; or (iv) your Property not complying with applicable law. You are required to notify us of any easements, restrictions, or home owners association requirements.

> At all times, you must keep your roof and home in good condition.

You hereby grant to us the right to access and use your Property to survey your roof and your home's electrical systems, install the System, operate and maintain the System, to enforce our rights under the Agreement, and to take any other action reasonably necessary under this Agreement. The foregoing rights of access to your Property shall constitute a license coupled with an interest and will be irrevocable until ninety (90) days after this Agreement terminates.

(c) <u>Removing/Reinstalling Your System</u>. If you need to repair your roof or other parts of your Property, or you, any government authority, or the Utility requires any change to the System, we will remove, reinstall, and modify, as required, the applicable portions of the System if you give us at least 30 days' notice. You will be

required to pay a fee equal to our labor, equipment, and overhead costs to remove and reinstall the System (which pricing will be made available to you upon request), plus any applicable taxes. You will also be required to safely store the System after we remove it. If we are unable to reinstall the System within thirty (30) days after removal for any reason, then we will charge you for the Estimated Energy.

(d) <u>Sunlight</u>. You acknowledge and agree that the System's unobstructed access to sunlight is essential to us and is a material inducement to our entering into this Agreement. You agree to take all actions necessary to keep the System's access to sunlight the same as existed on the Transaction Date, including (without limitation): (i) you will not alter or allow your Property to be altered in any way that would obstruct sunlight, (ii) you will trim all trees and foliage; and (iii) you will not allow the emission of particulate matter, smoke, or other airborne impediments to obstruct the System's access to sunlight.

(e) <u>Other Obligations</u>. You shall promptly notify us if: (i) you notice any person or thing interfering with the operation of the System; (ii) your Property has any ordinance or permit violations or encumbrance that may prevent proper System permitting, installation, or operation; (iii) you take any emergency action with respect to the System; or (iv) you receive or otherwise acquire any System Interests, including any incentive payments. Your failure to promptly notify us of such matters shall be a Customer Default (as defined in Section 5(a)). In the event of an emergency affecting the System, you shall contact us immediately. If we are unable to timely respond, you may (at your own expense) contract with a licensed and qualified solar installer to remove the System as necessary to make repairs required by the emergency. You shall be responsible for any damage to the System that results from actions taken by you or your contractor.

(f) <u>Taxes</u>. You will pay all taxes assessed on or arising from installation or operation of the System, including without limitation any transaction-based taxes on the Energy produced by the System. You will not be responsible for any personal property taxes assessed on the System; *provided, however*, you are responsible for any real property taxes associated with your Property. It is your responsibility to verify that the System is not included as part of any real property tax assessment specific to your Property. Where applicable, you may be eligible for an exemption from any increase to real property taxes on your Property associated with installation of the System.

> You are not responsible for personal property taxes assessed on the System.

(g) <u>Sale of Your Property</u>. You agree to notify us thirty (30) days prior to any sale or transfer of your Property. You have the following three (3) options upon a transfer of your Property:

> **If You Move:**
> 1. **You can transfer the Agreement to the buyer of your home, regardless of the buyer's credit rating;**
> 2. **You can prepay the Agreement; or**
> 3. **After the sixth anniversary, you can purchase the System.**
> 4. **We may relocate the System to your new home under certain circumstances.**

(i)    <u>Assignment</u>: the homebuyer may assume your rights under this Agreement by signing a transfer agreement. You will remain liable under this Agreement until the transferee assumes in writing all of your obligations.

(ii)    <u>Prepayment</u>. You may prepay the Agreement by paying the Prepayment Price. After our receipt of an amount equal to the Prepayment Price, the buyer of your property may assume the obligations under the Agreement other than the payment obligations by signing a transfer agreement.

(iii)    <u>Transfer Purchase</u>: In connection with a transfer of your Property that occurs any time after six (6) years after the In-Service Date, you may purchase the System by paying to us the Purchase Option Price at that time.

Copyright © 2020 Vivint Solar Developer, LLC. All Rights Reserved.

(h) Relocation. We may remove the System and reinstall it on your new home; *provided* that each of the following requirements are satisfied, in our sole discretion:

>  (i)     Your new home must: (A) be in a location with sun exposure that is not less than your current Property; (B) be located within our service territory and the service territory of the Utility; (C) have a roof type capable of supporting the System; (D) include roof sections where the System may be installed which are the same or similar in shape and size as the roof sections on the Property.
>  (ii)    In order to evaluate the feasibility of relocating the System to your new home, you will be required to pay to us an amount equivalent to our costs associated with evaluating the new home ("*Evaluation Fee*").
>  (iii)   If we determine, in our sole discretion, that relocating the System is feasible, then before we remove the System, you will: (A) pay to us all fees, our estimated labor, equipment, and overhead costs associated with removal, relocating, and reinstalling the System, including an amount equal to any loss of value in or recapture of System Interests (the "*Relocation Fee*"); (B) execute an amendment to this Agreement that identifies the new home and adjusts the Energy Price, as applicable, to a rate consistent with the location of the new home; and (C) provide any third party consents or releases required by us in connection with the new home.

## 5. Defaults.

(a) Customer Default.  You will be in default under this Agreement upon the occurrence of any of the following (each, a "*Customer Default*"):

>  (i)     you fail to make any payment under this Agreement within ten (10) days of its due date and such failure is not cured within ten (10) days after we give you written notice of such failure;
>  (ii)    you fail to perform any obligation under this Agreement and such failure is not cured within thirty (30) days after we give you written notice of such failure;
>  (iii)   you deny us access to your Property or fail to cooperate with us to successfully install or maintain the System;
>  (iv)    your bankruptcy, insolvency, or admission of your inability to pay your debts as they mature; or
>  (v)     your Property becomes subject to a foreclosure proceeding or you fail to perform any obligation which is secured by your Property.

(b) Default Remedies. Upon a Customer Default, we may exercise any or all of the following remedies: (i) terminate this Agreement and demand you pay the Default Payment, as that term is defined in Section 10 of the General Provisions; (ii) leave the System in place on your Property, but deny you use of the Energy it produces, which may be redirected and sold at our election; (iii) disconnect or take back the System as permitted by applicable law; (iv) engage a collection agency to collect payments from you; (v) report your default to credit reporting agencies; (vi) suspend our performance under this Agreement; and/or (vii) exercise any other remedy available to us in this Agreement or under applicable law.  Our remedies set forth in this section are cumulative and not exclusive.

(c) Seller Default.  We will be in default under this Agreement if we fail to perform any material obligation under this Agreement and we have not made diligent efforts to cure such default within a reasonable time after you give us written notice of such failure ("*Seller Default*").

If a Seller Default occurs and is continuing, you may terminate this Agreement and request removal of the System from your Property.  To the fullest extent permitted under applicable law, you have no right to claim damages as

Copyright © 2020 Vivint Solar Developer, LLC.  All Rights Reserved.

DocuSign Envelope ID: D0318DB8-6766-4054-BDFD-F3E01C6A1C92

a result of the termination of this Agreement, except for the actual costs to remove the System (if we fail to remove the System), and any damages to your Property that we cause in connection removal of the System.

# RESIDENTIAL SOLAR POWER PURCHASE AGREEMENT – GENERAL PROVISIONS

These GENERAL PROVISIONS (the "***General Provisions***"), shall be interpreted with, and incorporated by reference in, the Residential Solar Power Purchase Agreement (the "***PPA***"). Capitalized terms in the General Provisions not otherwise defined shall have the meaning given them in the PPA.

The PPA, the General Provisions, along with the Customer Packet, any Change Orders, any required disclosures, and any amendments or addenda between you and any Vivint Solar entity shall be considered part of one transaction (the "***Agreement***").

1.  <u>Payment</u>. You shall make payments to us by (a) automatic payment deduction from your designated checking account or (b) automatic charge to your credit card. It is your responsibility to ensure that there are adequate funds in your account or that you have an adequate credit limit to make payment as agreed.

The Energy Price and all other payments in this Agreement will include a seven dollar and fifty cents ($7.50) monthly discount if you allow us to automatically debit your checking account. You will not receive such seven dollar and fifty cents ($7.50) monthly discount if you choose to pay by any means other than automatic debit from your checking account (*e.g.*, credit card). You may update your payment information any time by calling us or by visiting account.vivintsolar.com.

**If you are more than fifteen (15) days past due, you may be charged a late charge of fifteen dollars ($15).** If you continue to fail to make any payment within ten (10) days after we give you written notice, then you will be in Customer Default under the Agreement and we may exercise all remedies available to us under the Agreement.

2.  <u>Governing Law</u>. Except as set forth below in Section 5 of the General Provisions, this Agreement, and any instrument or agreement required hereunder, shall be governed by, and construed under, the internal laws of the state of Maryland.

3.  <u>Limitation of Liability</u>. NOTWITHSTANDING ANY BREACH OF THIS AGREEMENT, ANY FAILURE OF THE SYSTEM, OR ANY NEGLIGENT ACT THAT CAUSED ANY INJURY OR LOSS (WHETHER PROPERTY DAMAGE, PERSONAL INJURY, OR DEATH) TO ANYONE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, WE AND YOU AGREE THAT, UNLESS SUCH INJURY OR LOSS WAS CAUSED BY A PARTY'S GROSS NEGLIGENCE, FRAUD, WILLFUL INJURY, OR VIOLATIONS OF LAW, SUCH PARTY'S LIABILITY ARISING OUT OF OR RELATING TO (1) SYSTEM REPAIRS OR REPLACEMENT UNDER THIS AGREEMENT, SHALL IN NO EVENT EXCEED THE DEFAULT PAYMENT, AND (2) DAMAGE TO PERSONS AND PROPERTY, SHALL IN NO EVENT EXCEED $2,000,000. YOU AND WE AGREE THAT THIS AMOUNT IS A FAIR REPRESENTATION OF THE DAMAGES THAT YOU OR WE EXPECT TO INCUR IN THE CASE OF ANY INJURY OR LOSS HEREUNDER.

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NEITHER YOU NOR WE MAY BRING A CLAIM AGAINST THE OTHER PARTY OR SUCH PARTY'S AFFILIATES, OWNERS, DIRECTORS, EMPLOYEES, AGENTS, CONTRACTORS, OR SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "***RELATED PARTIES***") FOR ANY SPECIAL, EXEMPLARY, INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES (WHETHER OR NOT THE CLAIM THEREFOR IS BASED ON CONTRACT, TORT, DUTY IMPOSED BY LAW, OR OTHERWISE), IN CONNECTION WITH, ARISING OUT OF, OR IN ANY WAY RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY ACT OR OMISSION OR EVENT OCCURRING IN CONNECTION THEREWITH. YOU FURTHER AGREE THAT NO CLAIM, LAWSUIT, OR ANY OTHER LEGAL OR ARBITRATION PROCEEDING IN CONNECTION WITH, ARISING OUT OF, OR IN

DocuSign Envelope ID: D0318DB8-6766-4054-BDFD-F3E01C6A1C92

ANY WAY RELATED TO THIS AGREEMENT MAY BE BROUGHT MORE THAN ONE (1) YEAR AFTER THE INCIDENT GIVING RISE TO SUCH CLAIM, OR AS LIMITED BY APPLICABLE LAW.

4.    <u>Indemnification</u>.  To the fullest extent permitted by applicable law, you agree to indemnify, advance expenses, and hold harmless us and our Related Parties from any and all claims, actions, costs, expenses (including reasonable attorneys' fees and expenses), damages, liabilities, penalties, losses, obligations, injuries, demands, and liens of any kind or nature in connection with, arising out of, or in any way related to your breach of this Agreement, your negligence or willful misconduct, or your violation of law.  Your indemnification obligations under this section shall not apply if the harm or damage that is the basis for such claim occurred while one of our employees or agents was at your Property and such harm or damage was caused by the negligence or willful misconduct of such employee or agent.

5.    <u>Arbitration of Disputes and Class Waiver</u>. Unless prohibited by applicable law and unless you opt out, you and we agree that if any Dispute (as defined below) arises from or relates to this Agreement or the breach thereof, the Parties shall engage in alternative dispute resolution. The Parties shall first attempt to settle the Dispute by participating in good faith in mediation (as defined below) administered by the American Arbitration Association ("*AAA*") with a mediator selected from the AAA National Roster of Mediators. If within sixty (60) days after service of a written demand for mediation, the mediation does not result in settlement of the Dispute, then any unresolved Dispute arising from or relating to this Agreement or breach thereof shall be resolved by binding arbitration (as defined below). Such arbitration shall be administered by the AAA before a sole arbitrator in accordance with AAA's Consumer Arbitration Rules. Judgment on the award rendered by the sole arbitrator may be entered in any court having jurisdiction thereof. You also agree to bring claims against us only in your individual capacity and YOU ARE WAIVING THE RIGHT TO INITIATE OR PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING.

- **What is mediation**? Mediation is an informal negotiation assisted by a neutral third party (the mediator). Pursuant to the Parties' Agreement, mediation is a precondition to any arbitration.
- **What is arbitration?  <u>An alternative to a court case.</u>** In arbitration, a third-party arbitrator ("*TPA*") resolves "Disputes" in a hearing. It is less formal than a court case.
- **Is arbitration different from court and jury trials? <u>Yes</u>.** The hearing is private. There is no jury. It is usually less formal, faster, and less expensive than a lawsuit. Pre-hearing fact finding (called "discovery") is limited. Appeals are limited. The arbitrator's findings are binding, and courts rarely overturn arbitration awards.
- **Who does this cover?  <u>You, us, and certain Related Parties</u>** (defined above)**.**  Either you or we may, after the required mediation and without the other's consent, elect to resolve disputes by mandatory, binding arbitration.
- **What does this cover? <u>All Disputes (except certain Disputes about this clause)</u>.** This governs all disputes that would usually be decided in court and are between us (or any Related Party) and you, including without limitation all claims related to or arising out of this Agreement, the System or our relationship with you ("*Disputes*"). Disputes include claims related to amendments, Lease Disclosures, Change Orders, collections, privacy and Customer Information, claims related to the validity of this Agreement, AND THE ARBITRABILITY OF ANY DISPUTE(S).  In short, Disputes has the broadest reasonable meaning.
- **Who handles the mediation and arbitration? <u>American Arbitration Association ("AAA")</u>.**  The arbitration company will be the AAA, 1.800.778.7879, www.adr.org.
- **What are the rules of the arbitration? <u>Those in this clause along with the AAA Rules.</u>**  Arbitrations are conducted under this Clause and the applicable AAA Active Rules and Procedures in effect at the time the arbitration is commenced. This Agreement is also subject to the AAA Consumer Arbitration Rules pursuant

to the Consumer Due Process Protocol, which set forth certain protections to you (including a maximum filing fee). Any other arbitration rules that conflict with this Clause do not apply.

- **Where will the arbitration hearing be held?** <u>In your hometown area.</u> If the Parties do not agree to the locale where the hearing is to be held, the AAA will determine the location of the hearing. You can find more information in the AAA Policy on Consumer Arbitrations, which is available here - <u>https://www.adr.org/sites/default/files/Consumer_Rules_Web_0.pdf</u>.

- **Are you giving up any rights?** <u>Yes.</u> For Disputes subject to this clause, you give up your right to:
    - o have juries decide Disputes;
    - o have courts decide Disputes;
    - o serve as a private attorney general or in a representative capacity;
    - o join a Dispute you have with a dispute by other consumers;
    - o bring or be a class member in a class action or class arbitration; and
    - o have a jury trial.

- **Can you or another consumer start class arbitration?** <u>No. AAA is not allowed to handle any Dispute between the Parties on a class or representative basis.</u> All Disputes subject to this clause must be decided in an INDIVIDUAL arbitration. This clause will be void if a court rules that the TPA can decide a Dispute on a class basis and the court's ruling is not reversed on appeal.

- **What law applies?** <u>The Federal Arbitration Act ("FAA").</u> This Agreement involves interstate commerce. ***THUS,*** the FAA governs this clause. The TPA must apply substantive law consistent with the FAA. The TPA must honor statutes of limitation and privilege rights. Punitive damages are governed by the constitutional standards that apply in judicial proceedings.

- **Will anything you do make this clause ineffective?** <u>No.</u> This clause stays in force even if you: (1) cancel this Agreement; (2) default, renew, prepay, or pay the Agreement in full; or (3) go into or through bankruptcy.

- **Will this clause survive termination of this Agreement?** <u>Yes.</u> This clause will remain in effect for Disputes that commence even after the Agreement has terminated.

**BY INITIALING, YOU AGREE TO ARBITRATION AND WAIVE THE RIGHT TO A JURY TRIAL.**

6.    <u>Force Majeure</u>.  If either you or we are unable to perform any obligation under this Agreement because of a Force Majeure Event, such affected Party will be excused from performance affected by such Force Majeure Event. "***Force Majeure Event***" shall mean any event, condition, or circumstance beyond the control of the affected Party which, by the exercise of due foresight, such Party could not reasonably have been expected to avoid, and is unable to overcome, including, *but not limited to*, action or inaction by a governmental authority or Utility or failure to obtain or maintain a permit, license, consent, or approval (*provided* that such action has been timely requested and diligently pursued), labor dispute, flood, earthquake, volcano, fire, lightning, wind, war, act of god, unavailability of electricity from the Utility, equipment, supplies of products, power surge caused by someone other than the affected Party, or failure of equipment not under the control of the affected Party.  In no event shall a Force Majeure Event excuse you from any of your payment obligations under this Agreement.

7.    <u>Amendments and Waivers</u>.  This Agreement (including all exhibits and notices attached hereto) may only be amended or modified by an instrument in writing signed by both you and us.

8.    <u>Entire Agreement</u>.  This Agreement, including without limitation the Customer Packet, constitutes the entire agreement between you and us, and supersedes all prior oral and written communications relating hereto. If you sign a PPA after the Transaction Date relating to the same Property and System before that System has received PTO, the later-signed PPA shall supersede and replace the prior-signed PPA in its entirety.

9.    <u>Termination</u>. (a) *Your Termination Rights*. You may terminate the Agreement after your right to cancel under the Notice of Cancellation has expired if a Seller Default has occurred as set forth in <u>Section 5(c)</u> of the PPA by delivering written notice of termination to us. (b) *Our Termination Rights*. We may terminate this Agreement prior to commencement of installation work or if a Customer Default has occurred as set forth in <u>Section 5(a)</u> of the PPA by delivering written notice of termination to you. (c) *Consequences of Termination*. Unless we transfer the System to you, we will remove the System, if it has been installed, within ninety (90) days after any termination or cancellation of this Agreement. If we elect to terminate this Agreement, we will have no further liability to you.

10.    <u>Default Payments</u>. If this Agreement is terminated or cancelled for any reason, other than if this Agreement is cancelled pursuant to the Notice of Cancellation, terminated pursuant to <u>Section 9</u> of the General Provisions, or terminated due to a Seller Default or a Force Majeure Event, you agree to pay us an amount equal to the sum of the Estimated Energy for the rest of the Term, discounted by five percent (5%) per year, loss of expected benefits from the System and the System Interests, our reasonable attorney's fees, and our other costs and losses including costs of removal of the System, plus any applicable taxes (collectively, the "**Default Payment**"). After you pay us the Default Payment, we will transfer ownership of the System to you on an "As Is, Where Is" basis; *provided* that we will retain all rights to the System Interests. **YOU AGREE THAT THE DEFAULT PAYMENT FAIRLY REFLECTS THE VALUE OF THE SYSTEM AND IS A FAIR REPRESENTATION OF THE DAMAGES AND LOSSES THAT WE MAY INCUR AS A RESULT OF A CUSTOMER DEFAULT.**

11.    <u>Data concerning you, the System, and your Property</u>. We may collect and store: nonpublic personal information about you, the System, your energy usage, your credit report, and other related information; and may install, operate, and maintain an energy consumption monitoring device on your Property that we may use to collect and store information about energy usage at your Property (collectively, "**Data**"). You agree that we may use, store, and disclose the Data to our assignees, affiliates, actual or prospective lenders, financing parties, investors, insurers, and acquirers. You also agree to provide to us directly, or work with us and your Utility to authorize your Utility to provide to us, Data associated with your energy usage throughout the Initial Term.

We use certain physical and technical safeguards that are designed to improve the integrity and security of Data in our possession and control. We cannot, however, ensure or warrant the security of all Data or guarantee that Data may not be accessed or disclosed by breach of our physical or technical safeguards. So long as no Customer Default has occurred or is continuing under the Agreement, we will make certain Data available to you via the Vivint Solar Account Center, *available at:* https://account.vivintsolar.com.

You agree that we may share your name, contact information, Property location, and other information we have collected or obtained about you, including the Data ("**Customer Information**") with our affiliates (including Vivint Inc., Solar Rights Alliance, and their affiliates). You authorize us, our affiliates, and others that may act on our behalf to make calls and send SMS text messages to you for marketing and other business purposes. You may opt-out of receiving marketing communications by calling or emailing our customer service department at help@vivintsolar.com.

BY INITIALING, YOU AGREE THAT WE MAY SHARE CUSTOMER INFORMATION WITH OUR AFFILIATES, AND THAT OUR AFFILIATES MAY CONTACT YOU.

12.    <u>Our Transfer</u>. We may assign, sell, or transfer (in whole or in part) this Agreement without your consent and without notice. If an assignee agrees in writing to assume all of our rights and obligations under this Agreement, we will have no further liability or obligation to you upon the effective date of such assignment.

13.   <u>Binding Effect</u>. This Agreement shall be binding upon and benefit you and us and our and your respective Related Parties, legal representatives, successors, and permitted assigns. Except as expressly provided in this Agreement, you may not assign this Agreement (or any of your obligations or rights under it) without our prior written and signed consent. Any purported assignment by you without our prior written and signed consent shall be null and void.

14.   <u>Survival</u>. After termination or expiration of this Agreement, any provisions which by their nature are intended to survive such termination or cancellation shall survive.

15.   <u>Severability</u>. If any provision of this Agreement is held to be invalid, prohibited, voidable, or otherwise unenforceable by an arbitrator or court of competent jurisdiction, this Agreement shall be considered divisible and such provision shall be deemed inoperative to the extent it is deemed invalid, prohibited, voidable, or unenforceable, and in all other respects this Agreement shall remain in full force and effect; *provided, however,* that if any such provision may be made enforceable by limitation thereof, then such provision shall be deemed to be so limited and shall be enforceable to the maximum extent permitted by applicable law.

16.   <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, and all such counterparts shall be deemed to constitute one instrument. A facsimile or portable document format ("pdf") shall constitute an original for purposes hereof.

17.   <u>Publicity</u>. You agree and hereby authorize us to use you and your Property's voice, photograph, video, and likeness in print media, radio, television, e-mail, social media, web materials, and any audio or video recording. We will not disclose your personally identifying information (except as provided in <u>Section 11</u> of the General Provisions).

18.   <u>System Hazards</u>. The System may contain hazardous materials, which could pose dangers related, but not limited, to health hazards, fire hazards, high-voltage hazards, mechanical damage, severe personal injury and even death. Please consult the manufacturer's user's manual and warranty materials for handling and operation information, as well as guidance on proper disposal.

19.   <u>Autodialed Telephone Calls and Text Messages</u>. You consent to receive autodialed telephone calls and text messages from us, our affiliates, our contractors, or anyone else on our behalf at any telephone number that you have provided or later provide to us, including the telephone number set forth on the first page of this Agreement. These telephone calls and text messages may relate to any aspect of this Agreement or your relationship with us and may be sent using an automatic telephone dialing system and may contain a prerecorded or artificial voice message. Standard call and text message charges may apply from your wireless provider, and you agree that we will not be liable for any such fees. **If you would like to receive promotional calls and text messages from us, please review and initial the agreement below** – you do not have to agree to receive these promotional calls and text messages to do business with us. To the extent you have the right to revoke the above consent under applicable law, you may do so only by contacting us at help@vivintsolar.com.

> **BY INITIALING HERE, YOU ALSO AGREE THAT WE (AND OUR AFFILIATES, CONTRACTORS, OR ANYONE ELSE ON OUR BEHALF) MAY INITIATE MARKETING TELEPHONE CALLS AND TEXT MESSAGES TO YOU AT (301) 595-7920 . THESE CALLS OR MESSAGES MAY BE SENT WITH AN AUTOMATIC TELEPHONE DIALING SYSTEM AND MAY CONTAIN A PRERECORDED OR ARTIFICIAL VOICE MESSAGE.**

20.   <u>Credit Authorization</u>. In connection with the execution of this Agreement and at any time during the Term, you agree that we may (a) obtain your credit rating and consumer report from credit reporting agencies;

DocuSign Envelope ID: D0318DB8-6766-4054-BDFD-F3E01C6A1C92

(b) report your payment performance to credit reporting agencies; and (c) disclose this and other information to our assignees, affiliates, actual or prospective lenders, financing parties, investors, insurers, and acquirers.

21. <u>Warranties</u>.

    (a) *Our Limited Warranty*.  Unless provided otherwise in Exhibit B, we will warranty all of our work associated with installation of the System, as follows:

        (i)    unless the System is installed on a tar-and-gravel or built-up roof, then the System will be free from material defects that we cause in workmanship for twenty (20) years after installation is completed, and any rooftop penetrations we make in connection with installation will be watertight for ten (10) years after installation is completed;

        (ii)    if the System is installed on a tar-and-gravel or built-up roof, then the System will be free from material defects that we cause in workmanship for twenty (20) years after installation is completed, and the roof will be free from damage we cause that results in a roof leak for twelve (12) months after installation.

    To make a claim, please contact us at help@vivintsolar.com or 877.404.4129.  This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.

    (b) *Warranty Exclusions*.  The limited warranties set forth above in <u>Section 21(a)</u> of the General Provisions do not cover problems resulting from: (i) your acts or omissions, including your failure to abide by the terms of this Agreement; (ii) exposure to harmful materials and chemicals; (iii) any Force Majeure Event; (iv) vandalism, theft, or tampering with the System by anyone; (v) damage caused by hail or ball strikes; and (vi) any other cause beyond our reasonable control. Our warranty and maintenance obligations may be transferred to a third party.

    (c) *Manufacturer Warranties*.  We do not provide any warranty to You with respect to any component of the System. Any manufacturer's warranty is for Our benefit as owner of the System and is independent of the limited warranties described above in <u>Section 21(a)</u>. The System's solar modules carry a minimum manufacturer's warranty that: (i) during the first ten (10) years of use, the modules' electrical output will not degrade by more than ten percent (10%) from the originally rated output; and (ii) during the first twenty-five (25) years of use, the modules' electrical output will not degrade by more than twenty percent (20%) from the originally rated output. During the Term, we will enforce these warranties as owner of the System.

THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION OF THE FACE HEREOF.  EXCEPT AS SET FORTH IN THIS <u>SECTION 21</u>, AND TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, WE MAKE NO OTHER WARRANTY TO YOU OR ANY OTHER PERSON, WHETHER EXPRESS, IMPLIED, OR STATUTORY, AS TO THE MERCHANTABILITY OR FITNESS FOR ANY PURPOSE OF THE EQUIPMENT, INSTALLATION, DESIGN, OPERATION, OR MAINTENANCE OF THE SYSTEM; THE PRODUCTION OR DELIVERY OF ENERGY; OR ANY OTHER ASSOCIATED SERVICE OR MATTER HEREUNDER, ALL OF WHICH WE HEREBY EXPRESSLY DISCLAIM.  TO THE EXTENT THAT ANY IMPLIED WARRANTY MAY NOT BE DISCLAIMED UNDER APPLICABLE LAW, SUCH IMPLIED WARRANTY SHALL BE OF A DURATION NO GREATER THAN THAT OF THE LIMITED WARRANTY SET FORTH IN THIS <u>SECTION 21</u>.  SOME STATES DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU.   TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, OUR LIABILITY FOR

ANY BREACH OF ANY WARRANTY IS LIMITED TO REPAIRING THE SYSTEM OR YOUR PROPERTY TO THE EXTENT REQUIRED UNDER THIS AGREEMENT. YOU ACKNOWLEDGE THAT WE ARE RELYING ON THIS AS A CONDITION AND MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT.

**22.**  <u>Disconnection.</u> There may be circumstances where we are required to turn off or disconnect the System due to requirements of the Utility or government authority or conditions on your Property that may affect the safe operation of the System. Except in the case of a condition caused by our negligence, you agree to pay us for the Estimated Energy that would have been produced by the System during any period of shutdown or disconnection of the System.

**23.**  <u>Lenders' Rights.</u> In order to clarify your and our obligations in the event of a foreclosure of the Property, and to ensure compliance of this Agreement with Fannie Mae's Selling Guide Topic B2 3-04 (as published on July 3, 2019) (the "***Fannie Mae Requirements***"), notwithstanding anything to the contrary contained in this Agreement, you and we agree as follows: *(a) Home Value.* The System should not be included in the appraised value of the Property. *(b) Utility Power.* You are required to maintain access and connection to the Utility at all times throughout the Term. *(c) Debt-to-Income.* Because this Agreement is a power purchase agreement (not a lease or loan), your payment under this Agreement should be excluded from the debt-to-income (DTI) ratio in accordance with the Fannie Mae Requirements. Notwithstanding the foregoing, we provide this information to you for informational purposes only. We do not provide any representation or guarantee concerning the decisions that may be made by any financing party or property transferee in the future. *(d) Damage to the Property.* We will repair any damage to the Property or your belongings that we cause, except as limited elsewhere in this Agreement. Upon removal of the System, we will repair and restore all rooftop penetrations to be free from leaks. *(e) Customer's Property Insurance.* We agree not to be named loss payee or a named insured on your property insurance policy covering your Property. *(f) Foreclosure.* If the Property is transferred to another person or entity by reason of foreclosure, trustee's sale, deed in lieu of foreclosure, or other proceeding for the enforcement of a security instrument on the Property, the transferee (including its successors and assigns, the "***Foreclosure Transferee***") may elect one of the following options: (i) request that we remove the System within ninety (90) days, and, to the extent this Agreement runs with the land, terminate this Agreement; (ii) assume the obligations in writing under this Agreement and become the beneficiary hereunder, without payment of any transfer charge or similar fee; or (iii) enter into a new agreement with us on terms no less favorable than this Agreement. In addition to electing one of the foregoing options, the Foreclosure Transferee shall be required to provide written notice to us concerning the date of the foreclosure and documentation reasonably satisfactory to us that evidences the Foreclosure Transferee's ownership of the Property. *(g) Notice of System Ownership.* You consent to and agree that we will file a notice of ownership in the real property records where the Property is located pursuant to the terms of this Agreement. You and we agree that the notice is not nor should it be construed as a title impediment or an encumbrance on the Property. Other than our ownership rights in the System and the System Interests, and our right to access the Property to install, operate, and maintain the System during the Term, we have no property right, security interest, or lien in or on the Property.

**24.**  <u>Our Insurance:</u>

    **(a)**  *Commercial General Liability Insurance (CGL).* As of the Transaction Date, Vivint Solar Developer, LLC and our affiliates carry commercial general liability insurance written by Navigators Specialty Insurance Company (NAIC #: 36056, Policy No. LA20CGL230321IC) in the amount of $2,000,000 per occurrence. For more information, visit https://www.vivintsolar.com/solar-insurance.

    **(b)**  *Workers' Compensation Insurance.* As of the Transaction Date, Vivint Solar Developer, LLC and our affiliates carry workers' compensation insurance for all employees written by Liberty

Insurance Corporation (NAIC #: 42404, Policy No. WA764D445522020) in the amount of $1,000,000 per occurrence. For more information, visit https://www.vivintsolar.com/solar-insurance.

(c)  *Property Insurance.* As of the Transaction Date, Vivint Solar Developer, LLC and their affiliates carry property insurance for all Vivint Solar properties written by Lloyds of London Syndicates (Policy No. PW1900065) in the amount of $1,000,000 for occurrences during installation. For more information, visit https://www.vivintsolar.com/solar-insurance.

(d)  *Casualty Event.* If the System is damaged or destroyed by fire, storm, flood, earthquake, or other disaster or accident (each, a "*Casualty Event*") fully covered by our insurance, we will repair or replace the damaged portions of the System as we deem necessary. If the System is damaged or destroyed by a Casualty Event not fully covered by our insurance, we may, at our option: repair or replace the damaged portions of the System as we deem necessary, or terminate this Agreement and convey the System in its then-existing condition, "As Is, Where Is", to you for no additional consideration.

25.  PRESCREEN AND OPT-OUT NOTICE. THIS "PRESCREENED" OFFER OF CREDIT IS BASED ON INFORMATION IN YOUR CREDIT REPORT INDICATING THAT YOU MEET CERTAIN CRITERIA. THIS OFFER IS NOT GUARANTEED IF YOU DO NOT MEET OUR CRITERIA. IF YOU DO NOT WANT TO RECEIVE PRESCREENED OFFERS OF CREDIT FROM US AND OTHER COMPANIES, CALL THE CONSUMER REPORTING AGENCIES TOLL-FREE, 888.567.8688; OR WRITE: EXPERIAN OPT OUT, DMA MAIL PREFERENCE SERVICE, PO BOX 643, CARMEL, NY 10512; TRANSUNION OPT OUT REQUEST, P.O. BOX 505 WOODLYN, PA 19094; EQUIFAX INFORMATION SERVICES, LLC, P.O. BOX 740123 ATLANTA, GA 30374-0123, OR VISIT WWW.OPTOUTPRESCREEN.COM

26.  Electronic Records. You may be entitled by law to receive certain information "in writing". You agree that all information, documents, disclosures, notices, and agreements between you and us in electronic form (collectively, "*Electronic Records*") will be deemed to be "in writing." You further agree that we may use and obtain from you electronic signatures (such as by clicking, checking, or signing using a digital pen) in the processing of Electronic Records. We will provide the Electronic Records to you by emailing them to you at the most recent e-mail address that we have on file and/or by making Electronic Records available to you at account.vivintsolar.com.

You must notify us of any change in your e-mail address. If we send an Electronic Record to you, but you do not receive it because the most recent e-mail address that we have on file for you is incorrect, out of date, blocked by your service provider, filtered by your service provider as "spam" or "junk mail", or you are otherwise unable to receive the Electronic Record, we will be deemed to have provided the Electronic Record to you. You must have a computer with an Internet connection, a compatible web browser, Adobe Acrobat Reader version 8.0 and above, and a valid and accessible e-mail account.

You may request a paper copy of any Electronic Record, and we will send your paper copy to you via U.S. mail within ninety (90) days. You may opt-out of receiving Electronic Records by calling or emailing our customer service department at help@vivintsolar.com.

**BY INITIALING, YOU AGREE TO RECEIVE DISCLOSURES FROM US ELECTRONICALLY, OTHERWISE AGREE TO THE PROVISIONS OF THIS SECTION 26 AND ACKNOWLEDGE YOU HAVE REVIEWED THESE GENERAL PROVISIONS.**

**[SIGNATURE PAGE FOLLOWS]**

Copyright © 2020 Vivint Solar Developer, LLC. All Rights Reserved.

## SIGNATURE PAGE AND NOTICE TO CUSTOMERS

**A.** **LIST OF DOCUMENTS TO BE INCORPORATED INTO THE CONTRACT.** These documents are incorporated as part of this Agreement and apply to the relationship between you and us: (1) Residential Solar Power Purchase Agreement, (2) General Provisions, (3) Customer Packet; and (4) Change Orders, as applicable.

**B.** **WE HAVE NOT GUARANTEED, PROMISED OR OTHERWISE REPRESENTED ANY REDUCTION IN ELECTRICITY COSTS IN RELATION TO THE SYSTEM THAT WILL BE INSTALLED ON YOUR PROPERTY.**

**C.** IT IS NOT LEGAL FOR US TO ENTER YOUR PREMISES UNLAWFULLY OR COMMIT ANY BREACH OF THE PEACE TO REMOVE GOODS INSTALLED UNDER THIS AGREEMENT.

**D.** IF YOU DO NOT ELECT ANY OF THE END-OF-TERM OPTIONS SET FORTH IN SECTION 2 OF THE PPA, THIS AGREEMENT WILL AUTOMATICALLY RENEW ON A YEAR-TO-YEAR BASIS. CONSULT SECTION 2 OF THE PPA FOR MORE INFORMATION.

**E.** YOU RISK THE LOSS OF ANY PAYMENTS MADE TO A SALES REPRESENTATIVE.

**F.** DO NOT SIGN THIS AGREEMENT IF THIS AGREEMENT CONTAINS ANY BLANK SPACES. You are entitled to a completely filled in copy of this Agreement, signed by both you and us, before any work may be started.

**G.** YOU, THE CUSTOMER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE TRANSACTION DATE OR, IF LATER, UNTIL THE START OF ANY WORK AT OR NEAR YOUR PROPERTY ASSOCIATED WITH INSTALLATION OF THE SYSTEM. SEE THE ATTACHED NOTICE OF CANCELLATION FOR AN EXPLANATION OF THIS RIGHT.

**REPRESENTATIVE:**

Signature: *Peyton Smith* (DocuSigned by)

Printed Name: Peyton Smith

Salesperson No.: 340239

Date: February 2, 2021 | 9:25 AM MST

---

**FOR OFFICE USE ONLY**

THIS AGREEMENT IS NOT EFFECTIVE NOR BINDING UPON VIVINT SOLAR DEVELOPER, LLC UNTIL SIGNED BY AN AUTHORIZED REPRESENTATIVE.

VIVINT SOLAR DEVELOPER, LLC

Signature: _____

Printed Name: _____

Date: _____

Processing No.: _____

---

**CUSTOMER(S):**

Signature: *William Mayhew* (DocuSigned by)

Printed Name: William Mayhew

Date: February 2, 2021 | 9:28 AM MST

Signature: _____

Printed Name: _____

Date: _____

DocuSign Envelope ID: D0318DB8-6766-4054-BDFD-F3E01C6A1C92

## EXHIBIT A - NOTICE OF CANCELLATION

*(Customer Copy)*

**Transaction Date:** _____February 2, 2021 | 9:28 AM MST_____  **Service No.:** _____S-6571653_____

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN FIVE (5) BUSINESS DAYS OF THE ABOVE DATE OR, IF YOU ARE AT LEAST 65 YEARS OLD, WITHIN SEVEN (7) BUSINESS DAYS AFTER THE TRANSACTION DATE.

IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN (10) BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE, OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.

IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY (20) DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT.

TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM, TO VIVINT SOLAR DEVELOPER, LLC, AT 1800 W ASHTON BLVD, LEHI, UT 84043, ATTN: PROCESSING DEPARTMENT NOT LATER THAN MIDNIGHT OF     2/13/2021   OR (IF LATER) UNTIL THE START OF ANY WORK AT OR NEAR YOUR PROPERTY ASSOCIATED WITH INSTALLATION OF THE SYSTEM.

I HEREBY CANCEL THIS TRANSACTION.

**Date:** _____

**Customer's Signature:** _____

I, William Mayhew          Contract Co-Signer          , HAVE BEEN PROVIDED ORAL NOTICE THAT I HAVE THE RIGHT TO CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN 5 BUSINESS DAYS FROM THE DATE OF THE TRANSACTION SPECIFIED ON THE "NOTICE OF CANCELLATION," OR, IF I AM AT LEAST 65 YEARS OLD, WITHIN 7 BUSINESS DAYS FROM THE DATE OF THE TRANSACTION SPECIFIED ON THE "NOTICE OF CANCELLATION."

CHECK THIS BOX IF THE BUYER IS AT LEAST 65 YEARS OLD.

BY INITIALING, YOU ACKNOWLEDGE RECEIPT OF THIS NOTICE OF CANCELLATION AS OF THE TRANSACTION DATE.

Copyright © 2020 Vivint Solar Developer, LLC. All Rights Reserved.

DocuSign Envelope ID: D0318DB8-6766-4054-BDFD-F3E01C6A1C92

## NOTICE OF CANCELLATION

*(Vivint Solar Copy)*

| | | | |
|---|---|---|---|
| *Transaction Date:* | February 2, 2021 \| 9:28 AM MST | *Service No.:* | S-6571653 |

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN FIVE (5) BUSINESS DAYS OF THE ABOVE DATE OR, IF YOU ARE AT LEAST 65 YEARS OLD, WITHIN SEVEN (7) BUSINESS DAYS AFTER THE TRANSACTION DATE.

IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN (10) BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE, OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.

IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY (20) DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER THE CONTRACT.

TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM, TO VIVINT SOLAR DEVELOPER, LLC, AT 1800 W ASHTON BLVD, LEHI, UT 84043, ATTN: PROCESSING DEPARTMENT NOT LATER THAN MIDNIGHT OF    2/13/2021   OR (IF LATER) UNTIL THE START OF ANY WORK AT OR NEAR YOUR PROPERTY ASSOCIATED WITH INSTALLATION OF THE SYSTEM.

I HEREBY CANCEL THIS TRANSACTION.

*Date:* _____

*Customer's Signature:* _____

## EXHIBIT B - MARYLAND DISCLOSURES

1. <u>Contractors are Required to be Licensed</u>.  Each contractor and each subcontractor must be licensed by the Maryland Home Improvement Commission. Anyone may ask the Maryland Home Improvement Commission about a contractor or subcontractor.  For information about contractor licensing requirements, contact the Maryland Home Improvement Commission at http://www.dllr.state.md.us/license/mhic or 888.218.5925.  Vivint Solar Developer, LLC *(EIN: 80-0756438)* is a licensed contractor in Maryland, Contractor License Nos. HIC-109078 and ME.11692.  For information about our licenses please visit http://www.vivintsolar.com/licenses.

2. <u>Dispute Resolution:</u>

   A. <u>Disputes</u>.  (1) Formal mediation of disputes between homeowners and contractors is available through the Maryland Home Improvement Commission; (2) The Maryland Home Improvement Commission administers the Guaranty Fund, which may compensate homeowners for certain actual losses caused by acts or omissions of licensed contractors; (3) A homeowner may request that a contractor purchase a performance bond for additional protection against losses not covered by the Guaranty Fund; and (4) under Business Regulation Article, §8-405(c), Annotated Code of Maryland, a claim against the Home Improvement Guaranty Fund by an owner shall be stayed until completion of any mandatory arbitration proceeding.

   B. <u>Arbitration Fee Schedule (COMAR § 09.08.01.25(A)(2))</u>.  We are required to provide the fee schedule for any mandatory fees to be charged for an arbitration.  Arbitration costs vary widely depending on the amount in dispute, the parties involved, and other factors specific to each individual arbitration. The amounts listed in this section represent a good-faith effort by us to estimate the costs of an arbitration under this Agreement. Actual costs may be more or less than the amounts listed below. Estimated arbitration costs include: (i) filing and case management fees of $800 per day; (ii) the average cost of an arbitrator at $600 per day; and (iii) the average daily cost to rent a hearing room at $150 per day. The maximum amount of the arbitration costs that you will be required to pay if you initiate arbitration is a filing fee of $250. The costs listed above do not include any estimate of attorneys' fees. Other than the costs specifically listed in this section, all costs of arbitration and enforcement will be determined and allocated by the arbitrator.

   C. <u>Arbitration of Disputes and Class Waiver</u>. This contract includes an arbitration clause, detailed in <u>Section 5</u> of the General Provisions.

   x  BY CHECKING THIS BOX, YOU ACKNOWLEDGE RECEIPT OF THESE DISCLOSURES, AND YOU AND WE AGREE THAT ANY PARTY MAY ELECT TO ARBITRATE OR REQUIRE ARBITRATION OF ANY DISPUTE, AS MORE FULLY SET FORTH IN SECTION 5 OF THE GENERAL PROVISION, AND AGREE THIS CHECKBOX CONSTITUTES YOUR ELECTRONIC SIGNATURE. (Customer).

   x  BY CHECKING THIS BOX, YOU ACKNOWLEDGE RECEIPT OF THESE DISCLOSURES, AND YOU AND WE AGREE THAT ANY PARTY MAY ELECT TO ARBITRATE OR REQUIRE ARBITRATION OF ANY DISPUTE, AS MORE FULLY SET FORTH IN SECTION 5 OF THE GENERAL PROVISION, AND AGREE THIS CHECKBOX CONSTITUTES YOUR ELECTRONIC SIGNATURE. (Sales Representative).

   DATE: _____February 2, 2021 | 9:28 AM MST_____

Copyright © 2020 Vivint Solar Developer, LLC.  All Rights Reserved.

DocuSign
SECURED

## Certificate Of Completion

Envelope Id: D0318DB867664054BDFDF3E01C6A1C92                                  Status: Completed
Subject: Please DocuSign: Cover Sheet - English.pdf, (20)-MD-PPA-v4.1-11.2020.pdf
Workday Category ID:
Start Date:
End Date:
Type:
Category:
Contract Preference:
Kind:
Preferred Language:
Contract Version:
State:
Utility:
Opportunity ID:
Contact ID:
Source Envelope:
Document Pages: 20                          Signatures: 2                    Envelope Originator:
Certificate Pages: 5                        Initials: 3                      SRV-Docusign Salesforce
AutoNav: Enabled                                                             1800 Ashton Blvd
EnvelopeId Stamping: Enabled                                                 Lehi, UT  84043
Time Zone: (UTC-07:00) Mountain Time (US & Canada)                           srv-docusign.sf@vivintsolar.com
                                                                            IP Address: 13.110.74.8

## Record Tracking

Status: Original                            Holder: SRV-Docusign Salesforce        Location: DocuSign
        2/2/2021 9:24:35 AM                         srv-docusign.sf@vivintsolar.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Peyton Smith<br>peyton.smith@sunrun.com<br>Inside Sales<br>Vivint Solar<br>Security Level: Email, Account Authentication (None) | *Peyton Smith*<br>2E3206CA7DA34A4...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 204.145.98.8 | Sent: 2/2/2021 9:24:44 AM<br>Viewed: 2/2/2021 9:25:04 AM<br>Signed: 2/2/2021 9:25:17 AM |
| **Electronic Record and Signature Disclosure:**<br>  Not Offered via DocuSign | | |
| William Mayhew<br>marenmayhew@gmail.com<br>Security Level: Email, Account Authentication (None) | *William Mayhew*<br>F54CE842DE594EE...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 71.178.244.252 | Sent: 2/2/2021 9:25:19 AM<br>Viewed: 2/2/2021 9:26:50 AM<br>Signed: 2/2/2021 9:28:49 AM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 2/2/2021 9:26:50 AM<br>  ID: 6be17516-bd9f-4f25-a00e-693b39322db0 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Peyton Smith<br>peyton.smith@vivintsolar.com<br>Vivint Solar<br>Security Level: Email, Account Authentication<br>(None) | COPIED | Sent: 2/2/2021 9:28:51 AM |

**Electronic Record and Signature Disclosure:**
   Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/2/2021 9:24:44 AM |
| Certified Delivered | Security Checked | 2/2/2021 9:26:50 AM |
| Signing Complete | Security Checked | 2/2/2021 9:28:49 AM |
| Completed | Security Checked | 2/2/2021 9:28:51 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Vivint Solar (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Vivint Solar:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: nic.johnson@vivintsolar.com

**To advise Vivint Solar of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at nic.johnson@vivintsolar.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Vivint Solar**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to nic.johnson@vivintsolar.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Vivint Solar**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

      i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

      ii. send us an e-mail to nic.johnson@vivintsolar.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**
To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.
By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Vivint Solar as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Vivint Solar during the course of my relationship with you.

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) MEA 45896, p. 0238, MSA_CE64_46205. Date available 07/26/2021. Printed 03/20/2024.

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
855-478-6786

**B. E-MAIL CONTACT AT FILER (optional)**
customercare@sunrun.com

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

Sunrun, Inc.
P.O. Box 981440
El Paso, TX 79998-1440

PRINCE GEORGE'S COUNTY, MD
APPROVED BY: # WD
DATE: 7/8/21
RECORDATION TAX PAID
TRANSFER TAX PAID
$
$

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

Ref:
LR - Finance
Surcharge
Total:

Stmt_Land
Record of the indices Debtor 20.00
Land Surcharge 40.00
Surcharge: 60.00
100.00
2021A003-21
CC16-CT
#15200730 CC0703 -
County/CC01.03.02 -
Register 02

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **OR** 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| Mayhew | William | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 11409 CEDAR LN | BELTSVILLE | MD | 20705-2610 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **OR** 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| Mayhew | MAREN | | S | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 11409 CEDAR LN | BELTSVILLE | MD | 20705-2610 | USA |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **OR** Sunrun, Inc. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 595 Market Street, 29th Floor | San Francisco | CA | 94105 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:

This is a true lease and does not create a Security Interest.  Amount of taxable debt for recording tax purposes is $0.

Not Subject to Recordation Tax based on section 12-108(k)(v) to publicize a lease of goods or fixtures, provided that the security agreement states on its face that it does not create a security interest.

The collateral described below is located at: 11409 CEDAR LN, BELTSVILLE, MD, 20705-2610

ALL OF THE DEBTOR'S RIGHT, TITLE AND INTEREST IN PHOTOVOLTAIC SOLAR ENERGY EQUIPMENT (IF ANY), INCLUDING BUT NOT LIMITED TO ROOFTOP SOLAR PANELS, ELECTRICAL INVERTERS, CABLES AND WIRES, SUPPORT BRACKETS, RELATED EQUIPMENT, ADDITIONS OR REPLACEMENTS OF THE SAME, AND WARRANTIES ISSUED IN RESPECT OF ANY OF THE FOREGOING.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☒ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:
Acct # S-6571653

UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

*Exhibit 5*

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) MEA 45896, p. 0239, MSA_CE64_46205. Date available 07/26/2021. Printed 03/20/2024.

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
|---|
| |

OR

9b. INDIVIDUAL'S SURNAME
**Mayhew**

FIRST PERSONAL NAME
**William**

ADDITIONAL NAME(S)/INITIAL(S)      SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only <u>one</u> additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)      SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME <u>or</u> ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only <u>one</u> name (11a or 11b)

| 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut   ☐ covers as-extracted collateral   ☒ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in Item 16 (if Debtor does not have a record interest):

William  Mayhew and MAREN S Mayhew

**16. Description of real estate:**

**County of:** Prince Georges

**Address of
Real Estate:** 11409 CEDAR LN, BELTSVILLE, MD, 20705-2610

**Parcel
Number:** 010067140

**Property
Description:** Sec 01, Block 4, Lot 11, HOME ACRES

**17. MISCELLANEOUS:**

UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

BOOK 45894 PAGE 340

## State of Maryland Land Instrument Intake Sheet

☐ Baltimore City    ☒ County: _Prince George's_

*Information provided is for the use of the Clerk's Office, State Department of Assessments and Taxation, and County Finance Office Only.*
*(Type or Print in Black Ink Only—All Copies Must Be Legible)*

| 1 | Type(s) of Instruments | ( Check Box if addendum Intake Form is Attached.) |
|---|---|---|

| | Deed | | Mortgage | | X | Other UCC | | Other _____ |
|---|---|---|---|---|---|---|---|---|
| | Deed of Trust | | Lease | | | Financing | | |

| 2 | Conveyance Type Check Box | Improved Sale Arms-Length [1] | Unimproved Sale Arms-Length [2] | Multiple Accounts Arms-Length [3] | Not an Arms-Length Sale [9] |
|---|---|---|---|---|---|

| 3 | Tax Exemptions (if applicable) Cite or Explain Authority | Recordation | 12-108 K (v) to publicize a lease of goods or fixtures, provided that the |
|---|---|---|---|
| | | State Transfer | security agreement states on its face that it does not create a security |
| | | County Transfer | interest |

| 4 | | Consideration Amount | | Finance Office Use Only |
|---|---|---|---|---|
| | | | | Transfer and Recordation Tax Consideration |

| | Purchase Price/Consideration | $ | | Transfer Tax Consideration | $ |
|---|---|---|---|---|---|
| Consideration and Tax Calculations | Any New Mortgage | $ | | X ( )% = | $ |
| | Balance of Existing Mortgage | $ | | Less Exemption Amount – | $ |
| | Other: | $ | | Total Transfer Tax = | $ |
| | Other: | $ | | Recordation Tax Consideration | $ |
| | | | | X ( ) per $500 = | $ |
| | Full Cash Value: | $ | | TOTAL DUE | $ |

| 5 | | Amount of Fees | Doc. 1 | Doc. 2 | Agent: |
|---|---|---|---|---|---|
| | | Recording Charge | $ 60.00 | $ | |
| Fees | | Surcharge | $ | $ | Tax Bill: |
| | | State Recordation Tax | $ 0 | $ | |
| | | State Transfer Tax | $ | $ | C.B. Credit: |
| | | County Transfer Tax | $ | $ | |
| | | Other | $ | $ | Ag. Tax/Other: |
| | | Other | $ | $ | |

| 6 | Description of Property | District | Property Tax ID No. (1) | Grantor Liber/Folio | Map | Parcel No. | Var. LOG |
|---|---|---|---|---|---|---|---|
| | SDAT requires submission of all applicable information. | 01 | 0067140 | | | 010067140 | (5) |
| | A maximum of 40 characters will be | Subdivision Name | | Lot (3a) | Block (3b) | Sect/AR (3c) | Plat Ref. | SqFt/Acreage (4) |
| | indexed in accordance | HOME ACRES | | 11 | | 01 | | |
| | with the priority cited in Real Property Article | Location/Address of Property Being Conveyed (2) |
| | Section 3-104(g)(3)(i). | 11409 CEDAR LN, BELTSVILLE, Prince Georges, MD 20705-2610 |
| | | Other Property Identifiers (if applicable) | | Water Meter Account No. |
| | | Residential ☑ or Non-Residential ☐ | Fee Simple or Ground Rent Amount: |
| | | Partial Conveyance? Yes No Description/Amt. of SqFt/Acreage Transferred: |
| | | If Partial Conveyance, List Improvements Conveyed: |

| 7 | Transferred From | Doc. 1 – Grantor(s) Name(s) | Doc. 2 – Grantor(s) Name(s) |
|---|---|---|---|
| | | Mayhew, William | |
| | | Mayhew, Maren S | |
| | | Doc. 1 – Owner(s) of Record, if Different from Grantor(s) | Doc. 2 – Owner(s) of Record, if Different from Grantor(s) |

| 8 | Transferred To | Doc. 1 – Grantee(s) Name(s) | Doc. 2 – Grantee(s) Name(s) |
|---|---|---|---|
| | | Vivint Solar Developer, LLC | |
| | | New Owner's (Grantee) Mailing Address |

| 9 | Other Names to Be Indexed | Doc. 1 – Additional Names to be Indexed (Optional) | Doc. 2 – Additional Names to be Indexed (Optional) |
|---|---|---|---|

| 10 | Contact/Mail Information | Instrument Submitted By or Contact Person | ☒ Return to Contact Person |
|---|---|---|---|
| | | Name: Filings Department | |
| | | Firm Vivint Solar Developer, LLC | ☐ Hold for Pickup |
| | | Address: P.O. Box 4589, Portland, OR 97208 | |
| | | Phone: ( 877 )404-4129 option (7) | ☒ Return Address Provided |

| 11 | | IMPORTANT: *BOTH* THE ORIGINAL DEED *AND A* PHOTOCOPY MUST ACCOMPANY EACH TRANSFER |
|---|---|---|
| | Assessment Information | Yes No Will the property being conveyed be the grantee's principal residence? |
| | | Yes No Does transfer include personal property? If yes, identify: |
| | | Yes No Was property surveyed? If yes, attach copy of survey (if recorded, no copy required). |

**Assessment Use Only – Do Not Write Below This Line**

| Terminal Verification | Agricultural Verification | Whole | Part | Tran. Process Verification |
|---|---|---|---|---|
| Transfer Number | Date Received: | Deed Reference: | | Assigned Property No.: |

| Year | 20 | | 20 | Geo. | Map | Sub | Block |
|---|---|---|---|---|---|---|---|
| Land | | | | Zoning | Grid | Plat | Lot |
| Buildings | | | | Use | Parcel | Section | Occ. Cd. |
| Total | | | | Town Cd. | Ex. St. | Ex. Cd. | |

REMARKS:

Distribution:    White – Clerk's Office      Canary – SDAT      AOC-CC-300 (5/2007)
                 Pink – Office of Finance     Goldenrod – Preparer

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) MEA 45896, p. 0240, MSA_CE64_46205. Date available 07/26/2021. Printed 03/20/2024.



3740 Lumar Dr   •   Fort Washington, MD 20744-1860   •   Phone: 3014470918
MHIC #05-150480

December 27th, 2023

Maren Mayhew & William Mayhew
Job Address:
11409 Cedar Ln
Beltsville, MD 20705

<u>Roof Damage Assesment Report</u>

To Whom It May Concern,

I, Walter Vasquez, a licensed contractor, conducted a thorough examination of the roof at 11409 Cedar Ln, Beltsville, MD 20705 in response to reports of water leaks and resultant damage within the home. The primary goal of this initial assessment was to identify the source of the leak originating from the roof and evaluate the extent of roof damages.

During this assessment, the focus shifted to broken shingles, and the findings strongly suggest that these damages are directly linked to the installation of solar panels. Notably, the broken shingles were concentrated exclusively around the area of the solar panel installation, leading me to believe that the shingles were compromised during the installation process. The improper mounting on flat roof members, combined with inadequate care during installation, has resulted in these specific damages.

Enclosed with this report are detailed photographs capturing the broken shingles in proximity to the solar panel installation, providing visual documentation to substantiate these findings.

In light of the identified damages, I recommend considering a comprehensive solution, which may involve a roof replacement. Given the extent of the damage caused by the improper installation of solar panels and the compromised integrity of the roof, a replacement would provide a more durable and long-term resolution. This approach ensures not only the repair of existing issues but also the prevention of future damage.

I am available to discuss the recommended course of action further and provide assistance in coordinating necessary steps for the roof replacement. Addressing these concerns promptly will contribute to the long-term stability and protection of the property.

Sincerely,

Walter Vasquez
sales@wv-remodel.com
(301) 447-0918

# WV Construction Remodeling LLC

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

Insured:   Maren S Mayhew
Property:   11409 Cedar Ln
Beltsville, MD 20705-2610

**Claim Number: 20-59W6-28F**        **Policy Number: 20BXC0897**        **Type of Loss:**

Date of Loss:   12/1/2023 12:00 AM

Date Entered:   12/6/2023 1:36 PM

Price List:   MDRO8X_DEC23
Restoration/Service/Remodel
Estimate:   MARENSMAYHEW-BB

**\*\*\*\*IMPORTANT PLEASE READ\*\*\*\***

WV Construction Remodeling LLC is submitting this estimate as a general contractor to the insured for the realization of all the necessary repairs to the property. This estimate could not be considered final and may vary due to hidden damages. Our pictures do not illustrate all the damages on the property.

The scope of damages noted herein is based on visual inspection; any and all hidden damages will be addressed in the future upon discovery. Any errors or omissions will be corrected as soon as we are made aware of them. Any errors or omissions do not constitute any misrepresentation on the part of the estimator, representative of the insured, it is only an error that will be corrected as soon as possible. Nothing herein constitutes, nor should it be constituted as a waiver of the rights of the policyholder under their insurance policy.

We are a true general contractor and we have been tasked with performing all tasks in this project, associated with several trades. If this project requires the use of subcontractors for all of its tasks listed we will coordinate all of these subcontractors and their tasks, over the course of many weeks (planning and assessing included). It requires several trips made by many personnel. We finance the costs of this project, order materials (including special order), pick up materials, deliver materials, etc.

This project involves many trades and requires extensive coordination, including, but not limited to: roofing, gutters, fencing, drywall, insulation, painting, mechanical, etc.

The level of complexity and/or coordination required of a general contractor to carry out this project definitely met and exceeded any threshold necessary to obtain Overhead and Profit (O&P). It has been assessed to this estimate accordingly. The unit prices published by Xactware should include the general contractor's cost to either perform the work in-house employees or to hire a subcontractor.

WV Construction Remodeling LLC uses the price list databases found in XACTIMATE for the calculation of the property loss to guarantee the correct pricing in the estimate, avoiding any violation.



**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

**MARENSMAYHEW-BB**

**Dwelling Roof**

**Shingle Roof**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 1. Remove Laminated - comp. shingle rfg. - w/ felt | 4.70 SQ | 71.53 | 0.00 | 0.00 | 67.24 | 403.43 |
| 2. Laminated - comp. shingle rfg. - w/out felt | 5.22 SQ | 0.00 | 344.60 | 45.07 | 368.78 | 2,212.66 |
| *11% waste included* | | | | | | |
| 3. Remove 3 tab - 25 yr. - composition shingle roofing - incl. felt | 1.65 SQ | 69.25 | 0.00 | 0.00 | 22.86 | 137.12 |
| 4. 3 tab - 25 yr. - comp. shingle roofing - w/out felt | 1.83 SQ | 0.00 | 324.30 | 14.01 | 121.50 | 728.98 |
| *11% waste included* | | | | | | |
| 5. Roofing felt - 15 lb. | 6.35 SQ | 0.00 | 50.30 | 3.10 | 64.50 | 387.01 |

*Allowance for pitch of 4/12 up to 8/12*

**IRC Chapter 9, Section R905.1.1 Underlayment -** *Underlayment for asphalt shingles, clay and concrete tile, metal roof shingles, mineral-surfaced roll roofing, slate and slate-type shingles, wood shingles, wood shakes, metal roof panels and photovoltaic shingles shall conform to the applicable standards listed in this chapter.*

*Underlayment materials required to comply with ASTM D226,D1970, D4869 and D6757 shall bear a label indicating compliance to the standard designation and, if applicable, type classification indicated in Table R905.1.1(1). Underlayment shall be applied in accordance with Table R905.1.1(2). Underlayment shall be attached in accordance with Table R905.1.1(3)*

*For roof slopes from two units vertical in 12 units horizontal (2:12), up to four units vertical in 12 units horizontal (4:12), underlayment shall be two layers applied in the following manner: apply a 19-inch strip of underlayment felt parallel to and starting at the eaves. Starting at the eave, apply 36-inch-wide sheets of underlayment, overlapping successive sheets 19 inches.*

*Distortions in the underlayment shall not interfere with the ability of the shingles to seal. For roof slopes of four units vertical in 12 units horizontal (4:12) or greater, underlayment shall be one layer applied in the following manner: underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches, distortions in the underlayment shall not interfere with the ability of the shingles to seal. End laps shall be 4 inches and shall be offset by 6 feet.*

| | | | | | | |
|---|---|---|---|---|---|---|
| 6. Ice & water barrier | 313.53 SF | 0.00 | 2.36 | 8.84 | 149.74 | 898.51 |

**IRC Chapter 9, Section R905.1.2 Ice Barriers.** *In areas where there has been a history of ice forming along the eaves causing a backup of water as designated in Table R301.2(1), an ice barrier shall be installed for asphalt shingles, metal roof shingles, mineral-surfaced roll roofing, slate and slate-type shingles, wood shingles and wood shakes.*

*The ice barrier shall consist of not fewer than two layers of underlayment cemented together, or a self-adhering polymer-modified bitumen sheet shall be used in place of normal underlayment and extend from the lowest edges of all roof surfaces to a point not less than 24 inches (610 mm) inside the exterior wall line of the building. On roofs with slope equal to or greater than 8 units vertical in 12 units horizontal, the ice barrier shall also be applied not less than 36 inches (914 mm) measured along the roof slope from the eave edge of the building.*

*EAVE ONLY = 313.53 SF*
*Total IWS 313.53 SF*
*Eave 313.53 SF*
*Support: Using the predominant soffit depth of 18 inches, wall thickness of 8 inches, and a 3/12 roof pitch, the ice barrier must extend onto the roof's surface at least 52 inches from the lowest edges of all roof surfaces to a point not less than 24 inches inside the exterior wall line of the building.*
*Eave Calc: Round to the nearest square foot of IWS on the eave using an eave length of 73 LF * 52 inches = 313.53 SF*

| | | | | | | |
|---|---|---|---|---|---|---|
| 7. Asphalt starter - universal starter course | 73.00 LF | 0.00 | 2.92 | 2.67 | 43.18 | 259.01 |

**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

## CONTINUED - Shingle Roof

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 8. Apply roofing sealant/cement - per LF | 73.00 LF | 0.00 | 0.97 | 1.18 | 14.40 | 86.39 |

*As of September 2021, sealant is no longer included in Xactimate's assumption for starter and must be accounted for separately.*

| | | | | | | |
|---|---|---|---|---|---|---|
| 9. R&R Drip edge | 113.00 LF | 0.42 | 3.81 | 7.86 | 97.18 | 583.03 |

*IRC Chapter 9, Section R905.2.8.5 Drip Edge - A drip edge shall be provided at eaves and rake edges of shingle roofs. Adjacent segments of drip edge shall be overlapped not less than 2 inches (51 mm). Drip edges shall extend not less than 1/4 inch (6.4 mm) below the roof sheathing and extend up back onto the roof deck not less than 2 inches (51 mm). Drip edges shall be mechanically fastened to the roof deck at not more than 12 inches (305 mm) o.c. with fasteners as specified in Section R905.2.5. Underlayment shall be installed over the drip edge along the eaves and under the drip edge along rake edges.*

| | | | | | | |
|---|---|---|---|---|---|---|
| 10. R&R Flashing - L flashing - galvanized | 46.00 LF | 0.75 | 6.45 | 6.10 | 67.46 | 404.76 |

*IRC Chapter 9, Section R903.2.1 Locations - Flashings shall be installed at wall and roof intersections, wherever there is a change in roof slope or direction and around roof openings. A flashing shall be installed to divert the water away from where the eave of a sloped roof intersects a vertical sidewall. Where flashing is of metal, the metal shall be corrosion resistant with a thickness of not less than 0.019 inch (0.5 mm) (No. 26 galvanized sheet).*

| | | | | | | |
|---|---|---|---|---|---|---|
| 11. Step flashing | 32.00 LF | 0.00 | 15.38 | 3.78 | 99.20 | 595.14 |

*IRC Chapter 9, Section R903.2.1 Locations - Flashings shall be installed at wall and roof intersections, wherever there is a change in roof slope or direction and around roof openings. A flashing shall be installed to divert the water away from where the eave of a sloped roof intersects a vertical sidewall. Where flashing is of metal, the metal shall be corrosion resistant with a thickness of not less than 0.019 inch (0.5 mm) (No. 26 galvanized sheet).*

| | | | | | | |
|---|---|---|---|---|---|---|
| 12. Flashing - pipe jack - lead | 4.00 EA | 0.00 | 99.59 | 11.18 | 81.92 | 491.46 |
| 13. Exhaust cap - through roof - up to 4" | 1.00 EA | 0.00 | 123.80 | 2.34 | 25.22 | 151.36 |
| 14. R&R Chimney flashing - average (32" x 36") | 1.00 EA | 23.64 | 617.60 | 6.00 | 129.44 | 776.68 |

*IRC Chapter 9, Section R903.2.1 Locations - Flashings shall be installed at wall and roof intersections, wherever there is a change in roof slope or direction and around roof openings. A flashing shall be installed to divert the water away from where the eave of a sloped roof intersects a vertical sidewall. Where flashing is of metal, the metal shall be corrosion resistant with a thickness of not less than 0.019 inch (0.5 mm) (No. 26 galvanized sheet).*

| | | | | | | |
|---|---|---|---|---|---|---|
| 15. Solar electric panel - Detach & reset | 14.00 EA | 0.00 | 336.71 | 0.00 | 942.78 | 5,656.72 |
| 16. Solar panel- mounting hardware- Detach & reset (per panel) | 14.00 EA | 0.00 | 32.04 | 0.00 | 89.72 | 538.28 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Totals: Shingle Roof | | | | 112.13 | 2,385.12 | 14,310.54 |

### Flat Roof

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 17. Tear off, haul and dispose of modified bitumen roofing | 11.44 SQ | 64.15 | 0.00 | 0.00 | 146.78 | 880.66 |
| 18. Modified bitumen roof - self-adhering | 12.01 SQ | 0.00 | 491.42 | 166.70 | 1,213.74 | 7,282.39 |

*5% waste included*

**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

### CONTINUED - Flat Roof

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 19. R&R Sheathing - OSB - 1/2" | 160.00 SF | 0.70 | 3.18 | 7.97 | 125.76 | 754.53 |
| 20. Water barrier joint taping - Mod. bitumen - 4" seam tape | 1,144.00 SF | 0.00 | 0.42 | 4.80 | 97.06 | 582.34 |
| 21. R&R Drip edge | 130.00 LF | 0.42 | 3.81 | 9.05 | 111.80 | 670.75 |

*IRC Chapter 9, Section R905.2.8.5 Drip Edge – A drip edge shall be provided at eaves and rake edges of shingle roofs. Adjacent segments of drip edge shall be overlapped not less than 2 inches (51 mm). Drip edges shall extend not less than 1/4 inch (6.4 mm) below the roof sheathing and extend up back onto the roof deck not less than 2 inches (51 mm). Drip edges shall be mechanically fastened to the roof deck at not more than 12 inches (305 mm) o.c. with fasteners as specified in Section R905.2.5. Underlayment shall be installed over the drip edge along the eaves and under the drip edge along rake edges.*

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 22. Elastomeric roof primer | 1,144.00 SF | 0.00 | 0.77 | 31.57 | 182.50 | 1,094.95 |
| Totals: Flat Roof | | | | 220.09 | 1,877.64 | 11,265.62 |
| Total: Dwelling Roof | | | | 332.22 | 4,262.76 | 25,576.16 |

### Main Level

**Hallway**                                                      Height: 8'

| | |
|---|---|
| 351.78 SF Walls | 99.33 SF Ceiling |
| 451.11 SF Walls & Ceiling | 99.33 SF Floor |
| 11.04 SY Flooring | 40.17 LF Floor Perimeter |
| 63.00 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| **Door** | 2' 6" X 6' 8" | **Opens into Exterior** |
| **Missing Wall - Goes to Floor** | 3' 7" X 6' 8" | **Opens into CLOSET** |
| **Door** | 1' 11" X 6' 8" | **Opens into Exterior** |
| **Door** | 2' 1" X 6' 8" | **Opens into Exterior** |
| **Door** | 2' 6" X 6' 8" | **Opens into Exterior** |
| **Door** | 2' 6" X 6' 8" | **Opens into Exterior** |
| **Door** | 2' 6" X 6' 8" | **Opens into CLOSET1** |
| **Missing Wall - Goes to Floor** | 5' 3" X 6' 8" | **Opens into Exterior** |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| **GENERAL** | | | | | | |
| 23. Mask and prep for paint - plastic, paper, tape (per LF) | 11.17 LF | 0.00 | 1.94 | 0.18 | 4.38 | 26.23 |
| 24. Floor protection - heavy paper and tape | 33.50 SF | 0.00 | 0.62 | 0.14 | 4.18 | 25.09 |
| 25. Final cleaning - construction - Residential | 99.33 SF | 0.00 | 0.35 | 0.00 | 6.96 | 41.73 |

*Allowance for post-construction cleanup*

**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

## CONTINUED - Hallway

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| **CEILING** | | | | | | |
| 26. R&R 5/8" drywall - hung, taped, ready for texture | 32.00 SF | 0.53 | 2.80 | 1.56 | 21.64 | 129.76 |
| 27. R&R Blown-in insulation - 20" depth - R50 | 32.00 SF | 1.72 | 2.57 | 3.92 | 28.22 | 169.42 |
| 28. Texture drywall - smooth / skim coat | 32.00 SF | 0.00 | 1.76 | 0.31 | 11.32 | 67.95 |

*When the drywall is replaced on the ceiling, the edges of the repair will have to be taped and bedded. This will leave a raised area around the entire repair. Due to the uneven surface of the existing texture, this will require floating the entire ceiling with a "Skim Coat" in order to provide a smooth flat surface over which to apply the new texture.*

| 29. Tape joint for new to existing drywall - per LF | 24.00 LF | 0.00 | 10.59 | 0.63 | 50.96 | 305.75 |

*Includes: Additional joint compound (mud), joint tape, and installation labor that would be required when drywall is being replaced against existing drywall (i.e. against a non-factory edge).*

*Note: This item is intended to be used for situations where drywall is being replaced and the new drywall being replaced will be joined with existing drywall. This item is calculated per lineal foot of joint area where the new drywall meets the existing drywall (e.g. same plane on a wall or ceiling, wall to wall intersection, ceiling to wall intersection)*

| 30. Seal the surface area w/latex based stain blocker - one coat | 32.00 SF | 0.00 | 0.88 | 0.17 | 5.68 | 34.01 |

*Allowance for prepping new textured drywall*

| 31. Paint the ceiling - two coats | 99.33 SF | 0.00 | 1.36 | 1.67 | 27.36 | 164.12 |
| **WALLS** | | | | | | |
| 32. Paint the surface area - two coats | 198.67 SF | 0.00 | 1.36 | 3.34 | 54.70 | 328.23 |
| **ELECTRICAL** | | | | | | |
| 33. Recessed light fixture - Detach & reset entire unit | 1.00 EA | 0.00 | 176.62 | 0.00 | 35.32 | 211.94 |
| 34. Light fixture - Detach & reset | 1.00 EA | 0.00 | 84.23 | 0.00 | 16.84 | 101.07 |
| Totals: Hallway | | | | 11.92 | 267.56 | 1,605.30 |

## WV Construction Remodeling LLC

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

**Living Room**                                                                                     **Height: 8'**

| | |
|---|---|
| 557.33 SF Walls | 349.07 SF Ceiling |
| 906.40 SF Walls & Ceiling | 340.41 SF Floor |
| 37.82 SY Flooring | 77.58 LF Floor Perimeter |
| 81.17 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| Window | 5' X 4' | **Opens into Exterior** |
| Window | 3' X 4' | **Opens into Exterior** |
| Window | 3' X 4' | **Opens into Exterior** |
| Window | 3' X 4' | **Opens into Exterior** |
| Window | 3' X 4' | **Opens into Exterior** |
| Window | 3' X 4' | **Opens into Exterior** |
| Window | 3' X 4' | **Opens into Exterior** |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| **GENERAL** | | | | | | |
| 35. Content Manipulation charge - per hour | 1.00 HR | 0.00 | 66.87 | 0.00 | 13.38 | 80.25 |
| 36. Mask and prep for paint - plastic, paper, tape (per LF) | 81.17 LF | 0.00 | 1.94 | 1.32 | 31.76 | 190.55 |
| 37. Floor protection - heavy paper and tape | 340.41 SF | 0.00 | 0.62 | 1.43 | 42.50 | 254.98 |
| 38. Final cleaning - construction - Residential | 340.41 SF | 0.00 | 0.35 | 0.00 | 23.82 | 142.96 |

*Allowance for post-construction cleanup*

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| **CEILING** | | | | | | |
| 39. R&R 5/8" drywall - hung, taped, ready for texture | 128.00 SF | 0.53 | 2.80 | 6.22 | 86.48 | 518.94 |
| 40. R&R Blown-in insulation - 20" depth - R50 | 128.00 SF | 1.72 | 2.57 | 15.67 | 112.98 | 677.77 |
| 41. Texture drywall - smooth / skim coat | 128.00 SF | 0.00 | 1.76 | 1.23 | 45.30 | 271.81 |

*When the drywall is replaced on the ceiling, the edges of the repair will have to be taped and bedded. This will leave a raised area around the entire repair. Due to the uneven surface of the existing texture, this will require floating the entire ceiling with a "Skim Coat" in order to provide a smooth flat surface over which to apply the new texture.*

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 42. Tape joint for new to existing drywall - per LF | 48.00 LF | 0.00 | 10.59 | 1.27 | 101.92 | 611.51 |

*Includes: Additional joint compound (mud), joint tape, and installation labor that would be required when drywall is being replaced against existing drywall (i.e. against a non-factory edge).*

*Note: This item is intended to be used for situations where drywall is being replaced and the new drywall being replaced will be joined with existing drywall. This item is calculated per lineal foot of joint area where the new drywall meets the existing drywall (e.g. same plane on a wall or ceiling, wall to wall intersection, ceiling to wall intersection)*

**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

### CONTINUED - Living Room

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 43. Seal the surface area w/latex based stain blocker - one coat | 128.00 SF | 0.00 | 0.88 | 0.69 | 22.66 | 135.99 |
| *Allowance for prepping new textured drywall* | | | | | | |
| 44. Paint the ceiling - two coats | 349.07 SF | 0.00 | 1.36 | 5.86 | 96.12 | 576.72 |
| **WALLS** | | | | | | |
| 45. R&R 1/2" drywall - hung, taped, ready for texture | 12.50 SF | 0.53 | 2.64 | 0.54 | 8.02 | 48.19 |
| 46. R&R Batt insulation - 6" - R20 - unfaced batt | 12.50 SF | 0.37 | 1.36 | 0.68 | 4.46 | 26.77 |
| 47. Tape joint for new to existing drywall - per LF | 5.00 LF | 0.00 | 10.59 | 0.13 | 10.62 | 63.70 |
| *Includes: Additional joint compound (mud), joint tape, and installation labor that would be required when drywall is being replaced against existing drywall (i.e. against a non-factory edge).* | | | | | | |
| *Note: This item is intended to be used for situations where drywall is being replaced and the new drywall being replaced will be joined with existing drywall. This item is calculated per lineal foot of joint area where the new drywall meets the existing drywall (e.g. same plane on a wall or ceiling, wall to wall intersection, ceiling to wall intersection)* | | | | | | |
| 48. Texture drywall - machine - knockdown | 12.50 SF | 0.00 | 1.12 | 0.05 | 2.82 | 16.87 |
| *Allowance to blend new texture* | | | | | | |
| 49. Seal the surface area w/latex based stain blocker - one coat | 12.50 SF | 0.00 | 0.88 | 0.07 | 2.22 | 13.29 |
| *Allowance for prepping new textured drywall* | | | | | | |
| 50. Paint the walls - two coats | 557.33 SF | 0.00 | 1.36 | 9.36 | 153.48 | 920.81 |
| **WINDOWS** | | | | | | |
| 51. Paint door/window trim & jamb - 1 coat (per side) | 1.00 EA | 0.00 | 30.32 | 0.25 | 6.12 | 36.69 |
| 52. Window blind - horizontal or vertical - Detach & reset | 2.00 EA | 0.00 | 41.36 | 0.00 | 16.54 | 99.26 |
| Totals: Living Room | | | | 44.77 | 781.20 | 4,687.06 |



## WV Construction Remodeling LLC

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

**Bedroom**        **Height: 8'**

| | | |
|---|---|---|
| 232.67 SF Walls | 93.02 SF Ceiling |
| 325.69 SF Walls & Ceiling | 93.02 SF Floor |
| 10.34 SY Flooring | 34.33 LF Floor Perimeter |
| 39.33 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| Window | 6' 1" X 4' | Opens into Exterior |
| Window | 6' 1" X 4' | Opens into Exterior |
| Door | 2' 6" X 6' 8" | Opens into Exterior |
| Door | 2' 6" X 6' 8" | Opens into CLOSET2 |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| **GENERAL** | | | | | | |
| 53. Content Manipulation charge - per hour | 1.00 HR | 0.00 | 66.87 | 0.00 | 13.38 | 80.25 |
| 54. Mask and prep for paint - plastic, paper, tape (per LF) | 39.33 LF | 0.00 | 1.94 | 0.64 | 15.38 | 92.32 |
| 55. Floor protection - heavy paper and tape | 93.02 SF | 0.00 | 0.62 | 0.39 | 11.62 | 69.68 |
| 56. Final cleaning - construction - Residential | 93.02 SF | 0.00 | 0.35 | 0.00 | 6.52 | 39.08 |
| *Allowance for post-construction cleanup* | | | | | | |
| **CEILING** | | | | | | |
| 57. R&R 5/8" drywall - hung, taped, ready for texture | 64.00 SF | 0.53 | 2.80 | 3.11 | 43.24 | 259.47 |
| 58. R&R Blown-in insulation - 20" depth - R50 | 64.00 SF | 1.72 | 2.57 | 7.83 | 56.48 | 338.87 |
| 59. Texture drywall - smooth / skim coat | 64.00 SF | 0.00 | 1.76 | 0.61 | 22.64 | 135.89 |

*When the drywall is replaced on the ceiling, the edges of the repair will have to be taped and bedded. This will leave a raised area around the entire repair. Due to the uneven surface of the existing texture, this will require floating the entire ceiling with a "Skim Coat" in order to provide a smooth flat surface over which to apply the new texture.*

| | | | | | | |
|---|---|---|---|---|---|---|
| 60. Tape joint for new to existing drywall - per LF | 40.00 LF | 0.00 | 10.59 | 1.06 | 84.94 | 509.60 |

*Includes: Additional joint compound (mud), joint tape, and installation labor that would be required when drywall is being replaced against existing drywall (i.e. against a non-factory edge).*

*Note: This item is intended to be used for situations where drywall is being replaced and the new drywall being replaced will be joined with existing drywall. This item is calculated per lineal foot of joint area where the new drywall meets the existing drywall (e.g. same plane on a wall or ceiling, wall to wall intersection, ceiling to wall intersection)*

| | | | | | | |
|---|---|---|---|---|---|---|
| 61. Seal the surface area w/latex based stain blocker - one coat | 64.00 SF | 0.00 | 0.88 | 0.35 | 11.34 | 68.01 |
| *Allowance for prepping new textured drywall* | | | | | | |
| 62. Paint the ceiling - two coats | 93.02 SF | 0.00 | 1.36 | 1.56 | 25.62 | 153.69 |

**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

**CONTINUED - Bedroom**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| **WALLS** | | | | | | |
| 63. Paint the walls - two coats | 232.67 SF | 0.00 | 1.36 | 3.91 | 64.06 | 384.40 |
| **WINDOWS** | | | | | | |
| 64. Paint door/window trim & jamb - 1 coat (per side) | 2.00 EA | 0.00 | 30.32 | 0.50 | 12.22 | 73.36 |
| 65. Window blind - horizontal or vertical - Detach & reset | 2.00 EA | 0.00 | 41.36 | 0.00 | 16.54 | 99.26 |
| Totals: Bedroom | | | | 19.96 | 383.98 | 2,303.88 |



**Closet**                          **Height: 8'**

| | |
|---|---|
| 79.33 SF Walls | 7.83 SF Ceiling |
| 87.16 SF Walls & Ceiling | 7.83 SF Floor |
| 0.87 SY Flooring | 9.50 LF Floor Perimeter |
| 12.00 LF Ceil. Perimeter | |

**Door**          2' 6" X 6' 8"          **Opens into BEDROOM**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| **GENERAL** | | | | | | |
| 66. Content Manipulation charge - per hour | 1.00 HR | 0.00 | 66.87 | 0.00 | 13.38 | 80.25 |
| 67. Mask and prep for paint - plastic, paper, tape (per LF) | 12.00 LF | 0.00 | 1.94 | 0.19 | 4.70 | 28.17 |
| 68. Final cleaning - construction - Residential | 7.83 SF | 0.00 | 0.35 | 0.00 | 0.54 | 3.28 |
| *Allowance for post-construction cleanup* | | | | | | |
| **CEILING** | | | | | | |
| 69. R&R 5/8" drywall - hung, taped, ready for texture | 7.83 SF | 0.53 | 2.80 | 0.38 | 5.30 | 31.75 |
| 70. Texture drywall - smooth / skim coat | 7.83 SF | 0.00 | 1.76 | 0.08 | 2.78 | 16.64 |
| *When the drywall is replaced on the ceiling, the edges of the repair will have to be taped and bedded. This will leave a raised area around the entire repair. Due to the uneven surface of the existing texture, this will require floating the entire ceiling with a "Skim Coat" in order to provide a smooth flat surface over which to apply the new texture.* | | | | | | |
| 71. Seal the ceiling w/latex based stain blocker - one coat | 7.83 SF | 0.00 | 0.88 | 0.04 | 1.38 | 8.31 |
| 72. Paint the ceiling - two coats | 7.83 SF | 0.00 | 1.36 | 0.13 | 2.16 | 12.94 |
| **WALLS** | | | | | | |
| 73. Paint the walls - two coats | 79.33 SF | 0.00 | 1.36 | 1.33 | 21.84 | 131.06 |



**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

### CONTINUED - Closet

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| **CABINETRY** | | | | | | |
| 74.  Closet shelf and rod package - Detach & reset | 12.00 LF | 0.00 | 13.15 | 0.00 | 31.56 | 189.36 |
| 75.  Seal & paint closet shelving - single shelf | 1.00 EA | 0.00 | 75.08 | 0.31 | 15.08 | 90.47 |
| Totals: Closet | | | | 2.46 | 98.72 | 592.23 |
| Total: Main Level | | | | **79.11** | **1,531.46** | **9,188.47** |

### General Conditions

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| **GENERAL CONDITIONS** | | | | | | |
| 76.  Taxes, insurance, permits & fees (Bid Item) | 1.00 EA | | | | | OPEN |
| 77.  Residential Supervision / Project Management - per hour | 23.12 HR | 0.00 | 76.32 | 0.00 | 352.90 | 2,117.42 |

*Xactware/Xactimate specifically states that general overhead expenses are those "that cannot be attributed to individual projects and include any and all expenses necessary for the general contractor to operate their business. However, "Job related overhead are expenses that can be attributed to a project, but cannot be attributed to a specific task and include any and all necessary expenses to complete the project other than direct materials and labor."*

*Xactware/Xactimate provides examples of such job related overhead items to include project managers or foreman and states such expenses should be added as a separate line item to estimate.*

**Xactimate components tab estimate total working hours of 184.96/8 hours per day = 23.12 days.**
   *23.12/crew size of 2 men = 5 days x 8 hours per day = 92.48 crew hours.*

   *A project such as this requires a MINIMUM calc of .25 for supervision the make sure the job is done properly and efficiently.*

**GENERAL DEBRIS REMOVAL**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 78.  Haul debris - per pickup truck load - including dump fees | 1.00 EA | 177.48 | 0.00 | 0.00 | 35.50 | 212.98 |
| *Allowance for non-roofing debris* | | | | | | |
| Totals: General Conditions | | | | 0.00 | 388.40 | 2,330.40 |
| **Line Item Totals: MARENSMAYHEW-BB** | | | | **411.33** | **6,182.62** | **37,095.03** |



**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

## Grand Total Areas:

| | | | | | |
|---|---|---|---|---|---|
| 1,459.22 | SF Walls | 581.50 | SF Ceiling | 2,040.72 | SF Walls and Ceiling |
| 572.84 | SF Floor | 63.65 | SY Flooring | 190.33 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 230.33 | LF Ceil. Perimeter |
| | | | | | |
| 572.84 | Floor Area | 651.78 | Total Area | 1,459.22 | Interior Wall Area |
| 1,435.00 | Exterior Wall Area | 189.33 | Exterior Perimeter of Walls | | |
| | | | | | |
| 0.00 | Surface Area | 0.00 | Number of Squares | 0.00 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 | Total Hip Length | | |



**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

## Summary for Dwelling

| | |
|---|---:|
| Line Item Total | 30,501.08 |
| Material Sales Tax | 411.33 |
| Subtotal | 30,912.41 |
| Overhead | 3,091.31 |
| Profit | 3,091.31 |
| **Replacement Cost Value** | **$37,095.03** |
| **Net Claim** | **$37,095.03** |



**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

## Recap of Taxes, Overhead and Profit

|  | Overhead (10%) | Profit (10%) | Material Sales Tax (6%) | Manuf. Home Tax (6%) | Storage Tax (6%) |
|---|---|---|---|---|---|
| **Line Items** | 3,091.31 | 3,091.31 | 411.33 | 0.00 | 0.00 |
| **Total** | **3,091.31** | **3,091.31** | **411.33** | **0.00** | **0.00** |

 **WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

## Recap by Room

**Estimate: MARENSMAYHEW-BB**

**Area: Dwelling Roof**

| | | |
|---|---|---|
| Shingle Roof | 11,813.29 | 38.73% |
| Flat Roof | 9,167.89 | 30.06% |
| Area Subtotal: Dwelling Roof | 20,981.18 | 68.79% |

**Area: Main Level**

| | | |
|---|---|---|
| Hallway | 1,325.82 | 4.35% |
| Living Room | 3,861.09 | 12.66% |
| Bedroom | 1,899.94 | 6.23% |
| Closet | 491.05 | 1.61% |
| Area Subtotal: Main Level | 7,577.90 | 24.84% |
| General Conditions | 1,942.00 | 6.37% |

| | | |
|---|---|---|
| Subtotal of Areas | 30,501.08 | 100.00% |

| | | |
|---|---|---|
| **Total** | **30,501.08** | **100.00%** |



**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

## Recap by Category

| O&P Items | Total | % |
|---|---|---|
| CLEANING | 189.21 | 0.51% |
| CONTENT MANIPULATION | 200.61 | 0.54% |
| GENERAL DEMOLITION | 2,153.42 | 5.81% |
| DRYWALL | 2,343.17 | 6.32% |
| ELECTRICAL - SPECIAL SYSTEMS | 5,162.50 | 13.92% |
| FINISH CARPENTRY / TRIMWORK | 157.80 | 0.43% |
| INSULATION | 592.68 | 1.60% |
| LABOR ONLY | 1,764.52 | 4.76% |
| LIGHT FIXTURES | 260.85 | 0.70% |
| PAINTING | 3,148.73 | 8.49% |
| ROOFING | 14,362.15 | 38.72% |
| WINDOW TREATMENT | 165.44 | 0.45% |
| O&P Items Subtotal | 30,501.08 | 82.22% |
| Material Sales Tax | 411.33 | 1.11% |
| Overhead | 3,091.31 | 8.33% |
| Profit | 3,091.31 | 8.33% |
| **Total** | **37,095.03** | **100.00%** |

****IMPORTANT PLEASE READ****
Thank you for your interest in our company, we are committed to service you.

This estimate could not be considered final and may vary due to hidden damages. Our pictures do not illustrate all the damages on the property.

The scope of damages noted herein is based on visual inspection; any and all hidden damages will be addressed in the future upon discovery. Any errors or omissions will be corrected as soon as we are made aware of them.

Any errors or omissions do not constitute any misrepresentation on the part of the estimator, representative of the insured, it is only an error that will be corrected as soon as possible. Nothing herein constitutes, nor should it be constituted as a waiver of the rights of the policyholder under their insurance policy.



# Roofr Report

**Prepared by Roofr**

1777 sqft

5 facets

11409 Cedar Lane, Beltsville, Maryland, United States

Predominant Pitch 1/12



This report was prepared by Roofr. Copyright © 2023 Roofr.com | All rights reserved.

1

Prepared by roofr

# Diagram

11409 Cedar Lane, Beltsville, Maryland, United States



Prepared by roofr

# Length Measurement Report

11409 Cedar Lane, Beltsville, Maryland, United States

- Eaves: 148ft 4in
- Ridges: 27ft 0in
- Step Flashing: 35ft 10in
- Unspecified: 0ft 0in
- Valleys: 0ft 0in
- Rakes: 113ft 5in
- Transitions: 0ft 0in
- Hips: 0ft 0in
- Wall Flashing: 52ft 10in
- Parapet Wall: 0ft 0in





Note: The above diagram contains measurements that have been rounded up. 6 and 9 are written •6 and •9 to avoid confusion. Some edge length totals have been hidden from the diagram to avoid overcrowding. Flashings are depicted as dotted lines.

This report was prepared by Roofr. Copyright © 2023 Roofr.com | All rights reserved.

Prepared by roofr

# Area Measurement Report

11409 Cedar Lane, Beltsville, Maryland, United States

**Total Roof Area: 1777 sqft**
**Pitched Roof Area: 634 sqft**
**Flat Roof Area: 1143 sqft**
Two Story Area: 0 sqft
Two Layer Area: 0 sqft

**Predominant Pitch: 1/12**
**Predominant Pitch Area: 1143 sqft**
**Unspecified Pitch Area: 0 sqft**



Note: The above diagram contains measurements rounded to the nearest whole number. The total at the top of the page is the sum of all the unrounded (exact) measurements, which is then rounded. Flashings are depicted as dotted lines. Deleted facets, which are not labeled with area, (Skylights, Chimneys, AC units) are omitted from area sums.
This report was prepared by Roofr. Copyright © 2023 Roofr.com | All rights reserved.

Prepared by roofr

# Pitch & Direction Measurement Report

11409 Cedar Lane, Beltsville, Maryland, United States

1 →

← 1

← 3

5 →

1 →

Note: Flashings are depicted as dotted lines. Deleted facets do not have a pitch and therefore are not labeled.



# All Structures Summary

11409 Cedar Lane, Beltsville, Maryland, United States



## Measurements

| | |
|---|---|
| Total Roof Area | 1777 sqft |
| Total Pitched Area | 634 sqft |
| Total Flat Area | 1143 sqft |
| Total Roof Facets | 5 facets |
| Predominant Pitch | 1/12 |
| Total Eaves | 148ft 4in |
| Total Valleys | 0ft 0in |
| Total Hips | 0ft 0in |
| Total Ridges | 27ft 0in |
| Total Rakes | 113ft 5in |
| Total Wall Flashing | 52ft 10in |
| Total Step Flashing | 35ft 10in |
| Total Transitions | 0ft 0in |
| Total Parapet Wall | 0ft 0in |
| Total Unspecified | 0ft 0in |
| Hips + Ridges | 27ft 0in |
| Eaves + Rakes | 261ft 9in |

| Pitch | 1/12 | 3/12 | 5/12 |
|---|---|---|---|
| Area (sqft) | 1,144 | 470 | 165 |
| Squares | 11.5 | 4.7 | 1.7 |

### Recommended

| Waste % | 0% | 10% | 11% | 12% | 15% | 17% | 20% |
|---|---|---|---|---|---|---|---|
| Area (sqft) | 1,778 | 1,955 | 1,973 | 1,991 | 2,044 | 2,080 | 2,133 |
| Squares | 17.8 | 19.6 | 19.8 | 20.0 | 20.5 | 20.8 | 21.4 |

This waste recommendation is based on a shingle roof with a closed valley system. Several other factors are involved in determining waste, including how complex the roof is and your roof application style. You must also calculate the quantity of other materials needed, such as capping and starter.

This report was prepared by Roofr. Copyright © 2023 Roofr.com | All rights reserved.




Prepared by roofr

# Material Estimate

**11409 Cedar Lane, Beltsville, Maryland, United States**

| Product | Unit | Waste (0%) | Waste (10%) | Waste (11%) | Waste (15%) |
|---|---|---|---|---|---|
| Shingle (total sqft) | | 635 sqft | 698 sqft | 704 sqft | 730 sqft |
| IKO - Cambridge | bundle | 20 | 21 | 22 | 22 |
| CertainTeed - Landmark | bundle | 20 | 22 | 22 | 23 |
| GAF - Timberline | bundle | 20 | 22 | 22 | 23 |
| Owens Corning - Duration | bundle | 20 | 22 | 22 | 23 |
| Atlas - Pristine | bundle | 20 | 22 | 22 | 23 |
| Starter (eaves + rakes) | | 262 ft | 288 ft | 291 ft | 302 ft |
| IKO - Leading Edge Plus | bundle | 3 | 3 | 3 | 3 |
| CertainTeed - SwiftStart | bundle | 3 | 3 | 3 | 3 |
| GAF - Pro-Start | bundle | 3 | 3 | 3 | 3 |
| Owens Corning - Starter Strip | bundle | 3 | 3 | 3 | 3 |
| Atlas - Pro-Cut | bundle | 2 | 3 | 3 | 3 |
| Ice and Water (eaves + valleys + flashings) | | 237 ft | 261 ft | 264 ft | 273 ft |
| IKO - StormShield | roll | 4 | 5 | 5 | 5 |
| CertainTeed - WinterGuard | roll | 4 | 5 | 5 | 5 |
| GAF - WeatherWatch | roll | 4 | 4 | 4 | 5 |
| Owens Corning - WeatherLock | roll | 4 | 4 | 4 | 4 |
| Atlas - Weathermaster | roll | 4 | 5 | 5 | 5 |
| Synthetic (total sqft; no laps) | | 635 sqft | 698 sqft | 704 sqft | 730 sqft |
| IKO - Stormtite | roll | 1 | 1 | 1 | 1 |
| CertainTeed - RoofRunner | roll | 1 | 1 | 1 | 1 |
| GAF - Deck-Armor | roll | 1 | 1 | 1 | 1 |
| Owens Corning - RhinoRoof | roll | 1 | 1 | 1 | 1 |
| Atlas - Summit | roll | 1 | 1 | 1 | 1 |
| Capping (hips + ridges) | | 28 ft | 30 ft | 31 ft | 32 ft |
| IKO - Hip and Ridge | bundle | 1 | 1 | 1 | 1 |
| CertainTeed - Shadow Ridge | bundle | 1 | 1 | 2 | 2 |
| GAF - Seal-A-Ridge | bundle | 2 | 2 | 2 | 2 |
| Owens Corning - DecoRidge | bundle | 2 | 2 | 2 | 2 |
| Atlas - Pro-Cut H&R | bundle | 1 | 1 | 1 | 2 |
| Other | | | | | |
| 8' Valley (no laps) | sheet | 0 | 0 | 0 | 0 |
| 10' Drip Edge (eaves + rakes; no laps) | sheet | 27 | 29 | 30 | 31 |

These calculations are approximations and are not guaranteed. Always double check material orders quantities before using these calculations. The calculations are based off the the totals from the report of pitched facets only and the final numbers are rounded to the hundredths of the unit.
This report was prepared by Roofr. Copyright © 2023 Roofr.com | All rights reserved.



# OneClick Code

## BUILDING CODE REPORT
### RESIDENTIAL | STEEP SLOPE

| | |
|---|---|
| REPORT #: | 564550 |
| DATE CREATED: | 12/06/2023 |
| CLAIM #: | N/A |
| PROJECT DATE: | 12/06/2023 |
| DATA VERIFIED AS OF: | 10/11/2023 |

**PROPERTY ADDRESS**

### 11409 Cedar Ln
### Beltsville, MD 20705



 ELEVATION **192** FT

---

**AUTHORITY HAVING JURISDICTION**

### PRINCE GEORGE'S COUNTY

**SALES TAX**

## 6%

301.559.8844 📞

WWW.PRINCEGEORGESCOUNTYMD.GOV 🌐 

athomaslester@co.pg.md.us 💬 

| | | | |
|---|---|---|---|
| CODE ENFORCED | YES | INSTALL PER ROOFING MANUFACTURER SPECIFICATIONS | YES |

**CHIEF BUILDING OFFICIAL**
JOSEPH BUSBY 

---

## 2018 IRC

| | |
|---|---|
| ICE & WATER SHIELD ON EAVES | YES |
| DRIP EDGE | YES |
| VALLEY LINER | YES |
| UNDERLAYMENT | YES |
| CHIMNEY CRICKET UNLESS GREATER THAN 30 INCHES | NO |

## 2018 IECC

| | |
|---|---|
| ELEVATION | 192 FT |
| CLIMATE ZONE | ZONE 4 / MOIST |
| WOOD FRAME WALL | R-20 OR R-13 + R-5 |
| CEILING | R-49 |

---

| | |
|---|---|
| ESTIMATED VALUE | $ 438,400 |
| HOME SIZE | 1,072 SF |
| DATE BUILT | 1951 |
| FLOORS | 1 |

**PROPERTY DETAILS**

---



## OneClick Data

**WHO WE ARE:** Geospatial data pioneers, partnering with all 32,000 U.S. municipalities and using patent-pending technology, we provide unmatched precision in jurisdictional building codes, delivering data our customers trust.

**OUR VISION:** Revolutionize construction estimates through cutting-edge tech and steadfast accuracy in building codes. Empower professionals to create swift and accurate estimations for restoration projects, nationwide.

**OUR MISSION:** At the forefront of innovation, we aspire to be the foremost authority in national building codes and permit data. With the goal of setting new industry standards and streamlining property restoration through automation.



# ROOFING REPORT DETAIL

## 11409 Cedar Ln, Beltsville MD 20705





**ONECLICK CODE HAS CONFIRMED WITH PRINCE GEORGE'S COUNTY THAT AN ICE BARRIER (ICE AND WATER SHIELD) IS REQUIRED ON THE EAVES.**

In areas where there has been a history of ice forming along the eaves causing a backup of water as designated in Table R301.2(1), an ice barrier shall be installed for asphalt shingles, metal roof shingles, mineral-surfaced roll roofing, slate and slate-type shingles, wood shingles and wood shakes. The ice barrier shall consist of not fewer than two layers of underlayment cemented together, or a self-adhering polymer-modified bitumen sheet shall be used in place of normal underlayment and extend from the lowest edges of all roof surfaces to a point not less than 24 inches (610 mm) inside the exterior wall line of the building. On roofs with slope equal to or greater than eight units vertical in 12 units horizontal (67-percent slope), the ice barrier shall also be applied not less than 36 inches (914 mm) measured along the roof slope from the eave edge of the building.

Exception: Detached accessory structures not containing conditioned floor area.

**R905.1.2 ICE BARRIERS.**





**ONECLICK CODE HAS CONFIRMED WITH PRINCE GEORGE'S COUNTY THAT A DRIP EDGE IS REQUIRED.**

A drip edge shall be provided at eaves and rake edges of shingle roofs. Adjacent segments of drip edge shall be overlapped not less than 2 inches (51 mm). Drip edges shall extend not less than 1/4 inch (6.4 mm) below the roof sheathing and extend up back onto the roof deck not less than 2 inches (51 mm). Drip edges shall be mechanically fastened to the roof deck at not more than 12 inches (305 mm) o.c. with fasteners as specified in Section R905.2.5. Underlayment shall be installed over the drip edge along the eaves and under the drip edge along rake edges.

**R905.2.8.5 DRIP EDGE.**





## OneClick Data

 **11409 Cedar Ln, Beltsville MD 20705**

 **ONECLICK CODE HAS CONFIRMED WITH PRINCE GEORGE'S COUNTY THAT VALLEY LINERS ARE REQUIRED.**

Valley linings shall be installed in accordance with the manufacturer's instructions before applying shingles. Valley linings of the following types shall be permitted:

1. For open valleys (valley lining exposed) lined with metal, the valley lining shall be not less than 24 inches (610 mm) wide and of any of the corrosion-resistant metals in Table R905.2.8.2.

2. For open valleys, valley lining of two plies of mineral-surfaced roll roofing, complying with ASTM D3909 or ASTM D6380 Class M, shall be permitted. The bottom layer shall be 18 inches (457 mm) and the top layer not less than 36 inches (914 mm) wide.

3. For closed valleys (valley covered with shingles), valley lining of one ply of smooth roll roofing complying with ASTM D6380 and not less than 36 inches wide (914 mm) or valley lining as described in Item 1 or 2 shall be permitted. Self-adhering polymer-modified bitumen underlayment complying with ASTM D1970 shall be permitted in lieu of the lining material.

**R905.2.8.2 VALLEYS.**





 **ONECLICK CODE HAS CONFIRMED WITH PRINCE GEORGE'S COUNTY THAT AN UNDERLAYMENT IS REQUIRED.**

Underlayment for asphalt shingles, clay and concrete tile, metal roof shingles, mineral-surfaced roll roofing, slate and slate-type shingles, wood shingles, wood shakes, metal roof panels and photovoltaic shingles shall conform to the applicable standards listed in this chapter. Underlayment materials required to comply with ASTM D226, D1970, D4869 and D6757 shall bear a label indicating compliance to the standard designation and, if applicable, type classification indicated in Table R905.1.1(1). Underlayment shall be applied in accordance with Table R905.1.1(2). Underlayment shall be attached in accordance with Table R905.1.1(3).

For roof slopes from two units vertical in 12 units horizontal (2:12), up to four units vertical in 12 units horizontal (4:12), underlayment shall be two layers applied in the following manner: apply a 19-inch strip of underlayment felt parallel to and starting at the eaves. Starting at the eave, apply 36-inch-wide sheets of underlayment, overlapping successive sheets 19 inches. Distortions in the underlayment shall not interfere with the ability of the shingles to seal.

For roof slopes of four units vertical in 12 units horizontal (4:12) or greater, underlayment shall be one layer applied in the following manner: underlayment shall be applied shingle fashion, parallel to and starting from the eave and lapped 2 inches. Distortions in the underlayment shall not interfere with the ability of the shingles to seal. End laps shall be 4 inches and shall be offset by 6 feet.

**R905.1.1 UNDERLAYMENT.**



**TABLE R905.1.1(2) UNDERLAYMENT APPLICATION - ASPHALT SHINGLES**



 **ONECLICK CODE HAS CONFIRMED WITH PRINCE GEORGE'S COUNTY THAT A CRICKET IS NOT REQUIRED UNLESS THE RIDGE SIDE OF CHIMNEY IS GREATER THAN 30 INCHES.**

Chimneys shall be provided with crickets where the dimension parallel to the ridgeline is greater than 30 inches (762 mm) and does not intersect the ridgeline. The intersection of the cricket and the chimney shall be flashed and counterflashed in the same manner as normal roof-chimney intersections. Crickets shall be constructed in compliance with Figure R1003.20 and Table R1003.20.

**R1003.20 CHIMNEY CRICKETS.**



11409 Cedar Ln, Beltsville MD 20705

 **ONECLICK CODE HAS CONFIRMED WITH PRINCE GEORGE'S COUNTY THAT ALL ROOFING ASSEMBLIES ARE TO BE INSTALLED PER MANUFACTURER SPECIFICATIONS.**

**R903.1 GENERAL.**
Roof decks shall be covered with approved roof coverings secured to the building or structure in accordance with the provisions of this chapter. Roof assemblies shall be designed and installed in accordance with this code and the approved manufacturer's instructions such that the roof assembly shall serve to protect the building or structure.

**R904.1 SCOPE.**
The requirements set forth in this section shall apply to the application of roof covering materials specified herein. Roof assemblies shall be applied in accordance with this chapter and the manufacturer's installation instructions. Installation of roof assemblies shall comply with the applicable provisions of Section R905.

 **ONECLICK CODE HAS CONFIRMED THAT BUILDING PERMITS FOR THE ABOVE PROPERTY ADDRESS ARE ISSUED AND BUILDING CODES ARE ENFORCED BY PRINCE GEORGE'S COUNTY**

**R104.1 GENERAL.**
The building official is hereby authorized and directed to enforce the provisions of this code. The building official shall have the authority to render interpretations of this code and to adopt policies and procedures in order to clarify the application of its provisions. Such interpretations, policies and procedures shall be in compliance with the intent and purpose of this code. Such policies and procedures shall not have the effect of waiving requirements specifically provided for in this code.

**R202 DEFINITIONS – ROOF ASSEMBLY.**
A system designed to provide weather protection and resistance to design loads. The system consists of a roof covering and roof deck or a single component serving as both the roof covering and the roof deck. A roof assembly includes the roof deck, underlayment and roof covering, and can also include a thermal barrier, ignition barrier, insulation or vapor retarder. For the definition applicable in Chapter 11, see Section N1101.6.

The Copyrighted Materials are provided to you provided on an "as is" and "as available" basis, and you agree to use them at your own risk. OneClick Data makes no warranties of any kind to the fullest extent permitted by law, and company expressly disclaims any and all warranties, whether express or implied, including, but not limited to, any implied warranties of merchantability, title, fitness for a particular purpose, and non-infringement. The Copyrighted Materials does not include every code, rule, or ordinance that might apply to a Roofing System. The Report is not intended to replace and does not replace a professional independent need to be aware of the entirety of the building Codes and other rules applicable to the work. The professional performing work should act in accordance with the applicable standard of care, adhere to today's methods, standards, and use their own good judgment. © OneClick Data, Inc 2017-2023. Reproduction and distribution is strictly prohibited without the written permission of OneClick Data. By receiving and using this Report, you agree to all of the terms, restrictions, and limitations located at https://www.oneclickcode.com/terms-of-use

 **OneClick Data**

Denver, Colorado | 720.340.7644 | www.oneclickcode.com

11409 Cedar Ln Beltsville MD

A + B   1-24-75
Int. From 5-1-80
C       6-2-15

TABLE R301.2(1)
CLIMATIC AND GEOGRAPHIC DESIGN CRITERIA

| GROUND SNOW LOAD | WIND DESIGN | | | | SEISMIC DESIGN CATEGORY[f] | SUBJECT TO DAMAGE FROM | | | WINTER DESIGN TEMP[e] | ICE BARRIER UNDERLAYMENT REQUIRED[h] | FLOOD HAZARDS[g] | AIR FREEZING INDEX[i] | MEAN ANNUAL TEMP[j] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Speed[d] (mph) | Topographic effects[k] | Special wind region[l] | Wind-borne debris zone[m] | | Weathering[a] | Frost line depth[b] | Termite[c] | | | | | |
| 20 | 115 | NO | NO | No | A | Moderate | 18 | Moderate to heavy | 17 | yes | Panels 6024-0332 | 1500 or less | 60 |

For SI: 1 pound per square foot = 0.0479 kPa, 1 mile per hour = 0.447 m/s.

a. Weathering may require a higher strength concrete or *grade* of masonry than necessary to satisfy the structural requirements of this code. The weathering column shall be filled in with the weathering index, "negligible," "moderate" or "severe" for concrete as determined from Figure R301.2(3). The *grade* of masonry units shall be determined from ASTM C 34, C 55, C 62, C 73, C 90, C 129, C 145, C 216 or C 652.

b. The frost line depth may require deeper footings than indicated in Figure R403.1(1). The *jurisdiction* shall fill in the frost line depth column with the minimum depth of footing below finish *grade*.

c. The *jurisdiction* shall fill in this part of the table to indicate the need for protection depending on whether there has been a history of local subterranean termite damage.

d. The *jurisdiction* shall fill in this part of the table with the wind speed from the basic wind speed map [Figure R301.2(4)A]. Wind exposure category shall be determined on a site-specific basis in accordance with Section R301.2.1.4.

e. The outdoor design dry-bulb temperature shall be selected from the columns of 97 1/2-percent values for winter from Appendix D of the *International Plumbing Code*. Deviations from the Appendix D temperatures shall be permitted to reflect local climates or local weather experience as determined by the *building official*.

f. The *jurisdiction* shall fill in this part of the table with the seismic design category determined from Section R301.2.2.1.

g. The *jurisdiction* shall fill in this part of the table with (a) the date of the *jurisdiction's* entry into the National Flood Insurance Program (date of adoption of the first code or ordinance for management of flood hazard areas), (b) the date(s) of the Flood Insurance Study and (c) the panel numbers and dates of the currently effective FIRMs and FBFMs or other flood hazard map adopted by the authority having *jurisdiction*, as amended.

h. In accordance with Sections R905.1.2, R905.4.3.1, R905.5.3.1, R905.6.3.1, R905.7.3.1 and R905.8.3.1, where there has been a history of local damage from the effects of ice damming, the *jurisdiction* shall fill in this part of the table with "YES." Otherwise, the *jurisdiction* shall fill in this part of the table with "NO."

i. The *jurisdiction* shall fill in this part of the table with the 100-year return period air freezing index (BF-days) from Figure R403.3(2) or from the 100-year (99 percent) value on the National Climatic Data Center data table "Air Freezing Index-USA Method (Base 32°F)."

j. The *jurisdiction* shall fill in this part of the table with the mean annual temperature from the National Climatic Data Center data table "Air Freezing Index-USA Method (Base 32°F)."

11409 Cedar Ln Beltsville MD

 **OneClick Code**   **CANOPY** WEATHER

# HAIL STORM HISTORY REPORT  BETA

CREATED 12/06/2023    REPORT #HS664650



**HAIL EXPOSURE**

MINIMAL



**ELEVATION**

192 FT

**PROPERTY ADDRESS**

**11409 Cedar Ln
Beltsville, MD
20705**



| STORM DATE | AT LOCATION | WITHIN 1 MILE | WITHIN 2 MILES | WITHIN 3 MILES |
|---|---|---|---|---|
| 08/07/23 | – | – | – | 0.75" |
| 06/27/23 | – | – | 0.75" | 0.75" |
| 08/10/22 | – | – | 0.75" | 0.75" |
| 08/05/22 | – | 0.75" | 0.75" | 0.75" |
| 07/12/22 | 0.75" | 0.75" | 1.1" | 1.1" |
| 07/29/21 | – | – | 0.75" | 0.75" |
| 07/01/21 | 0.75" | 0.75" | 1.25" | 1.25" |



Dime = 3/4 inch

Quarter = 1 inch

Ping Pong Ball = 1.5 inch

Golf Ball = 1.75 inches

Tennis Ball = 2.5 inches

Baseball = 2.75 inches

Grapefruit = 4 inches

Softball = 4.5 inches

 **OneClick Data**

**WHO WE ARE:** Geospatial data pioneers, partnering with all 32,000 U.S. municipalities and using patent-pending technology, we provide unmatched precision in jurisdictional building codes, delivering data our customers trust.

**OUR VISION:** Revolutionize construction estimates through cutting-edge tech and steadfast accuracy in building codes. Empower professionals to create swift and accurate estimations for restoration projects, nationwide.

**OUR MISSION:** At the forefront of innovation, we aspire to be the foremost authority in national building codes and permit data. With the goal of setting new industry standards and streamlining property restoration through automation.



# HAIL STORM HISTORY REPORT BETA

### DISCLAIMER

OneClick Data, Inc and Canopy Weather, LLC known as the "Companies". Each purchaser, user, individual, business and anyone else relying on this report or any data connected to or utilized in this report agrees, acknowledges and accepts notice that this report and the corresponding data are provided 'as is' without warranty of any kind, either express or implied, including without limitation, any warranties of merchant-ability, non-infringement, or fitness for a particular purpose (even if that purpose is known to Companies); or arising from a course of dealing, usage, or trade practice. The Companies are not responsible for any use of, nor any decisions based on or in reliance on, this report and the corresponding data. This is an automated report; it is not a court-ready expert report and you are not permitted to use this report as evidence in court or as an expert witness in court. Please contact Canopy Weather if you need an expert witness. The Companies do not represent or warrant that this report and the corresponding data are complete or free from error and does not assume, and expressly disclaims, any liability to any person or entity for any loss or damage caused by errors or omissions in this report and the corresponding data, whether such errors or omissions result from negligence, accident, or other cause. The Companies make no representations or warranties about the legality or propriety of the use of this report and the corresponding data in any geographic area. Use of this report and the corresponding data is further limited by and subject to the Terms of Service located at https://www.oneclickcode.com/terms-of-use and https://canopyweather.com



 

# WIND STORM HISTORY REPORT `BETA`

CREATED 12/06/2023    REPORT #WH564550



WIND



ELEVATION

192

FT

PROPERTY ADDRESS

**11409 Cedar Ln
Beltsville, MD
20705**



| STORM DATE | AT LOCATION | WITHIN 1 MILE | WITHIN 2 MILES | WITHIN 3 MILES |
|------------|-------------|---------------|----------------|----------------|
| 09/12/23 | 45 mph | 45 mph | 45 mph | 45 mph |
| 09/09/23 | 45 mph | 45 mph | 45 mph | 45 mph |
| 09/08/23 | – | – | 45 mph | 45 mph |
| 08/14/23 | 45 mph | 45 mph | 45 mph | 55 mph |
| 08/07/23 | 55 mph | 55 mph | 55 mph | 55 mph |
| 07/29/23 | 65 mph | 65 mph | 65 mph | 65 mph |
| 07/28/23 | 45 mph | 55 mph | 55 mph | 55 mph |
| 07/14/23 | 45 mph | 55 mph | 55 mph | 55 mph |
| 07/07/23 | – | 45 mph | 45 mph | 45 mph |
| 06/30/23 | – | 45 mph | 45 mph | 45 mph |
| 06/27/23 | 45 mph | 45 mph | 45 mph | 45 mph |
| 04/22/23 | 45 mph | 45 mph | 45 mph | 45 mph |
| 04/06/23 | 45 mph | 45 mph | 45 mph | 45 mph |
| 04/01/23 | 45 mph | 45 mph | 55 mph | 55 mph |
| 03/14/23 | 45 mph | 45 mph | 45 mph | 45 mph |
| 01/20/23 | – | – | – | – |

0 – 38 mph
Sub-Severe

39 – 73 mph
Severe

74 – 95 mph
Category 1 Hurricane

96 – 110 mph
Category 2 Hurricane

111 – 129 mph
Category 3 Hurricane

130 – 156 mph
Category 4 Hurricane

157 mph or higher
Category 5 Hurricane



**WHO WE ARE:** Geospatial data pioneers, partnering with all 32,000 U.S. municipalities and using patent-pending technology, we provide unmatched precision in jurisdictional building codes, delivering data our customers trust.

**OUR VISION:** Revolutionize construction estimates through cutting-edge tech and steadfast accuracy in building codes. Empower professionals to create swift and accurate estimations for restoration projects, nationwide.

**OUR MISSION:** At the forefront of innovation, we aspire to be the foremost authority in national building codes and permit data. With the goal of setting new industry standards and streamlining property restoration through automation.



# OneClick Code | CANOPY WEATHER | WIND STORM HISTORY REPORT (BETA)

CREATED 12/06/2023    REPORT #WH664560

| STORM DATE | AT LOCATION | WITHIN 1 MILE | WITHIN 2 MILES | WITHIN 3 MILES |
|---|---|---|---|---|
| 12/23/22 | 45 mph | 45 mph | 55 mph | 55 mph |
| 11/30/22 | – | – | 45 mph | 45 mph |
| 08/17/22 | – | – | – | 45 mph |
| 08/10/22 | 45 mph | 45 mph | 45 mph | 45 mph |
| 08/05/22 | 45 mph | 45 mph | 45 mph | 45 mph |
| 08/04/22 | 55 mph | 55 mph | 55 mph | 55 mph |
| 07/25/22 | | 45 mph | 45 mph | 45 mph |
| 07/12/22 | 55 mph | 55 mph | 55 mph | 55 mph |
| 07/05/22 | 45 mph | 45 mph | 45 mph | 45 mph |
| 07/02/22 | 45 mph | 45 mph | 45 mph | 45 mph |
| 06/08/22 | 45 mph | 45 mph | 45 mph | 45 mph |
| 06/02/22 | 55 mph | 55 mph | 55 mph | 55 mph |
| 05/27/22 | 55 mph | 55 mph | 55 mph | 55 mph |
| 05/22/22 | 55 mph | 55 mph | 55 mph | 55 mph |
| 03/07/22 | 45 mph | 45 mph | 45 mph | 45 mph |
| 02/19/22 | 45 mph | 45 mph | 45 mph | 45 mph |
| 02/18/22 | 45 mph | 45 mph | 45 mph | 45 mph |
| 02/17/22 | 45 mph | 45 mph | 45 mph | 45 mph |
| 01/17/22 | 45 mph | 45 mph | 45 mph | 45 mph |
| 01/16/22 | 45 mph | 45 mph | 45 mph | 45 mph |
| 12/11/21 | 45 mph | 55 mph | 55 mph | 55 mph |
| 12/06/21 | 45 mph | 45 mph | 45 mph | 45 mph |
| 10/29/21 | 45 mph | 45 mph | 45 mph | 45 mph |
| 10/26/21 | 45 mph | 45 mph | 45 mph | 45 mph |

0 – 38 mph
Sub-Severe

39 – 73 mph
Severe

74 – 95 mph
Category 1 Hurricane

96 – 110 mph
Category 2 Hurricane

111 – 129 mph
Category 3 Hurricane

130 – 156 mph
Category 4 Hurricane

157 mph or higher
Category 5 Hurricane



# OneClick Code | CANOPY WEATHER

## WIND STORM HISTORY REPORT (BETA)

CREATED 12/06/2023    REPORT #WH564550

| STORM DATE | AT LOCATION | WITHIN 1 MILE | WITHIN 2 MILES | WITHIN 3 MILES |
|---|---|---|---|---|
| 09/22/21 | 45 mph | 45 mph | 45 mph | 45 mph |
| 08/31/21 | 45 mph | 55 mph | 55 mph | 55 mph |
| 08/27/21 | 45 mph | 45 mph | 45 mph | 55 mph |
| 08/13/21 | 45 mph | 55 mph | 55 mph | 55 mph |
| 08/11/21 | 55 mph | 45 mph | 45 mph | 55 mph |
| 08/10/21 | – | – | – | 45 mph |
| 08/09/21 | 45 mph | 45 mph | 45 mph | 45 mph |
| 07/29/21 | 45 mph | 45 mph | 45 mph | 45 mph |
| 07/26/21 | 55 mph | 45 mph | 55 mph | 55 mph |
| 07/17/21 | – | – | 45 mph | 45 mph |
| 07/01/21 | 55 mph | 45 mph | 55 mph | 65 mph |
| 06/21/21 | 45 mph | 55 mph | 55 mph | 55 mph |
| 06/14/21 | 55 mph | 55 mph | 55 mph | 55 mph |
| 06/08/21 | – | – | – | 45 mph |
| 05/26/21 | 55 mph | 55 mph | 55 mph | 55 mph |
| 04/30/21 | 45 mph | 45 mph | 45 mph | 45 mph |
| 03/28/21 | 45 mph | 45 mph | 45 mph | 45 mph |

**Legend:**

- 0 – 38 mph — Sub-Severe
- 39 – 73 mph — Severe
- 74 – 95 mph — Category 1 Hurricane
- 96 – 110 mph — Category 2 Hurricane
- 111 – 129 mph — Category 3 Hurricane
- 130 – 156 mph — Category 4 Hurricane
- 157 mph or higher — Category 5 Hurricane

OneClick Data
Denver, Colorado | 720.340.7844 | www.oneclickcode.com



# WIND STORM HISTORY REPORT (BETA)

## DISCLAIMER

OneClick Data, Inc and Canopy Weather, LLC known as the "Companies". Each purchaser, user, individual, business and anyone else relying on this report or any data connected to or utilized in this report agrees, acknowledges and accepts notice that this report and the corresponding data are provided 'as is' without warranty of any kind, either express or implied, including without limitation, any warranties of merchant-ability, non-infringement, or fitness for a particular purpose (even if that purpose is known to Companies); or arising from a course of dealing, usage, or trade practice. The Companies are not responsible for any use of, nor any decisions based on or in reliance on, this report and the corresponding data. This is an automated report; it is not a court-ready expert report and you are not permitted to use this report as evidence in court or as an expert witness in court. Please contact Canopy Weather if you need an expert witness. The Companies do not represent or warrant that this report and the corresponding data are complete or free from error and does not assume, and expressly disclaims, any liability to any person or entity for any loss or damage caused by errors or omissions in this report and the corresponding data, whether such errors or omissions result from negligence, accident, or other cause. The Companies make no representations or warranties about the legality or propriety of the use of this report and the corresponding data in any geographic area. Use of this report and the corresponding data is further limited by and subject to the Terms of Service located at https://www.oneclickcode.com/terms-of-use and https://canopyweather.com







# Overhead and Profit

**What Is and Isn't Included in Verisk Property Estimating Solutions Pricing**

Verisk™

# Table of Contents

Introduction: overhead vs. profit ........................................................................ 3

Overhead categories .......................................................................................... 3

General overhead ................................................................................................. 3
Job-related overhead ........................................................................................... 3
Job-personnel overhead ....................................................................................... 4

# Introduction: overhead vs. profit

For individual trades, overhead is any additional expense not charged (or attributed) directly to the work being performed. It's typically classified as an indirect cost.

Profit is what remains after subtracting the costs of goods or services (including overhead) from their selling price. It's typically added to the cost of a construction-related job to allow the entity performing the work to grow their company through reinvestment.

While the ultimate amount of overhead and profit, as well as how and where it's accounted for within the estimate, is left to the discretion of the estimator based on the conditions of the job and the service provider performing the work, the information listed below should provide general insight into how Verisk's published pricing is created and intended to be used.

When the Verisk team performs market research on unit prices, those surveyed are specifically asked to not include expenses that would be included in general overhead (see below) or profit markup percentages.

# Overhead categories

Verisk's Property Estimating Solutions team, which has led the industry in providing estimating software, services, and building cost data since 1986, has recognized three categories of overhead.

## General overhead

Expenses incurred by a general contractor that can't be attributed to individual projects, including expenses necessary for business operation, are classified as general overhead. Examples include general and administrative (G&A) expenses, office rent, utilities, office supplies, salaries for office personnel, depreciation on office equipment, licenses, and advertising.

*Including general overhead expenses in an Xactimate® estimate:* General overhead expenses aren't included in Verisk's unit pricing but are typically added to the estimate as a percentage of the total bid along with the appropriate profit margin. These two costs constitute what's normally referred to in the insurance restoration industry as general contractor's O&P, or just O&P. General overhead and profit percentages can be added in the Estimate Parameters window within an Xactimate estimate.

## Job-related overhead

Expenses that can be attributed to a project but not a specific task, including expenses necessary to complete the project (other than direct materials and labor) are considered job-related overhead. Examples include project managers, onsite portable offices and restroom facilities, temporary power and fencing, security if needed, etc.

*Including job-related overhead expenses in an Xactimate estimate:* Job-related overhead expenses should be added as separate line items. This is done within the Line Item Entry window of an Xactimate estimate by selecting the proper price list items, or creating your own miscellaneous items.



# Job-personnel overhead

The non-wage-related expenses associated with having a general contractor's own employees perform the work, or the total G&A expenses incurred by a subcontractor when using their services, are known as job-personnel overhead. Examples include vehicle costs, uniforms, mobile phones, depreciation on hand-tools owned by the company, etc.

Job-personnel overhead also includes the portion of G&A expenses and profit that correlate to employees performing billable tasks that aren't included in the general contractor O&P markup. These expenses will be incurred by the general contractor's employees or by a subcontractor, depending on who's performing the work. If the work is subcontracted, these expenses are commonly called subcontractor O&P.

*Including job personnel overhead/subcontractor O&P in an Xactimate estimate:* Job personnel overhead (or subcontractor O&P) expenses are included in the labor overhead portion of each unit price in the Verisk price list. Labor overhead plus expenses for labor burden and worker wage (wage paid to the individual) make up the retail labor rate. For more information on retail labor rates, see the white paper in Verisk's eService Center.

You can update the labor overhead portion of the retail labor rate from the component list of an Xactimate estimate. Within the component list, select the View Retail Labor Rate Components option. This allows you to view and modify all retail labor rates used within the estimate. Price changes to a retail labor rate here will affect prices in all items in the estimate that use this retail labor rate.

Verisk's Property Estimating Solutions team publishes and makes unit price data available to all customers each month, based on market surveys. Every effort has been made to ensure that Xactimate users can access, view, and modify all detail within the published unit prices.

The building cost data published by Verisk is not designed to be inclusive of sales tax, general O&P, or job-related O&P within the unit prices. These can be specified and added at print time after all line items have been listed.

However, Verisk has designed flexibility into the system. The Xactimate system is designed to provide robust details on costs that are incurred, so users have the option to add these costs to their line items as they choose.



**Verisk™**

## Property Estimating Solutions Team

### United States
1100 West Traverse Parkway
Lehi, UT 84043

+1.800.424.9228
Fax: +1.801.932.8013

xsales@verisk.com

### Canada
6-5509 Canotek Road
Ontario, Canada K1J 9J8

+1.800.931.9228

canadiansales@verisk.com

### Europe
4th Floor, 40 Gracechurch Street
London EC3V OBT

+44.020.7680.4970
Fax: +44.020.7680.4999

ukpropertyclaims@verisk.com

**Verisk.com**

© 2023 Verisk Analytics, Inc. All rights reserved
Xactimate is a registered trademark of Xactware Solutions, Inc.

# Photo Sheet

**WV Construction Remodeling LLC**

**E-mail: admin@wv-remodel.com**
**Phone: 301-447-0918**
**MHIC License: 05-150480**

Insured:    Maren S Mayhew
Claim #:    20-59W6-28F
Policy #:    20BXC0897



**1**

Date Taken:

**2**

Date Taken:

# Photo Sheet

**WV Construction Remodeling LLC**

**E-mail: admin@wv-remodel.com**
**Phone: 301-447-0918**
**MHIC License: 05-150480**

Insured:     Maren S Mayhew

Claim #:     20-59W6-28F

Policy #:     20BXC0897



**3**

Date Taken:



**4**

Date Taken:

# Photo Sheet

**WV Construction Remodeling LLC**

**E-mail: admin@wv-remodel.com**
**Phone: 301-447-0918**
**MHIC License: 05-150480**

Insured:    Maren S Mayhew

Claim #:    20-59W6-28F

Policy #:    20BXC0897



**5**
Date Taken:



**6**
Date Taken:

# Photo Sheet

**WV Construction Remodeling LLC**

**E-mail: admin@wv-remodel.com**
**Phone: 301-447-0918**
**MHIC License: 05-150480**

Insured:     Maren S Mayhew

Claim #:     20-59W6-28F

Policy #:     20BXC0897



**7**

Date Taken:



**8**

Date Taken:

# Photo Sheet

**WV Construction Remodeling LLC**

**E-mail: admin@wv-remodel.com**
**Phone: 301-447-0918**
**MHIC License: 05-150480**

Insured:     Maren S Mayhew

Claim #:     20-59W6-28F

Policy #:     20BXC0897



**9**

Date Taken:



**10**

Date Taken:

# Photo Sheet

**WV Construction Remodeling LLC**

**E-mail: admin@wv-remodel.com**
**Phone: 301-447-0918**
**MHIC License: 05-150480**

Insured:    Maren S Mayhew

Claim #:    20-59W6-28F

Policy #:    20BXC0897



**11**

Date Taken:



**12**

Date Taken:

# Photo Sheet

**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

Insured:    Maren S Mayhew

Claim #:    20-59W6-28F

Policy #:    20BXC0897



**13**

Date Taken:

**14**

Date Taken:

# Photo Sheet

**WV Construction Remodeling LLC**

**E-mail: admin@wv-remodel.com**
**Phone: 301-447-0918**
**MHIC License: 05-150480**

Insured:    Maren S Mayhew

Claim #:    20-59W6-28F

Policy #:    20BXC0897



**15**

Date Taken:



**16**

Date Taken:

# Photo Sheet

**WV Construction Remodeling LLC**

**E-mail: admin@wv-remodel.com**
**Phone: 301-447-0918**
**MHIC License: 05-150480**

Insured:    Maren S Mayhew
Claim #:    20-59W6-28F
Policy #:    20BXC0897



**17**

Date Taken:



**18**

Date Taken:

# Photo Sheet

**WV Construction Remodeling LLC**

E-mail: admin@wv-remodel.com
Phone: 301-447-0918
MHIC License: 05-150480

Insured:    Maren S Mayhew

Claim #:    20-59W6-28F

Policy #:    20BXC0897



**19**

Date Taken:



**20**

Date Taken:

# Photo Sheet

**WV Construction Remodeling LLC**

**E-mail: admin@wv-remodel.com**
**Phone: 301-447-0918**
**MHIC License: 05-150480**

Insured:    Maren S Mayhew

Claim #:    20-59W6-28F

Policy #:    20BXC0897



**21**

Date Taken:

*Providing Insurance and Financial Services*
Home Office, Bloomington, IL

 **StateFarm®**

December 20, 2023

MAYHEW, MAREN
11409 CEDAR LN
BELTSVILLE MD 207052610

State Farm Insurance Companies
Fire Claims
PO BOX 106169
Atlanta, GA 30348-6169
Fax 844 236 3646

RE: Insured:        MAYHEW, MAREN
    Claim Number:  20-59W6-28F
    Policy Number: 20-BX-C089-7
    Date of Loss:   December 1, 2023

Dear Ms. Mayhew:

Thank you for the opportunity to discuss the damage resulting from a loss occurring on or around December 1st, 2023. After inspecting the damage to your roof, we found that this damage resulted from the improper installation of your solar panels and/or other roof accessories. The damage observed to the interior of your home was determined not to be sudden in nature and has likely been occurring over a period of time due to various reasons.

As discussed, your policy provides coverage for sudden damage resulting from accidental direct physical losses; however, the policy excludes damage
resulting from improper construction, maintenance or repair.

Please refer to the following language:

## SECTION I – LOSSES INSURED

### COVERAGE A – DWELLING

*We* will pay for accidental direct physical loss to the property described in Coverage A, unless the loss is excluded or limited in **SECTION I – LOSSES NOT INSURED** or otherwise excluded or limited in this policy. However, loss does not include and *we* will not pay for, any *diminution in value*.

## SECTION I – LOSSES NOT INSURED

1. *We* will not pay for any loss to the property described in Coverage A that consists of, or is directly and immediately caused by, one or more of the perils listed in items a. through n. below, regardless of whether the loss occurs abruptly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:



20-59W6-28F
Page 2
December 20, 2023

 k. settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations (including slabs, basement walls, crawl space walls, and footings), walls, floors, roofs, or ceilings;

However, *we* will pay for any resulting loss from items a. through m. unless the resulting loss is itself a Loss Not Insured as described in this Section.

3. *We* will not pay for, under any part of this policy, any loss consisting of one or more of the items below. Further, *we* will not pay for any loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to, or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:

 a. conduct, act, failure to act, or decision of any person, group, organization, or governmental body whether intentional, wrongful, negligent, or without fault;

 b. defect, weakness, inadequacy, fault, or unsoundness in:

  (1) planning, zoning, development, surveying, or siting;

  (2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, or compaction;

  (3) materials used in repair, construction, renovation, remodeling, grading, or compaction; or

  (4) maintenance;

  of any property (including land, structures, or improvements of any kind) whether on or off the ***residence premises***; or

 c. weather conditions.

However, *we* will pay for any resulting loss from items 3.a., 3.b., and 3.c. unless the resulting loss is itself a Loss Not Insured as described in this Section.

Since the damage sustained falls within this exclusionary language, we regret we can make no payment as a result of this loss.

Please feel free to call me if you have additional questions regarding your claim. My telephone number is (844)458-4300 ext. 3099942562.

Thank you for allowing us to be of service.

Sincerely,

Fantasia Howard
Proximity Claim Specialist
(844)458-4300 ext. 3099942562
Fax: 1-844-236-3646
statefarmfireclaims@statefarm.com

*For your protection, when emailing State Farm, please do not include sensitive personal information such as Social Security Number, credit/debit card number (financial account number), driver's license number, or health/medical information in an email. Please contact us at (844)458-4300 ext. 3099942562 to discuss sensitive information.*

20-59W6-28F
Page 3
December 20, 2023

State Farm Fire and Casualty Company

Take advantage of our self-service options
Go to statefarm.com® to easily review claim status, update communication and claim payment
preferences, and many other insurance services.

CS1 Remodeling
4546 Beech Rd.
Temple Hills, MD 20748
Phone: 301-873-6514
sunrunquotes@cs1remodeling.com
CS1Remodeling.com
MHIC# 135423



**CS1 REMODELING, LLC**
CUSTOMER SATISFACTION #1

# DRYWALL QUOTE

MHIC# 135423

**QUOTE**
**DATE:2/20/2024**

| | |
|---|---|
| **QUOTE TO:** | **PR/PO#:** FSD-918499 |
| Sunrun Installation Services | **PROJECT:** William Mayhew |
| 775 Fiero Lane, Suite 200 | 11409 Cedar Ln |
| San Luis Osbipo | Beltsville, MD 20705 |

| ITEM | DESCRIPTION | COST/ITEMS |
|------|-------------|------------|
| Drywall | Drywall repair (Repaired Drywall in locations where needed) | $3,200.00 |
| | * Protect floor, ½ Drywall- Hang, Tape, Sand and Paint * | |
| | * This may include Wall, Ceiling, Etc * | |
| | * Repaired damaged drywall around main electrical panel | |
| | * Taped, spackled and sand wall and ceiling to prepare for prime and paint | |
| | * Primed and painted wall and ceiling to match customers' custom paint | |
| | *High Ceiling areas | |

| | |
|---|---|
| **TOTAL:** | **$3,200.00** |

*Make all checks payable to CS1Remodeling, LLC.*
*If you have any questions concerning this invoice, Contact Carmelo (678)984-9988 or*
*sunrunquotes@cs1remodeling.com*





# New Day Construction

101 dover ct

Barnegat NJ

08005

732-814-9720

ndscheduling@newdayconstruction.net

ESTIMATE FSD- 925817

EST1180

**DATE**

Mar 14, 2024

**TOTAL**

USD $15,873.26

**TO**

## William Mayhew

775 fiero ln

san luis obispo

93401

720-399-1532

brinnley.noble@sunrun.com

| DESCRIPTION | AMOUNT |
|---|---|
| **Shingle replacement**<br>Replacement of broken/ripped/damaged shingles | $8,250.00 |
| **Trim Repair** | $600.00 |
| **Plywood replacement**<br>Per sheet | $100.00 |
| **Interior Paint Repairs**<br>-Fix any imperfections made by staining<br>-Apply stain blocker to seal stained areas<br>-Prime entire ceiling to color match<br>-Premium ceiling ultra flat white applied to entire ceiling to create seamless look<br>-Prep/clean up | $4,887.00 |
| **Solar mount fix/Sealant of mounts**<br>Removal/Reseal of solar mount in question of damaged area. | $1,050.00 |

| | SUBTOTAL | $14,887.00 |
|---|---|---|
| | TAX (6.625%) | $986.26 |



| TOTAL | USD $15,873.26 |

William Mayhew
(301) 641-0605
(301) 595-7920
11409 Cedar Ln, Beltsville, MD 20705, USA

Homeowner stated that she had solar damage and was not happy had a contractor there with her that said she was only allowing him to do the job. Talked with Dana to still do the inspection on the home. When I went in the home I was living room area which was a large room. The interior damage that is caused by water is above the window and down the wall damaging the window itself, the trimming and framing. Below the window on the wall was a little bit of interior damage as well. The second room which was an additional bedroom area which was a medium sized room. Has some nail pops and paint cracking on the ceiling. Once I got onto the roofing system for inspection, notice the area of mounts above the bedroom need to be removed which is about 4-6 panels. The second area which is in the living room area the mounts in the middle, which would be about 6-8 panels removed. Unfortunately, there is no attic space and they are vaulted ceilings in the living room so I could not identify any plywood damage rafter damage or insulation damage.

New Day recommends removing these panels in the area and then reshingiling and reflashing those areas. There are a lot of open penetrations from install that were not filled. This is causing the leaks to the living room and bedroom. Since there is no attic space, we are uncertain of the status of the plywood or insulation underneath those shingled areas and wont know until we make said repairs.

The window also needs all new trim around and a sheet of plywood in the wet areas. Both ceilings in the living room and bedroom will then need to be painted to color match.















